IN THE

# United States Court of Appeals for the Fifth Circuit

JONATHAN CORRENTE; CHARLES SHAW; LEO WILLIAMS,
*Plaintiffs – Appellees,*

v.

THE CHARLES SCHWAB CORPORATION,
*Defendant – Appellee,*

v.

STATE OF IOWA, OBJECTOR; SHIYANG HUANG, OBJECTOR
*Appellants.*

On Appeal from the United States District Court
for the Eastern District of Texas
4:22-cv-00470
(The Honorable Amos L. Mazzant, III)

## BRIEF OF APPELLANT STATE OF IOWA

BRENNA BIRD
Attorney General of Iowa

ERIC WESSAN
*Solicitor General*

BREANNE A. STOLTZE
*Assistant Solicitor General*
Hoover State Office Building
1305 East Walnut Street
Des Moines, Iowa 50319
(515) 823-9117 / (515) 281-8770
eric.wessan@ag.iowa.gov
breanne.stoltze@ag.iowa.gov

March 23, 2026

*Counsel for Appellant State of Iowa*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Appellant State of Iowa certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1) **<u>Plaintiffs-Appellees:</u>**

   Jonathan Corrente; Charles Shaw; Leo Williams

2) **<u>Defendant-Appellee:</u>**

   The Charles Schwab Corporation

3) **<u>Appellants:</u>**

   State of Iowa, Objector; Shiyan Huan, Objector

4) **<u>Counsel for Plaintiffs-Appellees:</u>**

   Brian J. Dunne; Yavar Bathaee; Priscilla Ghita; Edward Maxwell Grauman; Allison Watson/Bathaee Dunne, LLP

   Chad Emerson Bell/Korein Tillery

   Christopher M. Burke/Burke, LLP

   Elizabeth L. DeRieux/Capshaw DeRieux, LLP

i

**5) Counsel for Defendant-Appellee:**

Jason J. Mendro; Jeffrey Liu; Cynthia Richman; Daniel Glen Swanson/Gibson, Dunn & Crutcher, LLP

Harry Lee Gillam, Jr.; Andrew Thompson Gorham/Gillam & Smith, LLP

David Charles Marcus; Jennifer Milici; Alan E. Schoenfeld/Wilmer Cutler Pickering Hale & Dorr, LLP

Veronica Smith Moye/King & Spalding, LLP

**9) Counsel for Appellant State of Iowa:**

Eric H. Wessan; Breanne A. Stoltze/Office of the Attorney General of Iowa

**10) Counsel for Appellant Shiyang Huang:**

Shiyang Huang/pro se

*/s/ Eric H. Wessan*
**ERIC H. WESSAN**
**Attorney of record for**
**Appellant State of Iowa**

## STATEMENT REGARDING ORAL ARGUMENT

Appellant State of Iowa requests oral argument as it believes that oral argument could significantly aid the decisional process in this case.

# TABLE OF CONTENTS

**CERTIFICATE OF INTERESTED PERSONS**.......................................i

**STATEMENT REGARDING ORAL ARGUMENT** ...........................iv

**STATEMENT OF JURISDICTION** ......................................................1

**ISSUES PRESENTED**.........................................................................1

**INTRODUCTION**................................................................................2

**STATEMENT OF THE CASE**..............................................................2

**SUMMARY OF THE ARGUMENT** .....................................................5

I.   Offering class members uncertain, hypothetical value while
     giving tangible monetary relief to named plaintiffs and class
     counsel is an abuse of discretion. ...................................................6

II.  Awarding class counsel approximately $9 million while class
     members received only hypothetical injunctive relief was an
     abuse of discretion. .......................................................................6

III. The district court failed to consider lodestar or the *Johnson*
     factors. ...........................................................................................6

IV.  Iowa received inadequate notice under the Class Action
     Fairness Act.....................................................................................7

**ARGUMENT** .......................................................................................8

I.   STANDARD OF REVIEW..................................................................9

II.  OFFERING    CLASS    MEMBERS    UNCERTAIN,
     HYPOTHETICAL VALUE WHILE GIVING TANGIBLE
     MONETARY RELIEF TO NAMED PLAINTIFFS AND CLASS
     COUNSEL IS AN ABUSE OF DISCRETION. ................................10

A. The Court Owes a Fiduciary Duty to Unnamed Class Members. ........................................................... 12

B. The settlement's injunctive relief provides only uncertain, hypothetical relief for the class. ............................................. 15

C. The District Court improperly determined that the settlement agreement was fair, reasonable, and adequate under Rule 23(e)(2) and *Reed*. .............................................................. 21

III. AWARDING CLASS COUNSEL APPROXIMATELY $9 MILLION WHILE CLASS MEMBERS RECEIVED ONLY HYPOTHETICAL INJUNCTIVE RELIEF WAS AN ABUSE OF DISCRETION. ............................................................. 39

A. The district court abused its discretion when it approved a nearly $9 million for class counsel without following the proper process........................................................................ 42

IV. STATE ATTORNEYS GENERAL RECEIVED INADEQUATE CAFA NOTICE. .............................................................. 59

**CONCLUSION**......................................................................... 63

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*Ackerman v. Arkema Inc.*, 157 F.4th 715 (5th Cir. 2025).......................39

*Amchem Prods. Inc. v. Windsor*, 521 U.S. 591 (1997) ...........................31

*American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974) ...................38

*Bode v. United States*, 919 F.2d 1044 (5th Cir. 1990) ...........................44

*Brantley v. Surles*, 804 F.2d 321 (5th Cir. 1986) ...................................55

*Briseño v. Henderson*, 998 F.3d 1014 (9th Cir. 2021)............................58

*Broussard v. Meineke Disc. Muffler Shops*,
    155 F.3d 331 (4th Cir. 1998) .......................................................33

*C.R.R. & Banking Co. v. Pettus*, 113 U.S. 116 (1885) ...........................27

*Campbell v. Facebook, Inc.*, 951 F.3d 1106 (9th Cir. 2020) ...................34

*China Agritech v. Resh*, 584 U.S. 732 (2018)...................................37, 38

*CHU de Quebec—Universite Laval v. DreamScape Dev. Grp. Holdings,
    Inc.*, 2023 WL 2749633 (E.D. Tex. Mar. 31, 2023)...................51, 52

*Combs v. City of Huntington*, 829 F.3d 388 (5th Cir. 2016))...................7

*Concord Boat Corp. v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) ...............................................36, 37

*Creative Montessori Learning Ctrs. v. Ashford Gear LLC*,
    662 F.3d 913 (7th Cir. 2011) .......................................................34

*Cruson v. Jackson Natl. Life Ins. Co.*,
    2021 WL 3702483 (E.D. Tex. June 4, 2021) ...........................50, 51

*DeHoyos v. Allstate Corp.*, 240 F.R.D. 269 (W.D. Tex. 2007) ................14

*Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012) ..............................14

*Evans v. Jeff D.*, 475 U.S. 717 (1986) ...................................................57

*Farrar v. Hobby*, 506 U.S. 103 (1992) ...................................................55

*Fessler v. Porcelena Corona de Mexico, S.A. DE C.V.*,
     23 F.4th 408 (5th Cir. 2022) .........................................................7

*Forbush v. J.C. Penney Co.*, 98 F.3d 817 (5th Cir. 1996) ................. 10, 42

*Foster v. Boise-Cascade, Inc.*, 420 F.Supp. 674 (S.D. Tex. 1976),
     *aff'd*, 577 F.2d 335 (5th Cir. 1978) ...............................................40

*Grigson v. Creative Artists Agency, LLC*,
     210 F.3d 524 (5th Cir. 2000) .......................................................10

*Gusinsky v. Reynolds*, 2026 WL 747179 (N.D. Tex. Mar. 17, 2026).......17

*Ibarra v. Texas Emp't Comm'n*, 823 F.2d 873 (5th Cir. 1987)................13

*Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*,
     2018 WL 1602460 (E.D. Tex. Apr. 3, 2018) ........................... 49, 50

*In re Bluetooth Headset Probs. Liab. Litig.*,
     654 F.3d 935 (9th Cir. 2011) .......................................................58

*In re Corrugated Container Antitrust Litig.*,
     643 F.2d 195 (5th Cir. 1981) .......................................................13

*In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013) ......... passim

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
     55 F.3d 768 (3d Cir. 1995)......................................................27, 41

*In re High Sulfur Content Gasoline Prods. Liab. Litig.*,
  517 F.3d 220 (5th Cir. 2008) ................................................. passim

*In re Katrina Canal Land Breaches Litig.*,
  628 F.3d 185 (5th Cir. 2010) ................................................. passim

*In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg.,*
  *Sales Practices & Prods. Liab. Litig.*,
  27 F.4th 291 (4th Cir. 2022) .........................................................10

*In re Mercury Interactive Corp. Sec. Litig.*,
  618 F.3d 988 (9th Cir. 2010) .........................................................14

*In re Subway Footlong Sandwich Mktg. & Sales Practices Litig.*,
  869 F.3d 551 (7th Cir. 2017) ................................................. 9, 20, 25

*In re Wawa, Inc. Data Sec. Litig.*, 85 F.4th 712 (3d Cir. 2023) ..............15

*Johnson v. Ga. Highway Express, Inc.*,
  488 F.2d 714 (5th Cir. 1974) ............................................... 7, 42, 53

*Johnson v. NPAS Sols., LLC*, 975 F.4th 1244 (11th Cir. 2020) .............27

*Jones v. Singing River Health Servs. Found.*,
  865 F.3d 285 (5th Cir. 2017) ................................................. passim

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997) ....................................37

*Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071 (9th Cir. 2017) ....... passim

*Kurtz v. Kimberly-Clark Corp.*, 142 F.4th 112 (2d Cir. 2025) ................14

*La. Power & Light Co. v. Kellstrom*, 50 F.3d 319 (5th Cir. 1995) ..........43

*Leroy v. City of Houston*, 831 F.2d 576 (5th Cir. 1987) .........................44

*Lobatz v. U.S.W. Cellular of Calif., Inc.*,
  222 F.3d 1142 (9th Cir. 2000) .......................................................34

*Longden v. Sunderman*, 979 F.2d 1095 (5th Cir. 1992) ........................54

*Maher v. Zapata Corp.*, 714 F.2d 436 (5th Cir. 1983) ...........................32

*Manual for Complex Litigation* § 14.231 (4th ed. 2004)........................41

*Midwestern Mach. Co. v. Nw. Airlines, Inc.*,
   392 F.3d 265 (8th Cir. 2004) .....................................................37

*Migis v. Pearle Vision, Inc.*, 135 F.3d 1041 (5th Cir. 1998)....................55

*Morrow v. Washington*, 2020 WL 5534486
   (E.D. Tex. Sept. 15, 2020)..................................................... 46, 48

*Moses v. New York Times Co.*, 79 F.4th 235 (2d Cir. 2023)....................10

*Newby v. Enron Corp.*, 394 F.3d 296 (5th Cir. 2004)..............................9

*Orbcomm Inc. v. CalAmp Corp.*,
   2016 WL 3965205 (E.D. Va. Jul. 22, 2016)....................................49

*Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014) ..............................9

*Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010) ...........................52

*Piambino v. Bailey*, 610 F.2d 1306 (5th Cir. 1980).............. 40, 41, 54, 58

*Red Lion Med. Safety Inc. v. Gen. Elec. Co.*,
   2016 WL 3770958 (E.D. Tex. Mar. 31, 2016)................................36

*Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014) ........... 14, 58

*Reed v. Gen. Motors Corp.*, 703 F.2d 170 (5th Cir. 1983) ..... 22, 23, 26, 29

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
   471 F.Supp.3d 981 (N.D. Cal. 2020) ...........................................37

*SAP Am., Inc. v. Investpic, LLC*, 2018 WL 6329690
(N.D. Tex. Dec. 4, 2018), *aff'd*, 779 F. App'x 744 (Fed. Cir. 2019) 52

*Shipes v. Trinity Indus.*, 987 F.2d 311 (5th Cir. 1993).....................43, 47

*Stanton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) ............................27

*Strong v. BellSouth Telecomms., Inc.*,
137 F.3d 844 (5th Cir. 1998) ............................................... passim

*Tech Pharmacy Servs., LLC v. Alixa Rx LLC*,
298 F.Supp.3d 892 (E.D. Tex. 2017) ................................ 49, 50, 51

*Therasense, Inc. v. Becton, Dickinson & Co.*,
649 F.3d 1276 (Fed. Cir. 2011).........................................49

*Trustees v. Greenough*, 105 U.S. 527 (1882) ...........................................27

*Vasalle v. Midland Funding LLC*, 708 F.3d 747 (6th Cir. 2013)...........26

*Von Clark v. Butler*, 916 F.2d at 255 (5th Cir. 1990) ........... 44, 46, 47, 55

*Watkins v. Fordice*, 7 F.3d 453 (5th Cir. 1993)......................................43

*Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594 (6th Cir. 2014) .............36

## Statutes

15 U.S.C. § 15b .......................................................................................36

28 U.S.C. § 1291 ........................................................................................1

28 U.S.C. § 1715 ................................................................ 7, 60, 61, 62

Tex. Bus. Orgs. Code Ann. § 21.522(a)(3) .............................................17

## Rules

Fed. R. Civ. P. 23 ................................................................ passim

## Treatises

4 Newberg & Rubenstein on Class Actions § 13.40 ............................. 14

## Other Authorities

Alexandra Lahav, *Fundamental Principles for Class Action Governance*,
37 Ind. L. Rev. 65 (2003) ............................................. 62

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*,
7 J. of Empirical Legal Studies 811 (2010) ................................. 30

David O. Fisher, Am. Antitrust Inst.,
*Class Action Issues Update Fall 2025* (Oct. 30, 2025) ................... 30

Fed. R. Civ. P. 23(e)(2)
Advisory Comm. Notes to 2018 Amendment .......................... 22, 23

Fed. R. Civ. P. 23€(2)(A) and (B)
Advisory Comm. Notes to 2018 Amendment .......................... 30, 31

Fed. R. Civ. P. 23(e)(2)(C) and (D)
Advisory Committee Notes to 2018 Amendment ........................ 23

Howard M. Erichson, *Aggregation as Disempowerment: Red Flags in Class Action Settlements*, 92 Notre Dame L. Rev. 859 (2016). 15, 26

*Manual for Complex Litigation* § 14.211 (4th ed. 2004) ........................ 40

S. Rep. No. 109-14, 2005 U.S.C.C.A.N. 3 ............................................. 60

S. Rep. No. 109-14, 2005 U.S.C.C.A.N. 5 ............................................. 60

Tex. Bar Ass'n, *2019 Income & Hourly Rates* (2020)..............................48

Theodore Eisenberg & Geoffrey Miller, *Attorney Fees in Class Action Settlements: An Empirical Study,*
1 J. Empirical Legal Stud. 27 (2004) .............................................30

U.S. Patent & Trademark Office, *General Requirements Bulletin for Admission* (January 2025) ..........................................................50

## STATEMENT OF JURISDICTION

This Court has jurisdiction of this appeal under 28 U.S.C. § 1291 because it is an appeal of two final orders that granted Plaintiffs' Motion for Final Approval of Class Action Settlement and Plaintiffs' Counsel's Motion for an Award of Attorney's Fees, Litigation Expenses, and Service Awards. ROA.2441–2492; ROA.2493–2521. Iowa timely appealed by filing its notice of appeal within 30 days of the district court's November 24, 2025 orders. ROA.3125–3126.

## ISSUES PRESENTED

This class action appeal raises questions regarding the fairness, adequacy, and reasonableness of class action settlement and fee award under Federal Rule of Civil Procedure 23 and this Court's precedent.

1. **Whether offering class members uncertain, hypothetical value while giving tangible monetary relief to named plaintiffs and class counsel is an abuse of discretion.**

2. **Whether awarding class counsel approximately $9 million while class members received only hypothetical injunctive relief was an abuse of discretion.**

3. **Whether the district court abused its discretion when it approved nearly $9 million in attorney fees and expenses without following this Court's required lodestar analysis or *Johnson* factor analysis.**

4. **Whether the district court abused its discretion where State Officials were given inadequate CAFA notices.**

1

## INTRODUCTION

This case asks whether hypothetical injunctive relief that offers, at best, uncertain benefits for class members can justify nearly $9 million in attorneys' fees and costs. The district court said yes. But that is only possible by disregarding warnings from Plaintiffs' experts, this Court's precedent, and the requirements of Rule 23. This Court should instead answer "no." The district court abused its discretion and should be reversed.

## STATEMENT OF THE CASE

This class action challenges an October 2020 merger between two financial companies–Defendant The Charles Schwab Corporation ("Schwab") and competitor TD Ameritrade—with alleged anticompetitive effects. Plaintiffs' 103-page complaint details the alleged "damage inflicted by the anticompetitive combination of two of the largest retail brokerages in the United States in October 2020." ROA.37 [¶ 1].

Plaintiffs contended that the merged entity reduced competition for retail order flow—the flow of "buy" and "sell" orders that individual, non-professional investors place through their brokers. ROA.37 [¶¶ 2–3]. The

merger allegedly consolidated that market, resulting in higher prices for class members with Schwab accounts. ROA.101 [¶ 294].

Following the merger, Plaintiffs assert that Schwab now holds enough of the market to negotiate more profitable deals with the massive trading companies that process these retail orders. ROA.101–102 [¶ 296]. Plaintiffs theorize that because the merger decreases competition, it will raise consumer costs or lower potential customer rebates by increasing Schwab's market power. ROA.115 [¶ 369]. According to Plaintiffs, the post-merger Schwab entity will harm consumers even though the number of competitors seeking to purchase retail order flow remains robust and even though new alternatives and competitors, like Robinhood, have forced changes. ROA.47 [¶ 56], 92–101 [¶¶ 254–292].

To guard against that alleged harm, Plaintiffs sought three key remedies: (1) damages "in the form of the amount of retail order flow payments;" (2) "injunctive relief to remedy the antitrust injury they have sustained due to the Merger, including to remedy their inability to control trade executions;" and (3) "injunctive relief to prevent further antitrust injury going forward from the Merger, including an appropriate divestiture or segregation order meaningfully separating the pre-merger

TD Ameritrade and pre-merger Schwab lines of business." ROA.132–33 [¶¶ 457–459].

After three years of litigation, the parties presented a proposed settlement agreement to the district court. ROA.1291–1329, 1330–1394. But the proposed settlement did not include any of Plaintiffs' proposed key remedies. It forgoes damages, creates no control over trade executions, and does not attempt either divestiture or segregation.

Instead, it states that Schwab will "engage [a] Consultant]" to design an "Antitrust Compliance Program" that exist will for four years "[o]nce implementation of the Program is complete." ROA.1340–1343 [¶ 2.2]. But that compliance program does not yet exist. *Id.* Under the terms of the proposed settlement, the consultant that the parties have selected will have at least 180 days to review Schwab's policies, procedures and practices then at least another 60 days to submit its initial report or recommendation. ROA.1342 [¶ 2.2(d)(i)–(ii)]. The final report is not due for at least another 120 days, following the Parties' review. ROA.1342 [¶ 2.2(d)(iii)]. All these deadlines are subject to "reasonable extensions." ROA.1342 [¶ 2.2(d)(iv)]. So under the proposed settlement agreement, the final terms of the program likely were at least

a year in the future at the time the district court approved the proposed agreement. *See* ROA.1340–1343 [¶ 2.2]

Meanwhile, the agreement gives $5,000 to each named plaintiff along with $50 in brokerage account credits. ROA.1340 [¶ 2.1], ROA.1350 [¶ 8.1]. The prosed settlement also authorized up to $8.25 million in attorneys' fees and up to $700,000 in expenses for class counsel. ROA.1476, 1502 [¶ 24]. Class counsel ultimately requested the full $8.25 million in fees and $686,000 in expenses. ROA.1472.

The district court received approximately 70 objections to the proposed settlement (ROA.2444), including an objection from the State of Iowa, challenging the class relief, fee award, and notice. ROA.1956–1986. The district court overruled these objections and approved both the class settlement and the attorney fee award. ROA.2441–2492, 2493–2521. Iowa filed its notice of appeal on December 19, 2025. ROA.3125–3126.

## SUMMARY OF THE ARGUMENT

This case illustrates the harm that can befall consumers when a district court defers to class counsel and so fails to fulfill its required fiduciary rule in scrutinizing a proposed class action settlement and attorney fee award.

5

I. **Offering class members uncertain, hypothetical value while giving tangible monetary relief to named plaintiffs and class counsel is an abuse of discretion.**

The settlement agreement creates a four-year antitrust monitoring program. But the monitoring program has not been designed, and even the proponents' experts contend it will provide only "uncertain" relief to the class. But the district court plucked two paragraphs from Plaintiffs' expert report out of context to justify a nearly $9 million attorney award when class members receive only speculative relief. Meanwhile, named plaintiffs take home $5,050 in cash and brokerage account credits. Such an award does not comply with Rule 23 or this Court's precedent.

II. **Awarding class counsel approximately $9 million while class members received only hypothetical injunctive relief was an abuse of discretion.**

Under this Court's precedent and Rule 23, a district court has a duty to the class and to the public to ensure that attorneys' fees are fair and reasonable. Instead, the district court accepted class counsel's request at face value, providing inadequate oversight for class members.

III. **The district court failed to consider lodestar or the *Johnson* factors.**

This Court has established a two-step process that district courts must follow when evaluating class action attorneys' fees. *See, e.g., Fessler*

*v. Porcelena Corona de Mexico, S.A. DE C.V.*, 23 F.4th 408, 415–16 (5th Cir. 2022) (quoting *Combs v. City of Huntington*, 829 F.3d 388, 391 (5th Cir. 2016)).

First, the district court must use the "lodestar method" to "determine the reasonable number of hours expended on the litigation and the reasonable hourly rate for the participating attorney." *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 228 (5th Cir. 2008) (citation omitted).

Second, the district court must analyze the lodestar to determine whether it should adjust that award upward or downward based on the twelve factors this Court set forth in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). But the district court did not apply any *Johnson* factor—justification alone for vacatur and remand.

## IV. Iowa received inadequate notice under the Class Action Fairness Act.

Under the Class Action Fairness Act ("CAFA"), a class action Defendant must serve certain State and federal officials with specific settlement information. 28 U.S.C. § 1715(b)(1)–(8). Iowa informed the district court that it did not receive this required information in this case.

That notice deficiency required rejecting the proposed settlement. But the district court did not address these arguments.

## ARGUMENT

The district court did not uphold its fiduciary duty under Rule 23 and this Court's precedent when it approved hypothetical injunctive relief for class members while giving class counsel and named plaintiffs a windfall. Even Plaintiffs' own experts are uncertain that the unwritten antitrust monitoring plan will benefit consumers. But there is no doubt that the $5,050 named plaintiff awards and the nearly $9-million award for class counsel are concrete benefits.

The district court abused its discretion and failed to properly apply Rule 23 when it approved class relief. It also abused its discretion when it failed to conduct the proper attorney fee analysis and instead rubber-stamped class counsel's hours and rates. And it erred when it approved the settlement and fee award despite deficient notice to class members and State officials.

Any one of these errors requires reversal.

## I. STANDARD OF REVIEW.

This Court reviews a district court's class action settlement approval for an abuse of discretion. *In re Katrina Canal Land Breaches Litig.*, 628 F.3d 185, 194 (5th Cir. 2010) (citing *Newby v. Enron Corp.*, 394 F.3d 296, 300 (5th Cir. 2004)).

But despite this deferential standard of review this Court's duty in the class action context "is 'far from pro forma'" as the district court judge is "akin to 'fiduciary for the class,'" and so owes a high duty of care to the class. *In re Subway Footlong Sandwich Mktg. & Sales Practices Litig.*, 869 F.3d 551, 555 (7th Cir. 2017) (quoting *Pearson v. NBTY, Inc.*, 772 F.3d 778, 786 (7th Cir. 2014)); *see also Jones v. Singing River Health Servs. Found.*, 865 F.3d 285, 296 (5th Cir. 2017) ("The court must be assured that the settlement secures an adequate advantage for the class in return for the surrender of litigation rights against the defendants.") (citation and quotation marks omitted).

This court likewise reviews a district court's attorneys' fee award for abuse of discretion. *High Sulfur*, 517 F.3d at 227 (citing *Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 850 (5th Cir. 1998). It reviews

the court's findings of fact supporting the award for clear error. *Strong*, 137 F.3d at 227 (citation omitted).

An abuse of discretion "must be either premised on an erroneous application of the law, or on an assessment of the evidence that is clearly erroneous." *Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524, 528 (5th Cir. 2000). This Court also "must determine whether 'the record clearly indicates that the district court has utilized the *Johnson* framework as the basis of its analysis, has not proceeded in a summary fashion, and has arrived at an amount that can be said to be just compensation.'" *High Sulphur*, 517 F.3d at 227 (quoting *Forbush v. J.C. Penney Co.*, 98 F.3d 817, 823 (5th Cir. 1996)).

Federal courts review the CAFA's legal requirements de novo. *See, e.g.*, *Moses v. New York Times Co.*, 79 F.4th 235, 242 (2d Cir. 2023); *In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Practices & Prods. Liab. Litig.*, 27 F.4th 291, 304 n.8 (4th Cir. 2022).

## II. OFFERING CLASS MEMBERS UNCERTAIN, HYPOTHETICAL VALUE WHILE GIVING TANGIBLE MONETARY RELIEF TO NAMED PLAINTIFFS AND CLASS COUNSEL IS AN ABUSE OF DISCRETION.

Hypothetical injunctive relief does not benefit consumers. Yet that is all class members receive here. Under the settlement agreement, class

members get four years of unspecified antitrust monitoring. The district court then used that hypothetical relief to justify almost $9 million in fees and costs for class counsel as well as $5,000 cash and $50 in brokerage account credits for named Plaintiffs. To do so, the district court cherry picked two paragraphs from a 29-page expert report filled with cautions and caveats and concluded that an antitrust compliance program that does not yet exist "provides meaningful relief to the entire settlement class." ROA.2489. That is an abuse of discretion.

At the time of the district court's rulings, the Parties had not finalized their contract with the consultant selected to design the compliance program. ROA.1334 [¶ 1.7], 1341 [¶ 2.2(b)], 1353 [¶ 12.1]. That consultant has eight months to review Defendant's policies and procedures and make an initial report and recommendation, and the settlement agreement explains that any final compliance program proposal will take at least a year subject to any "reasonable extensions." ROA.1342 [¶ 2.2(d)]. And without any actual compliance plan proposal, any class benefits are simply guesswork.

Even Plaintiffs' own experts cannot definitively state that consumers will benefit from this to-be-determined compliance program.

11

Instead, "[a]t this stage, the benefits reasonably expected to redound to consumers from the proposal above remain uncertain as the parties have not yet finalized the Compliance Program's provisions. Moreover, we have limited data on the basis of which to estimate such potential benefits." ROA.2851–2852 [¶ 57]. As such, Plaintiffs' experts explain that "[w]e preface our analysis with the caveat that our estimates provide a value range, the accuracy of which is subject to considerable uncertainty." *Id.*

Given that uncertainty, the district court's settlement approval should be reversed. *See Katrina Breaches*, 628 F.3d at 196 (holding that district court erred in approving settlement where "we are unable to definitively state, based on the record below, that the class will receive any benefit from the settlement"). The injunctive relief here does not give a meaningful benefit to the class, while rewarding named plaintiffs and class counsel. Such a settlement is neither fair nor adequate and should be rejected.

A. **The Court Owes a Fiduciary Duty to Unnamed Class Members.**

"Class-action settlements are different from other settlements. The parties to an ordinary settlement bargain away only their own rights—

which is why ordinary settlements do not require court approval." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 715 (6th Cir. 2013). Unlike ordinary settlements, "class-action settlements affect not only the interests of the parties and counsel who negotiate them, but also the interests of unnamed class members who by definition are not present during the negotiations." *Id.* "[T]hus there is always the danger that the parties and counsel will bargain away the interest of the unnamed class members in order to maximize their own." *Id.*

So Federal Rule of Civil Procedure 23(e) requires court approval of class action settlements to give fiduciary protection to absent class members whose interests may be compromised. *See Ibarra v. Texas Emp't Comm'n*, 823 F.2d 873, 878 (5th Cir. 1987) (citing *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 225 (5th Cir. 1981)); *see also Corrugated Container*, 643 F.2d at 225 ("The reason the court is called on to review a settlement is to protect the rights of the many absent class members who were not involved in the negotiations leading to the settlement.").

"The court's role as fiduciary is primarily to ensure that the class's own agents—its class representatives and class counsel—have not sold

out its interests in settling the case." *Kurtz v. Kimberly-Clark Corp.*, 142 F.4th 112, 118 (2d Cir. 2025) (quoting 4 Newberg & Rubenstein on Class Actions § 13.40). That role must be undertaken with "a jealous regard" for the rights and interests of the absent class members." *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010). And courts placed in that role must not "assume the passive role" that is appropriate when confronted with an unopposed motion in a suit between two private parties." *Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014).

Thus when a court exercises its discretion in deciding on the fairness, adequacy, and reasonability of a class settlement, it must "ensure that the settlement is to the interest of the class, does not unfairly impinge on the rights and interests of dissenters, and does not merely mantle oppression." *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 285–86 (W.D. Tex. 2007) (citations omitted).

Settlement valuation "must be examined with great care to eliminate the possibility that it serves only the 'self-interests' of the attorneys and the parties, and not the class by assigning a dollar number to the fund that is fictitious." *Dennis v. Kellogg Co.*, 697 F.3d 858, 868 (9th Cir. 2012). Instead, "[t]he court must be assured that the settlement

14

secures an adequate advantage for the class in return for the surrender of litigation rights against the defendants." *Jones*, 865 F.3d at 296 (quoting *Katrina Breaches*, 628 F.3d at 195).

As explained below, the district court's evaluation failed to provide these assurances, so should be reversed.

**B.** **The settlement's injunctive relief provides only uncertain, hypothetical relief for the class.**

Courts warn that injunctive relief can be a potential "red flag[]," warranting "searching scrutiny." *In re Wawa, Inc. Data Sec. Litig.*, 85 F.4th 712, 719 & n. 8 (3d Cir. 2023); *see also Pampers*, 724 F.3d at 718 (where settlement agreement "provides unnamed class members a medley of injunctive relief[, w]e must scrutinize that relief"). But the district court ignored that red flag and approved a settlement that provides dubious relief for the class.

"The fact that class counsel and defendant struck a deal with an injunctive component does not necessarily indicate that the injunctive remedy accomplishes anything useful." Howard M. Erichson, *Aggregation as Disempowerment: Red Flags in Class Action Settlements*, 92 Notre Dame L. Rev. 859, 878 (2016). More analysis is required. And this Court has held that a district court abuses its discretion under Rule

23 when it concludes that a settlement is fair, reasonable, and adequate where "there has been no demonstration on the record below that the settlement will benefit the class in any way." *Katrina Breaches*, 628 F.3d at 195. That is the case here.

Under the settlement agreement, the parties agree to retain a consultant that will work with them to design an antitrust monitoring program. ROA.1340–1341 [¶ 2.2(a)–(b)]. The consultant and the parties have at least one year to design to design this compliance program, subject to any "reasonable extensions" of any deadlines. ROA.1342 [¶ 2.2(d)]. Schwab then has two months to implement the compliance program, which is to remain in place for four years. ROA.1343 [¶ 2.2(e)]. The settlement does not give class members any monetary relief. ROA.1340–1343 [¶ 2].

Meanwhile, the settlement extinguishes "all injunctive, equitable and non-monetary claims" for the class members. ROA.1339 [¶ 1.33], 1344 [¶ 3.3]. That includes claims seeking to unwind, divest, or otherwise segregate Schwab's purchased business. *Cf.* ROA.132 [¶¶ 458–59]. In other words, millions of class members must surrender their claims to undo any harm Schwab's merger might have caused in exchange for

16

undefined antitrust monitoring that *might* prevent additional harm at some point in the future. And it is not even clear under Texas law whether opt-out defendants would be able to bring their own claims. *See Gusinsky v. Reynolds*, 2026 WL 747179, at \*2 (N.D. Tex. Mar. 17, 2026) (interpreting Tex. Bus. Orgs. Code Ann. § 21.522(a)(3)).

In contrast, the settlement agreement awards each of the three named plaintiffs $5,000 each along with $50 in brokerage account credits. ROA.1340 [¶ 2.1], 1350 [¶ 8.1]. And class counsel has asked for almost $9 million in fees and expenses. ROA.1472.

Plaintiffs submitted one partially redacted expert report to justify the outcome. *See* ROA.2832–2862. But Plaintiffs' report offers weak support. In the experts' defense, they faced a tall task. They needed to both analyze the benefits of a compliance program that does not yet exist and might take any number of forms, *and* do so based on limited data.

To their credit, Plaintiffs' experts repeatedly acknowledge their difficulties. They explain up front that "[w]e understand that Consultant's recommendations will occur after the effective date of the Stipulation of Settlement, and, as of the writing of this report, neither Schwab not Consultant have finalized the specific details." ROA.2835

[¶ 4]; *see also* ROA.2851–2852 [¶ 57]. ("At this stage, the benefits reasonably expected to redound to consumers from the proposal above remain uncertain as the parties have not yet finalized the Compliance Program's provisions."). And they state nearly half a dozen times in their report that they had only limited data for their analysis. *See, e.g.*, ROA.2851–2852 [¶ 57] ("[W]e have limited data on the basis of which to estimate such potential benefits."); ROA.2855 [¶ 66] ("[W]e note that the calculation above necessarily makes use of the limited data available to us at the time of this report."); ROA.2861 [¶ 82] ("We caution that the analyses contained in this report rely on limited data compared to that available to Schwab."); *Id.* (data "were only available to use in very limited scope"); ROA.2862 [¶ 87]. ("[O]ur estimates rely on limited data").

"As a result," Plaintiffs' experts based their conclusions on "reasonable inferences," but "[t]o the extent that the finalized provisions of the Compliance Program diverge substantively and materially from the assumptions that constitute the basis of the findings in this report, we anticipate that the effects of the Compliance Program on trading costs will also differ." ROA.2835 [¶ 4]. And "[they] preface [their] analysis with

the caveat that [their] estimates provide a value range, the accuracy of which is subject to considerable uncertainty." ROA.2851–2852 [¶ 57].

Plaintiffs' experts also note that "the recommended features outlined in this report are not the only viable methods." ROA.2862 [¶ 87]. Indeed, they explain that there is an alternative approach that would lead to more transparency and consumer benefits, but the report does not detail that alternative. ROA.2862 [¶ 86].

Adding to the uncertainty: Consumers already are expected to see price decreases following the merger due to economies of scale. ROA.2848–2849 [¶ 48]. That undercuts the value of any injunctive relief. *See Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1080 (9th Cir. 2017) ("A settlement's 'injunctive relief is of no real value" where it does "not obligate [defendant] to do anything it was not already doing.").

Further, under the settlement terms, the antitrust monitoring program will end after just four years. ROA.1343 [¶ 2.2(e)]. But neither Plaintiffs nor Plaintiffs' experts explain why any risks from post-merger market concentration vanishes after that time. Do the harms from market concentration dissipate? Or do future market changes reduce the harms? Or does monitoring simply become too cumbersome or expensive?

Plaintiffs do not say, and the district does not address the issue. *See Subway*, 869 F.3d at 556 ("The plaintiffs and Subway defend this settlement by insisting that it actually provides meaningful benefits to the class because Subway has bound itself, for a period of four years, to a set of procedures designed to achieve better bread-length uniformity. A simple comparison of the state of affairs before and after the settlement exposes the cynicism of this argument.").

Yet the district court plucked two paragraphs from the 29-page report, set aside the report's own caveats and lack of certainty, and concluded that "the compliance program will provide substantial monetary benefit to the Settlement Class." ROA.2477 (citing Dkt 196 at ¶¶ 84–85/ROA.2861–2862 [¶¶ 84–85]).[1] That is an abuse of discretion. Where a court is "unable to definitively state, based on the record below, that the class will receive any benefit from the settlement," that settlement should be rejected. *See Katrina Breaches*, 628 F.3d at 196.

---

[1] Docket 196 is the unredacted version of Plaintiffs' expert report, which is not part of the Record on Appeal. As such, this brief cites the redacted version at Docket 205 (ROA.2832–2862), unless quoting the district court's citations where the parallel ROA cite will also be provided.

The compliance program is the only benefit being given to the class—in exchange for extinguishing what Plaintiffs contend are serious and damaging claims. At minimum, the district court should have more closely examined the compliance program benefits—if any—before approving the settlement.

## C. The District Court improperly determined that the settlement agreement was fair, reasonable, and adequate under Rule 23(e)(2) and *Reed*.

This Court expects district courts to "exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions to consider whether the settlement is fair, adequate, and reasonable, and not a product of collusion. *Jones*, 865 F.3d at 293 (citation and internal quotation marks omitted). And "if the record points unmistakably toward the conclusion that the settlement was the product of uneducated guesswork, a court may be acting within its discretion in disapproving the agreement without ever considering whether the agreement's terms are adequate." *Jones*, 865 F.3d at 300 (quoting *In re Corrugated Container Antitrust Litig.*, 643 F.2d at 211).

But even if this Court believes that the hypothetical antitrust monitoring program has firm-enough foundations, it still should reject

this settlement under Rule 23(e) and *Reed v. Gen. Motors Corp.*, 703 F.2d 170 (5th Cir. 1983).

Rule 23 allows a court to approve a class action settlement "only on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Approximately 40 years ago, this Court set forth a six-factor test to evaluate the appropriateness of a class action settlement. *See Jones*, 865 F.3d at 1094 (citing *Reed*, 703 F.2d at 172). *Reed* examines:

> (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members.

703 F.2d at 172.

The 2018 Amendments to Rule 23(e)(2) impose four "primary procedural considerations and substantive qualities that should always matter to the decision whether to approve [a settlement] proposal." Fed. R. Civ. P. 23(e)(2) Advisory Comm. Notes to 2018 Amendment. Among these: "whether the class representatives and class counsel have adequately represented the class," "whether the relief provided to the class is adequate, taking into account . . . the effectiveness of any

proposed method of distributing relief to the class . . . [as well as] the terms of any proposed award of attorney's fees, including timing and payment," and "whether . . . the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2).

The Rule 23(e) factors do not "displace any factor" that courts have previously approved—including the *Reed* factors. Fed. R. Civ. P. 23(e)(2) Advisory Committee Notes to 2018 Amendment. Instead, both are read together with any existing factors and "focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision to approve the proposal." *Id.* And the relief here falls short under both the 2018 Amendments to Rule 23(e) and *Reed*.

*1. Inadequate Relief*—This settlement fails under Rule 23(e)(2)(C), which requires courts to consider the effectiveness of distributing relief to the class and the attorneys' fees to be paid. Under Rule 23, "[t]he relief that the settlement is expected to provide to class members is a central concern." Fed. R. Civ. P. 23(e)(2)(C) and (D) Advisory Committee Notes to 2018 Amendment. But even after final approval, the antitrust compliance program is purely hypothetical, providing uncertain relief to the class at best. On the other side of the scale from this ineffective class

relief, named Plaintiffs and counsel receive a financial windfall. "The signs are not particularly subtle" that such relief is plainly inadequate. *Pampers*, 724 F.3d at 718.

Multiple circuits have reversed class action settlement approvals where the proposed injunctive relief did not clearly benefit the class. For example, the Ninth Circuit rejected a class action settlement that required class members to relinquish their right to pursue damages claims in exchange for *future* defendant disclosures. *See Koby*, 846 F.3d at 1080. But the class was defined to include consumers who did not receive proper disclosures in the past, so the forward-looking injunctive relief created "an obvious mismatch between the injunctive relief provided and the definition of the proposed class." *Id.* at 1079; *see also id.* at 1080 ("Because the settlement gave the absent class members nothing of value, they could not fairly or reasonably be required to give up anything in return.").

The same is true here. The alleged harms stem from a merger that the settlement does not undo or alter. At most, the settlement will reduce future harm should Schwab violate its antitrust obligations. But there is little evidence that that actual order flow costs will increase or that they

24

will do so in a way that harms the class. *Cf. id.* Indeed, the cost of expensive antitrust monitoring and a nearly $9 million attorney award—all paid by Schwab—might *harm* class members on net. Schwab, as a for-profit business, might pass those hefty costs onto consumers.

Similarly, the Seventh Circuit rejected a proposed four-year injunction that would have imposed "new measuring tools, protocols, and inspections" that left unchanged the "same small chance" that the harm alleged—footlong sandwiches measuring fewer than 12 inches in length—could recur. *Subway*, 869 F.3d at 557. So too here, where even under "antitrust monitoring," there is no way to be sure that any price protections will give relief to the class. *Cf. id.*

The Sixth Circuit also vacated a class action settlement for similar reasons. *See Pampers*, 724 F.3d at 716. *Pampers'* proposed settlement agreement included injunctive-only relief that protected future damages claims but extinguished all equitable claims." *Id.* Meanwhile, named Plaintiffs received $1,000 incentive awards and attorneys received $2.73 million in fees. *Id.* at 722, 719. Relying in part on Fifth Circuit precedent, that court held that the settlement did not satisfy Rule 23's fairness requirements. *Id.* at 719 (citing *Katrina Breaches*, 628 F.3d at 196).

In short, hypothetical injunctive relief does not benefit consumers. *See* Erichson, *supra*, at 878. "The fact that class members were required to give up anything at all in exchange for worthless injunctive relief preclude[s] approval of the settlement as fair, reasonable, and adequate under Rule 23(e)(2)." *Koby*, 846 F.3d at 1081.

*2. Inequitable treatment*— The district court found that "as current Schwab brokerage customers themselves, [named] Plaintiffs' interests are identical to the members of the settlement class." ROA.2471. But under the settlement, named Plaintiffs and class members receive strikingly different relief. The lopsided award makes the proposed settlement unfair under Rule 23 and *Reed*.

"[I]n evaluating the fairness of a settlement," courts examine "whether the settlement gives preferential treatment to the named plaintiffs, while only perfunctory relief to unnamed class members." *Pampers*, 724 F.3d at 718 (quoting *Vasalle v. Midland Funding LLC*, 708 F.3d 747, 755 (6th Cir. 2013)). "[S]uch inequities in treatment make a settlement unfair." *Id.* (citation omitted). A settlement that gives preferential treatment to class counsel is likewise unfair to the class. *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55

F.3d 768, 788 (3d Cir. 1995). That is because if the "fees are unreasonably high, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have [been] obtained." *Stanton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003).

Again, the Sixth Circuit's decision in *Pampers* is instructive. There, "[t]he named plaintiffs (*i.e.*, the class representatives) exercise their Rule 23 rights and receive an award of $1000 per child in return," while "the unnamed members are barred from exercising those same rights and receive nothing but illusory injunctive relief." 724 F.3d at 722. *Pampers* warned courts that they should be "most dubious of incentive payments when they make the class representatives whole, or (as here) even more than whole; for in that case the class representatives have no reason to care whether the mechanisms available to unnamed class members can provide adequate relief." *Id.*; *see also Johnson v. NPAS Sols., LLC*, 975 F.4th 1244, 1260 (11th Cir. 2020) ("[W]e hold that [*Trustees v. Greenough*, 105 U.S. 527 (1882), and *C.R.R. & Banking Co. v. Pettus*, 113 U.S. 116 (1885)] prohibit the type of incentive award that the district court

27

approved here—one that compensates a class representative for his time and rewards him for bringing a lawsuit.").

Fee awards also undercut settlement approval. As the court explained, to approve the settlement, its value had to be "so great, for unnamed class members as to render counsel's $2.73 million fee reasonable rather than preferential in light of it." *Pampers*, 724 F.3d at 719.

The same is true here where class members receive only questionable injunctive relief while class representatives take home $5,050 and class counsel receives nearly $9 million.

The timing of each type of relief shows further inequities. Under the settlement agreement, class counsel has arranged for an agreed-upon and complete payday "within fifteen (15) business days of an order awarding such amounts, notwithstanding the existence of any timely objections thereto, or potential for appeal or collateral attack on the Settlement." ROA.1349–1350 [¶ 7.2].

Meanwhile, the parties' proposed consultant has eight months to review Charles Schwabs's "policies, procedures, and practices" and "submit its initial report and recommendation" for the compliance

program—subject to "reasonable extensions of any of these deadlines." ROA.1342 [¶¶ 2.2(d)(i), (ii), (iv)]. Thus, only class members bear the risk and uncertainly that an untested, hypothetical compliance program will bring tangible results.

"That counsel assured themselves a multimillion-dollar bird in hand, while leaving the class members two in the bush, is disturbing." *Jones*, 865 F.3d at 298. If class counsel were confident about the compliance plan's ability to bring tangible class benefits, "they could have accepted payments over its prescribed duration." *See id.* Instead, counsel has created a situation "reminiscent of justly derided class action settlements where counsel take home substantial fees while the class members receive worthless coupons." *Id.* A settlement agreement that displays such preferential treatment should not be approved under Rule 23 or *Reed*.

*3. Inadequate representation*—The district court also erred in approving the proposed settlement because class counsel's representation was inadequate. Rule 23 conditions class certification upon a demonstration that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The

Rule similarly commands courts to determine that "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). The district court erred in concluding that these requirements were satisfied.

Iowa does not question class counsel's credentials or experience. But under Rule 23, adequate representation requires more than a polished resume. After all, "[i]f the court has appointed class counsel or interim class counsel, it will have made an initial evaluation of counsel's capacities and experience." Fed. R. Civ. P. 23(e)(2)(A) and (B) Advisory Comm. Notes to 2018 Amendment. Instead, during settlement approval, "the focus . . . is on the actual performance of counsel acting on behalf of the class." *Id.*

As the district court recognized, this focus might include evaluating counsel's conduct during discovery and settlement negotiations. *See, e.g.*, ROA.2463.[2] But it also is proper—and perhaps essential under Rule 23—

---

[2] The fact that class counsel's efforts spanned "the last three years" (ROA.2464, 2471) should not change this Court's analysis. Studies have found that the average time to settlement for class actions was about 2.9 years, with antitrust class actions taking slightly longer than average. *See* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. of Empirical Legal Studies 811, 820 (2010);

for a court to scrutinize the proposed settlement terms. *See Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 619–20 (1997). As the product of counsel's settlement negotiations, these terms "may bear on whether [the negotiations] here conducted in a manner that would protect and further the class interests." Fed. R. Civ. P. 23(e)(2)(A) and (B) Advisory Comm. Notes to 2018 Amendment. And "[p]articular attention might focus on the treatment of any award of attorney's fees, with respect to both the manner of negotiating the fee ward and its terms." *Id.*

Here, class representatives and class counsel have agreed to a settlement that gives at-best hyppthetical benefit to the class but thousands to class representatives and millions to class counsel. That imbalance reveals a failure to "protect and further the class interests," sacrificing class recovery for personal reward. Such representation is inadequate.

---

*see also* Theodore Eisenberg & Geoffrey Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Stud. 27, 59–60 (2004) This case reached settlement relatively quickly compared to the average antitrust class action. From 2009 to 2014, "most antitrust class actions that reached final approval did so within 5-7 years." David O. Fisher, Am. Antitrust Inst., *Class Action Issues Update Fall 2025* at 13 (Oct. 30, 2025), *available at* https://perma.cc/9G4Y-WMRD.

The range of possible recovery also raises questions about the adequacy of class counsel's representation. The district court adopted Plaintiffs' characterization and estimated a wide range of possible recovery, ranging from "no recovery" to "divestiture of Schwab and TD Ameritrade or segregation of the lines of business within the merged entity." ROA.2477; ROA.1321–1322.

As an initial matter, this estimated range is incorrect because it considers only the range of possible recovery in an injunctive-relief class under Rule 23(b)(2). But this factor requires courts to "establish the range of possible damages that could be recovered at trial." *Maher v. Zapata Corp.*, 714 F.2d 436, 460 (5th Cir. 1983). Here, Plaintiffs' complaint sought treble damages, punitive damages, restitution, divestiture, "segregation of the respective Schwab and TD Ameritrade lines of business with the merged entity," and "an injunction requiring that Defendant allow them to opt out of payment for order flow in their trades with Defendant." ROA.138. And at this stage, it is unknown whether Plaintiffs would abandon their claims for punitive and treble damages and instead seek to certify a class for injunctive relief absent the proposed settlement agreement here.

But even accepting the district court's purported range, the negotiated relief is barely one notch past "no recovery at all" and the rest of the belt away from divestiture or segregation. Plaintiffs even concede that the "antitrust compliance program" is not the "drastic" remedy they sought. ROA.1321. And for the reasons explained above, Iowa is skeptical that a hypothetical compliance program with unspecified terms with an annual announcement that class members have suffered no further harm is accurately valued at $128.4 million to $174 million annually. ROA.2454 n.6; ROA.1322.

Further, under the proposed settlement Schwab has not agreed to change any of the alleged behavior that Plaintiffs contend distorted the market and cost class members actual dollars. Of the class, only named Plaintiffs receive anything beyond the "lowest end of the range of recovery." Such a settlement can only be the result of inadequate representation.

Rule 23, along with "basic due process," demand more than the class received here. Named class representatives and class counsel must manifest "undivided loyalties to absent class members." *Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 338 (4th Cir. 1998). And class

counsel must "prosecute the case in the interest of the class . . . rather than just in their interests as lawyers who will successfully obtain a share of any judgment or settlement as compensation for their efforts. *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 917 (7th Cir. 2011). When "class counsel agree[s] to accept excessive fees and costs to the detriment of class plaintiffs, then class counsel breache[s] their fiduciary duty to the class." *Lobatz v. U.S.W. Cellular of Calif., Inc.*, 222 F.3d 1142, 1147 (9th Cir. 2000).

*4. Illusory preservation of class damages claims does not change the Rule 23 analysis*—The district court rejected objections to the adequacy of the class award in part because "the injunctive-only Settlement does not force the Settlement Class to release their individual damages claims." ROA.2489. But the settlement agreement's purported preservation of class damages claims does not rescue this unfair and inadequate injunctive relief. *Pampers*, 724 F.3d at 718–19.

First, as the Parties explain, "the settlement's benefits must be considered in comparison to what the class actually gave up by settling." ROA.1317 (quoting *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1123 (9th Cir. 2020)). Here, class members must give up all equitable relief related

34

to the merger, including relief from the myriad harms detailed in Plaintiffs' 103-page complaint. That means that class members must abandon any claims for divestiture or segregation of Schwab's services—relief that Plaintiffs claimed was essential. In return, they receive some amorphous antitrust monitoring with no guarantee that they will receive any meaningful price relief.

Further, class members will be giving up any benefit from the expensive damages modeling that counsel touted in its sizeable attorneys' fee request. *See* ROA.1478. ("Plaintiff's counsel invested significant time working with experts to develop a damages model using the 6.5 terabytes of financial information provided by Schwab.").

And even if the class could benefit from counsel's expensive damages modeling, it likely would be irrelevant as any preservation of future damages claims is illusory. That is because the preservation of damages claims likely only exists on paper. In reality, the settlement agreement effectively extinguishes most—if not all—class member damages claim because the length of this case means the statute of limitations now bars those claims.

Plaintiffs' complaint alleges that Schwab's October 2020 merger with TD Ameritrade violated Section 7 of the Clayton Act. ROA.37 [¶ 1], ROA.137. "Section 7 exists primarily to end, at the very beginning, mergers that could produce anti-competitive results." *Red Lion Med. Safety Inc. v. Gen. Elec. Co.*, 2016 WL 3770958, at *2 (E.D. Tex. Mar. 31, 2016) (citation omitted). And all cases under Section 7 of the Clayton Act "are governed by the limitations period in Section 4B that requires that an action be commended 'within four years after the cause of action accrued.'" *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1050 (8th Cir. 2000) (quoting 15 U.S.C. § 15b). So generally, "[a] Section 7 action challenging the initial acquisition of another company's stocks or assets accrues at the time of the merger or acquisition." *Id.*; *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 604 (6th Cir. 2014) ("As with the Sherman Act, a Section 7 cause of action challenging an acquisition accrues at the time of the merger or acquisition, and there is a four-year statute of limitations."); *Red Lion Med. Safety*, 2016 WL 3770958, at *2.

To be sure, Section 7 actions can also challenge "the holding or use of assets," but those claims still are subject to the four-year statute of limitations period and the limitations period still "starts to run at 'the

36

point the first act causes injury.'" *Concord*, 207 F.3d at 1051 (quoting *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190–91 (1997)). And multiple courts have held that the continuing violation doctrine does not apply to Section 7 claims. *See, e.g.*, *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 271 (8th Cir. 2004); *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F.Supp.3d 981, 994 (N.D. Cal. 2020). That is because if the continuing violation applied "every business decision could qualify as a continuing violation to restart the statute of limitations as long as the firm continued the desire to be merged." *Midwestern Mach.*, 392 F.3d at 271.

Class members' limitations period for damages claims began to accrue in October 2020 and expired in October 2024. So for any class members that did not file separate claims, the settlement agreements preservation of damages does not preserve any recovery. Instead, class members who chose to rely on the class action to vindicate their damages claims may end up with nothing. *See China Agritech v. Resh*, 584 U.S. 732, 736 (2018).

That reflects *Koby* which held that the magistrate judge abused her discretion when "[t]here was no evidence that the relief afforded by the

settlement has any value to the class members, yet to obtain it they had to relinquish their right to seek damages in any other class action." 846 F.3d at 1079.

There, the magistrate "approved a class action settlement in which the named plaintiffs and class counsel got what they wanted but the remaining four million class members got worthless injunctive relief." *Id.* at 1074. And "[i]n exchange for receiving nothing of value, the class members gave up their right to assert damages claims against the defendant in any other class action." *Id.* at 1073. The same is effectively true here where Class members would likely be time barred from asserting damages claims against Defendant despite any waiver exceptions in the settlement agreement.

And it is unclear whether the *American Pipe* doctrine, which tolls the statute of limitations during a pending class action, would save class members here. *See American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974). For example, the Supreme Court recently held that while *American Pipe* tolls individual claims, it does not allow a class member to "commence a class action anew beyond the time allowed by the applicable statute of limitations." *Resh*, 584 U.S. at 735–36. The is a

significant hurdle where, as here, the district court acknowledged that "there are a large number of members within the class that have a very small damages claims—i.e., fraction of a penny, third of a cent, or fifth of a cent—making many of their individual claims unprofitable." ROA.2454 n.6. For these class members, the only feasible path to monetary recovery would be through another class action—a path that is barred here. Further, to the extent class members instead intend to pursue state remedies, some states—like Texas—have held that *American Pipe* does not permit cross-jurisdictional tolling. *See Ackerman v. Arkema Inc.*, 157 F.4th 715, 717–18 (5th Cir. 2025).

The district court's failure to consider these issues was error.

## III. AWARDING CLASS COUNSEL APPROXIMATELY $9 MILLION WHILE CLASS MEMBERS RECEIVED ONLY HYPOTHETICAL INJUNCTIVE RELIEF WAS AN ABUSE OF DISCRETION.

"The court's review of the attorneys' fee component of a settlement agreement is . . . an essential part of its role as guardian of the interests of class members." *Strong*, 137 F.3d at 850. That is because, in a class action, the defendant's adversarial role with regard to attorneys' fees is diminished, so "the court must strive to minimize the conflict of interest

between the class and its attorney inherent in such an arrangement." *Id.* (citations omitted).

As a result, "the district court has an independent duty under Federal Rule of Civil Procedure 23 to the class and the public to ensure that attorneys' fees are reasonable." *High Sulphur*, 517 F.3d at 227 (citations omitted). The duty "includes the obligation to explore the manner in which fees of class counsel are to be paid and the dollar amount for such services." *Strong*, 137 F.3d at 849 (quoting *Foster v. Boise-Cascade, Inc.*, 420 F.Supp. 674, 680 (S.D. Tex. 1976), *aff'd*, 577 F.2d 335 (5th Cir. 1978)); *see also Manual for Complex Litigation* § 14.211 (4th ed. 2004) ("Judges have an independent duty to review fees and specifically determine if they are reasonable, applying traditional legal tests.").

Rule 23 imposes this duty to "protect the nonparty members of the class from unjust or unfair settlements affecting their rights" and "minimize conflicts that 'may arise between the attorney and the class [and] between the named plaintiffs and the absentees.'" *Strong*, 137 F.3d at 849 (quoting *Piambino v. Bailey*, 610 F.2d 1306, 1327–28 (5th Cir. 1980)). Further, "the court's examination of attorneys' fees guards

against the public perception that attorneys exploit the class action device to obtain large fees at the expense of the class." *Id.* (citing *In re Gen. Motors*, 55 F.3d at 820).

As such, this Court has "repeatedly held that a district court abuses its discretion if it approves a class action settlement without determining that any attorneys' fees claimed as part of that settlement are reasonable and that the settlement itself is reasonable in light of those fees." *Katrina Breaches*, 628 F.3d at 196 (citing *Strong*, 137 F.3d at 849; *Piambino*, 610 F.2d at 1328). "To fulfill its duty, 'the district court must not cursorily approve the attorneys' fee provision of a class settlement or delegate that duty to the parties.'" *High Sulphur*, 517 F.3d at 228 (quoting *Strong*, 137 F.3d at 850). To be sure, "exacting judicial review of fee applications may be burdensome," but "it is 'necessary to discharge the [court's] obligation to award fees that are reasonable and consistent with governing law.'" *Id.* (quoting *Manual for Complex Litigation* § 14.231).

Here, the district court incorrectly accepted wholesale class counsel's calculations and characterizations without applying the required scrutiny. The court failed to properly evaluate the proposed lodestar as required under this Court's precedent and instead treated

classic class-action red flags as justification for an unreasonable award. In doing so, it awarded class counsel a nearly $9-million windfall while providing the class almost none of the relief that counsel set out to achieve. This was an abuse of discretion and requires reversal.

**A. The district court abused its discretion when it approved a nearly $9 million for class counsel without following the proper process.**

This Court has established a specific process for district courts to follow when evaluating class action attorneys' fees. Under that process, the district court first must use the "lodestar method" to "determine the reasonable number of hours expended on the litigation and the reasonable hourly rate for the participating attorney." *High Sulphur*, 517 F.3d at 228 (citing *Strong*, 137 F.3d at 850).

The district court must calculate the lodestar by multiplying the number of hours reasonably expended by the reasonable hourly rate. *Id.* (citation omitted). Next, the district court must analyze the lodestar to determine whether it should adjust that award upward or downward based on the twelve factors this Court set forth in *Johnson*, 488 F.2d at 717–19. *High Sulphur*, 517 F.3d at 228 (citing *Forbush*, 98 F.3d at 821); *see also Strong*, 137 F.3d at 850. But the district court abused its

discretion at both stages of this process when it did not properly scrutinize how many hours counsel spent on the case, approved exorbitant hourly rates, and performed only a cursory review of the *Johnson* factors. Both abuses require reversal. And Defendant's lack of opposition does not negate these errors.

**1. The district court abused its discretion when failed to properly scrutinize class counsel's hours and hourly rates.**

"[T]he first step in determining reasonable attorneys' fees is an evaluation of the number of hours reasonably expended." *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir. 1995) (citation omitted). To do so, "the district court must determine the compensable hours from the attorneys' time records, including only hours reasonably spent." *Shipes v. Trinity Indus.*, 987 F.2d 311, 319 (5th Cir. 1993). The court should then "exclude all time that is excessive, duplicative, or inadequately documented." *Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir. 1993).

"[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Kellstrom*, 50 F.3d at 324. "[T]he party seeking reimbursement of

attorneys' fees . . . can only meet that burden by presenting evidence that is adequate for the court to determine what hours should be included in the reimbursement." *Bode v. United States*, 919 F.2d 1044, 1047 (5th Cir. 1990); *see also Von Clark v. Butler*, 916 F.2d at 255, 259 (5th Cir. 1990) ("Part of the applicant's ability to meet his burden includes maintaining billing time records in a manner that would enable the reviewing court to identify each distinct claim." (citation omitted)). "This burden does not shift to the opposing party merely because that party does not show that the hours are unreasonable or that it did not make specific objections to the hours claimed." *Von Clark*, 916 F.2d at 259 (citing *Leroy v. City of Houston*, 831 F.2d 576, 586 (5th Cir. 1987)).

Here, class counsel only presented summaries of their time sheets. ROA.1506, 1512, 1519 1524. Its summaries are labeled as "Lodestar by Timekeeper" (ROA.1506) or "Time Report" (ROA.1512, 1524) and listing the attorney or staff member name, title, and total number of hours spent in the litigation. Attorney declarations stating generally the type of tasks the attorneys and legal staff performed accompanied these time summaries. *See, e.g.*, ROA.1495–1504, 1509–1511. But none of these records are complete, contemporaneous time records for any attorney,

and they do not contain any description of how any specific attorney or legal staff member spent any of the supposed 14,774.5 hours on the case.

From the records that class counsel submitted, it is impossible to tell what tasks any of the 32 attorneys and support staff listed on class counsel's timekeeper reports performed. Iowa's objection noted that "staff attorneys" at Bathaee Dunne LLP and Korein Tillery LLC "*appear* to be contracted document reviewers from whom actual market participants would pay substantially lower rates than they would for permanent employees at white-shoe firm." ROA.1979 (emphasis added) (citation omitted). But the records do not allow for certainty.

And without more detailed records, it is impossible for the district court to truly determine whether counsel "efficiently allocate[d] tasks so that skilled complex class action litigators with the higher rates worked only on complex tasks (i.e., key briefing an analysis) with the lower billing rate attorneys handling the less complex task (i.e., preliminary stage discovery and document review)." ROA.2517 (citing ROA.1478, 1504 [¶ 31]). Instead, the district court simply relied on counsel's assertions. And given that summary information, how could the district

court determine whether any time was "excessive" or "duplicative" as this Court requires? It could not.

This Court has held that that such summaries that "are at best scanty and lacking in any explanatory detail" are inadequate. *See Von Clark*, 916 F.2d at 259. And, as Iowa pointed out to the district court, counsel in *Morrow v. Washington*, even gave "disaggregated billing rates for different stages of the litigation and considered the appropriateness of those rates given both the time they were charged and the difference in difficulty in the case." ROA.1978 (citing *Morrow v. Washington*, 2020 WL 5534486, at *8 (E.D. Tex. Sept. 15, 2020)). And even then, the district court found that the fees were excessive based on the information provided. *Id.* at 22–23 (citing *Morrow*, 2020 WL 5534486, at *8).

The declaration from Texas attorney Warren T. Burns as to Texas billing rates does not change the analysis because it does not address whether the number of hours spent was reasonable. *See* ROA.1526–1528.

Based on the inadequate documentation, the district court should have independently "determine[d] a reasonable number of hours that should have been expended in pursing the claim." *Von Clark*, 916 F.2d at

46

259. The district court did not do so, and instead unquestioningly accepted counsel's totals. This was an abuse of discretion.

### 2. The district court abused its discretion when it approved class counsel's high rates.

As the second step in its analysis, "the district court must select an appropriate hourly rate based on prevailing community standards for attorneys of similar experience in similar cases." *Shipes*, 987 F.2d at 319. But the district court did not "select" any hourly rate. Instead, it simply reviewed the rates that class counsel presented in the fee application and approved them. That was improper under this Court's precedent.

The district court accepted wholesale counsel's hourly rates. That means that—with the exception of Capshaw Derieux, which spent only 41.4 hours on the case (ROA.1524)—partner rates ranged from $900 to $1,700 per hour, with all but two partners charging hourly rates of $1,200 or more. ROA.1506, 1512, 1519. The firms then charged between $800 and $900 per hour for counsel, with one firm, Korein Tillery, charging similar rates for its associates. ROA.1506, 1512. Bathaee Dunne charged slightly less for its associates at $650/hour (ROA.1506), while it seems Burke did not staff any associates on the case. (ROA.1512). Bathaee Dunne then charged $500/hour for staff attorneys "who were principally

assigned the role of document review." ROA.1506, 1499 [¶ 13]. And both Burke and Korein Tillery charged $350/hour for its "legal analysts," though neither firm explains that that position means. ROA.1509–1511, 1512, 1514–1517, 1519

The rates that counsel presented—and that the district court unquestioningly approved—are not reasonable based on the prevailing community standards for attorneys with similar experience in similar cases.

In contrast, a 2020 Texas Bar Association Survey—the most recent survey of hourly rates that Iowa was able to locate—found that the median hourly rate for the Dallas-Fort Worth-Arlington Metropolitan Statistical Area was $308 in 2019. Tex. Bar Ass'n, *2019 Income & Hourly Rates*, at 10 (2020), *available at* http://bit.ly/4rJPZa2 (last accessed Mar. 19, 2026). And the Eastern District of Texas recently found rates of $500/hour excessive for a partner in a "complex class action civil rights case that involved Fourth and Fourteenth Amendment equal protection issues, a significant plaintiff class, and widespread national coverage." *Morrow*, 2020 WL 5534486, at *4.

The district court admitted that it "has been unable to find any other similar complex cases in either the Eastern or Northern District of Texas that have awarded attorneys' fees at these higher billing rates." ROA.2505. Instead, both class counsel and the court compared apples to oranges, identifying cases in different geographic communities with higher average hourly rates; distinct, more complex subject areas; and dissimilar settlement awards. *See* ROA.1482 (collecting cases); ROA.2505 (collecting cases).

For example, *Tech Pharmacy Services* and *Imperium*—upon which the district court relied—both involved claims for patent infringement. *See Tech Pharmacy Servs., LLC v. Alixa Rx LLC*, 298 F.Supp.3d 892, 897 (E.D. Tex. 2017); *Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*, 2018 WL 1602460, at *1 (E.D. Tex. Apr. 3, 2018). But courts routinely recognize that patent infringement cases are unusually complex due to the technical expertise required. *See, e.g.*, *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1288 (Fed. Cir. 2011) ("patent infringement litigation" is "notorious for its complexity and high cost" (citation omitted)); *Orbcomm Inc. v. CalAmp Corp.*, 2016 WL 3965205, at *2 (E.D. Va. Jul. 22, 2016) (noting the "atypical complexity" of dispositive

motions in patent infringement cases). And because of that complexity, the patent bar requires applicants to posses not only law degrees but degrees in engineering, science, or technology or have comparable scientific of technical training. *See* U.S. Patent & Trademark Office, *General Requirements Bulletin for Admission*, 3–9 (January 2025), *available at* https://perma.cc/M3ZW-KGJM (last accessed Mar. 19, 2026).

Also, both cases involved fees awarded after jury trials, rather than discovery-stage settlements. *See Tech Pharmacy Servs.¸* 298 F.Supp.3d at 897; *Imperium*, 2018 WL 1602460, at *1. As the district court explained in *Tech Pharmacy Services*, "[t]his is a case with close to 400 docket entries, several dispositive and discovery motions, and a three-week jury trial." 298 F.Supp.3d at 907. And "Tech Pharmacy sued Defendants not only for breach of contract, but also for patent, infringement, misappropriation of trade secrets, fraud, and equitable estoppel." *Id*. These cases simply are not comparable to this case.

While not a patent infringement case, the third case upon which the district court relied is also distinguishable. ROA.2505 (citing *Cruson v. Jackson Natl. Life Ins. Co.*, 2021 WL 3702483 (E.D. Tex. June 4, 2021)). There, the district court awarded fees based on rates of $823.94 and

$951/hour for two McKool Smith attorneys, one of whom had "roughly forty years' experience litigating complex commercial cases." *Cruson*, 2021 WL 3702483, at *6. And the district court still admitted that these rates were "high." *Id.* at *3. None of the attorneys here similarly tout a professional lifetime of experience in their declarations.

The district court here even admitted that the hourly fee awards here exceeded even those cases. For example, in *Tech Pharmacy Services*, the court approved rates of $600 to $860/hour for the partners in the case (298 F.Supp.3d at 906), Korein Tillery charged between $800 to $850/hour for its *associates*. ROA.1519. Similarly, the rates that the court approved for the partners in *Cruson* also match some of the associate rates approved here. ROA.1519.

To be sure, the Eastern District of Texas noted in 2023 that while some Texas attorneys were charging more than $1,000/hour for services, those attorneys were outliers. *See CHU de Quebec—Universite Laval v. DreamScape Dev. Grp. Holdings, Inc.*, 2023 WL 2749633, at *7–8 (E.D. Tex. Mar. 31, 2023). And the court here held that with partner rates up to $1,365/hour, associate rates up $930/hour, "CHU de Quebec seeks to

recover attorney's fees billed at the outer boundaries of these prevailing rates." *Id.* at *8. The court explained that "

> CHU de Quebec's attorneys are certainly competent, experienced, and belong to a reputable national law firm: Arnold & Porter. They also achieved favorable results for their client on each of the discovery motions at issue here. But CHU de Quebec has not established that this experience and success justifies charging the very top market rates to litigate the claims presented in this action.

*Id.* (citing *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 557 & n.7 (2010) (district court inappropriately awarded attorney's fees at a top rate of $866.00 per hour in Atlanta); *SAP Am., Inc. v. Investpic, LLC*, 2018 WL 6329690, at *5 (N.D. Tex. Dec. 4, 2018) (refusing to award attorney's fees at a top rate of $1,175.00 per hour), *aff'd*, 779 F. App'x 744 (Fed. Cir. 2019).

Further, there, "CHU de Quebec had not identified any cases of similar importance or complexity awarding attorney's fees at the requested rates. Nor has it presented any evidence supporting those rates except for two conclusory declarations." *Id.* The same is true here.

Because rates here are not reasonable, the district court's determination should be reversed.

### 3. The district court's cursory review of the *Johnson* Factors requires reversal.

In *Johnson*, this Court laid out twelve factors that district courts must consider after determining the lodestar:

> (1) The time and labor required for the litigation; (2) the novelty and difficulty of the questions presented; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney be acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the result obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Johnson*, 488 F.2d at 717–19.

The district court here did not apply any of the twelve *Johnson* factors. ROA.2506–2507. But a district court, "must scrutinize a fee award under the *Johnson* factors and not merely 'ratify a pre-arranged compact.'" *High Sulphur*, 517 F.3d at 228 (citation omitted). And when a district court summarily approves attorneys' fees presented in an unopposed settlement agreement, it "abdicate[s] its responsibility to assess the reasonableness of the attorneys' fees proposed under a

settlement of a class action, and its approval of the settlement must be reversed on that grounds alone." *Piambino*, 610 F.2d at 1328.

The district court abdicated its responsibility here. Because "neither Plaintiffs' Counsel nor Defendant argue for an adjustment to the lodestar in this case," and "[i]ndeed, Plaintiffs' Counsel seeks an award for *less* than the lodestar," the district court simply rubberstamped the award without analyzing a single *Johnson* factor. ROA.2507–2507. That error requires reversal.

And mere reference to the *Johnson* factors does not save final approval. Indeed, this Court requires district courts to perform more than a cursory review of these factors. Rather, "[w]hen a district court awards attorneys' fees it must explain how each of the *Johnson* factors affects its award." *High Sulphur*, 517 F.3d at 228 (citing *Longden v. Sunderman*, 979 F.2d 1095, 1099–1100 (5th Cir. 1992)). While the district court's *Johnson* analysis "need not be meticulously detailed to survive appellate review," the district court must at least "articulate[] and correctly appl[y] the correct criteria." *Id.* at 228–29 (citations omitted). And "the district court's findings and reasons must be 'complete enough to assume a review which can determine whether the court has used proper factual

criteria in exercising its discretion to fix just compensation.'" *Id.* at 229 (quoting *Brantley v. Surles*, 804 F.2d 321, 325–26 (5th Cir. 1986)).

Had the district court analyzed the *Johnson* factors, it would have found that a further reduction of the lodestar was necessary given the dubious results for anyone other than counsel and named plaintiffs. This Court "ha[s] explained that, of the *Johnson* factors, the court should give special heed to the time and labor involved, the customary fee, the amount involved and the result obtained, and the experience, reputation, and ability of counsel." *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir. 1998) (citing *Von Clark*, 916 F.2d at 258). And in analagous contexts, this Court has "made clear that 'the most critical factor' in determining the reasonableness of a fee award . . . 'is the degree of success obtained.'" *Id.* (quoting *Farrar v. Hobby*, 506 U.S. 103, 114 (1992)). As in *Migis*, "the court did not give adequate consideration to the eighth *Johnson* factor, the amount involved and the result obtained." *Id.* at 1047–48. And that failure resulted in an inflated attorney fee award.

To be sure, a lawsuit—even a class action lawsuit—cannot always generate a large monetary recovery for the class. Damages might be too small or too speculative. That happens. But when that happens, there

should not be an outsized reward for counsel. But that is precisely what happened here.

As explained above, class members receive only hypothetical injunctive relief. There is no proof that "the antitrust compliance program provided for by the Settlement will result in a substantial monetary benefit to the Settlement Class" as the district court asserts. ROA.2511. Further, most generously Plaintiffs' counsel achieved almost none of the goals they sought in their complaint, walking away without damages for the class, without divestment, and without segregation. Under *Johnson*, those results warranted a further reduction in fees.

The district court also erred in failing to further adjust the fee award simply because "Plaintiff's Counsel seeks an award for *less* than the lodestar." ROA.25016–2507. The proposed award might have been less than the initial lodestar, but as explained above, that amount had inadequate support and never received proper district court scrutiny. Lodestar is not intended to be a participation trophy. Failing to achieve meaningful relief for the class should have some effect on fees.

**4. The district court abused its discretion when it based its attorney fee approval on Defendant's lack of opposition.**

The district court placed considerable weight on the fact that "Defendant does not object to the attorneys' fees requested by Plaintiffs' Counsel." ROA.2497; *see also* ROA.2499 ("Defendant does not object to any of the fee awards requested by Plaintiffs' Counsel in this instant motion."); ROA.2511 (same). And the district court relied on that non-objection to justify its approval. *See, e.g.*, ROA.2504–2505 ("To begin, the fact that Defendant does not contest the reasonableness of the hourly rates charged by Plaintiffs' Counsel, is, on its own, significant."); 2506 ("[T]he fact that Plaintiffs' Counsel's requested fee award is . . . unopposed by Defendant . . . weighs heavily in favor of finding reasonableness.").

But the district court's position "underestimates . . . the scope of the court's duty under Rule 23 to protect absent class members and to police class action proceedings." *Strong*, 137 F.3d at 848–49 (citing Fed. R. Civ. P. 23(e); *Evans v. Jeff D.*, 475 U.S. 717, 726 (1986)). And this Court expressly rejected the idea that party agreement on fees somehow relieves the district court of its obligation to review the reasonableness of fees. *See id.* at 849–50.

*Strong* explained that the district court cannot delegate its Rule 23(e) duty to scrutinize attorneys' fees to the parties. *Id.* at 850. And a district court that bases its attorney fee approval on the existence of an unopposed settlement agreement "abdicate[s] its responsibility to assess the reasonableness of the attorneys' fees proposed under a settlement of a class action, and its approval of the settlement must be reversed on this ground alone." *Piambino,* 610 F.2d at 1328. Thus, "[e]ven when the district court finds the settlement agreement to be untainted by collusion, fraud, and other irregularities, the court must thoroughly review the attorneys' fees agreed to by the parties in the proposed settlement agreement." *Strong*, 137 F.3d at 850.

Unfortunately, the district court here did not do so.

The district court also did not consider the "clear-sailing" agreement in which "Schwab agreed not to object to these [fee] applications." ROA.1323. Such arrangements can suggest that class counsel has "bargained away something of value to the class." *Briseño v. Henderson,* 998 F.3d 1014, 1026–27 (9th Cir. 2021) (quoting *In re Bluetooth Headset Probs. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011)); *see also Redman,* 768 F.3d at 637 (explaining clear-sailing clauses are

"questionable" because "the defendant won't agree to a clear-sailing clause without compensation"). Thus, this Court has held that a "district court, rightly concerned about the implications of [a] 'clear sailing' fee agreement" properly "applie[s] a heightened standard of care is examining the allegations of collusion" when faced with such an arrangement. *Jones¸* 865 F.3d at 295. That is because, along with party agreement on fees, a clear sailing agreement is a bug, not a feature; a red flag, rather than an "all clear." And the district court erred in finding otherwise.

## IV. STATE ATTORNEYS GENERAL RECEIVED INADEQUATE CAFA NOTICE.

"Notice of a mandatory class settlement, which will deprive class members of their claims . . . requires that class members be given information reasonably necessary for them to make a decision whether to object to the settlement." *Katrina Breaches*, 628 F.3d at 197. The proposed settlement here is just such a mandatory settlement, barring class members from opting out of the proposed settlement. ROA.2465 n.8 ("Plaintiffs seek certification of an injunctive-relief class under Rule 23(b)(2), which is known as a 'mandatory class action.'"). And CAFA requires specific notice be sent to State Attorneys General in particular.

State Attorneys General are responsible for protecting consumer class members under CAFA. *See* 28 U.S.C. § 1715. To allow them to fulfill that role, the law requires that "notice of class action settlements be sent to appropriate state and federal officials" exists "so that they may voice concerns if they believe that the class action settlement is not in the best interest of their citizens." S. Rep. No. 109-14, 2005 U.S.C.C.A.N. 3, 5; *see also id.* ("Notice will also deter collusion between class counsel and defendants to craft settlements that do not benefit the injured parties.").

CAFA includes specific requirements that must be included in this notice to states. These requirements include: (1) "a copy of the complaint and any materials filed with the complaint and any amended complaints[;]" (2) "notice of any scheduled judicial hearing in the class action[;]" (3) "any proposed of final notification to class members of" (a) the right to request exclusion from the class action or (b) if no right of exclusion exists, a statement of that the right does not exist; (4) "any proposed or final class action settlement[;]" (5) any contemporaneous settlement or agreement; (6) "any final judgment or notice of dismissal[;]" (7) "if feasible, the names of class members who reside in each State and the estimated proportionate share of the claims of such members to the

entire settlement" or, if not feasible, "a reasonable estimate of the number of class members residing in each state and the estimated proportionate share of the claims of such members to the entire settlement[;]" and (8) "any written judicial opinion related to the materials described under subparagraphs (3) through (6). 28 U.S.C. § 1715(b)(1)–(8).

Iowa received two pages:

- Page one: a list of two attachments (the complaint and the motion for preliminary approval of the class settlement) that were not attached.

- Page two: a signature block.

ROA.1985–1986. That is incomplete and deficient under any reading of § 1715(b).

To be sure, CAFA states that electronic availability of the complaint is sufficient if "made electronically available through the Internet and such service includes notice of how to electronically access such material." 28 U.S.C. § 1715(b)(1). But actual service is required for all other documents. *Id.* § 1715(b)(2)–(8). And Iowa's notice plainly did not

include a list of affected Iowans or an approximation of how many Iowans were affected.

That omission is particularly notable given that each class member has Schwab account that includes an address, making such information easy to provide. And the two-page document also did not include any "notice of any scheduled judicial hearing in the class action." *See id.* § 1715(b)(2). Perhaps Defendant intended to send more—the signature page is numbered "4"—but the State received only two pages.

The principle of disclosure through notice has been called the 'first and perhaps most important principle for class action governance." Alexandra Lahav, *Fundamental Principles for Class Action Governance*, 37 Ind. L. Rev. 65, 118 (2003). And State Attorneys General use CAFA notices to monitor class settlements and watch for settlement terms that undermine consumer interests. As repeat players in the class action process, Attorneys General can spot arrangements that reward attorneys for settlements that provide little or no meaningful value to class members. Those Attorneys General then are well placed to register their objections. But failure to provide required notice directly undermines those consumer protections.

The district court should have rejected final approval on these deficiencies alone. Instead, it did not even address them. This requires reversal.

## CONCLUSION

This Court should reverse the district court's approval of the class action settlement and the attorney fee award.

Respectfully submitted,

BRENNA BIRD
  *Attorney General*

  */s/ Eric H. Wessan*
ERIC H. WESSAN
  *Solicitor General*
BREANNE A. STOLTZE
  *Assistant Solicitor*
  *General*
IOWA ATTORNEY GENERAL'S
OFFICE
1305 E. Walnut St.
Des Moines, IA 50319
Phone: (515) 823-9117
eric.wessan@ag.iowa.gov

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on March 23, 2026. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

March 23, 2026

*/s/ Eric H. Wessan*
ERIC H. WESSAN
*Solicitor General*

*Counsel for Appellant State of Iowa*

## CERTIFICATE OF COMPLIANCE

Consistent with Rule 27(d)(2) of the Federal Rules of Appellate Procedure, this brief contains 12,345 words, excluding the parts of the document exempted by Rule 32(f), and complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6), as required by Rule 27(d)(1)(E), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

<u>/s/ Eric H. Wessan</u>
ERIC H. WESSAN
*Solicitor General*

*Counsel for Appellant State of Iowa*