# United States Court of Appeals

## for the

# Fifth Circuit

Case No. 25-40774

JONATHAN CORRENTE; CHARLES SHAW; LEO WILLIAMS,

*Plaintiffs-Appellees,*

v.

THE CHARLES SCHWAB CORPORATION,

*Defendant-Appellee,*

v.

SHIYANG HUANG, Objector; STATE OF IOWA, Objector,

*Movants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
NO. 4:22-CV-470, HON. AMOS L. MAZZANT, III, CHIEF JUDGE

## BRIEF OF PLAINTIFFS-APPELLEES

CHRISTOPHER M. BURKE
BURKE LLP
402 West Broadway, Suite 1890
San Diego, California 92101
(619) 369-8244

ALLISON WATSON
BATHAEE DUNNE LLP
3420 Bristol Street, Suite 600
Costa Mesa, California 92626
(213) 458-7075

BRIAN J. DUNNE
EDWARD M. GRAUMAN
BATHAEE DUNNE LLP
901 South MoPac Expressway, Suite 300
Barton Oaks Plaza I
Austin, Texas 78746
(213) 462-2772

YAVAR BATHAEE
BATHAEE DUNNE LLP
445 Park Avenue, 9th Floor
New York, New York 10022
(332) 322-8835

*Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF INTERESTED PERSONS

No. 25-40774, *Corrente v. The Charles Schwab Corporation*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. **Plaintiffs-Appellees**

   a. Jonathan Corrente

   b. Charles Shaw

   c. Leo Williams

2. **Counsel for Plaintiffs-Appellees**

   a. Bathaee Dunne LLP

   b. Yavar Bathaee

   c. Brian J. Dunne

   d. Edward M. Grauman

   e. Andrew Wolinsky

   f. Priscilla Ghita

   g. Allison Watson

    h.  Burke LLP

    i.  Christopher Burke

    j.  Korein Tillery P.C.

    k.  Chad E. Bell

    l.  Capshaw Derieux LLP

    m. Elizabeth L. DeRieux

    n.  S. Calvin Capshaw

**3.**  **Defendant-Appellee**

    a.  The Charles Schwab Corporation

**4.**  **Counsel for Defendant-Appellee**

    a.  King & Spalding LLP

    b.  Veronica S. Moyé

    c.  Gibson, Dunn & Crutcher, L.L.P.

    d.  Jason J. Mendro

    e.  Cynthia Richman

    f.  Daniel G. Swanson

    g.  Jeffrey Liu

    h.  Gillam & Smith, LLP

    i.  Harry Lee Gillam, Jr.

j. Andrew Thompson Gorham

k. Melissa R. Smith

l. Wilmer Cutler Pickering Hale & Dorr L.L.P.

m. Alan E. Schoenfeld

n. David Charles Marcus

o. Jennifer Milici

**5.   Movants-Appellants (Objectors)**

a. Shiyang Huang (*pro se*)

b. State of Iowa

**6.   Counsel for Movant-Appellant State of Iowa**

a. Iowa Department of Justice

b. Brenna Bird

c. Eric H. Wessan

**7.   Settlement Class Members**

a. Persons, entities, and corporations who, as of November 24, 2025 (the date of final approval), were current U.S. brokerage customers of Schwab or any of its affiliates, including customers who previously held accounts at TD Ameritrade

The Charles Schwab Corporation is a publicly held Delaware corporation that has no parent corporation. As of May 22, 2026, no

corporation has filed a Schedule 13G with the U.S. Securities and Exchange Commission disclosing ownership of ten percent or more of stock of The Charles Schwab Corporation.

s/ Brian J. Dunne
Brian J. Dunne

*Counsel for Plaintiffs-Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

Although many aspects of this appeal are straightforward, Plaintiffs-Appellees submit that oral argument could benefit the Court, particularly on the issue of the State of Iowa's standing to appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................i

STATEMENT REGARDING ORAL ARGUMENT ................................. v

TABLE OF CONTENTS ......................................................... vi

TABLE OF AUTHORITIES........................................................ix

JURISDICTIONAL STATEMENT ........................................... 1

STATEMENT OF THE ISSUES.................................................3

INTRODUCTION ................................................................. 4

STATEMENT OF THE CASE .............................................. 10

    A.    The Merger and the Antitrust Suit ................................. 10

    B.    Litigation and Discovery...............................................11

    C.    Settlement Negotiations ...............................................13

    D.    The Settlement Structure ..............................................14

    E.    Preliminary Approval, Notice, and Objections....................17

    F.    The Final Approval and Fee Orders ...................................19

    G.    The Appeals...............................................................22

SUMMARY OF THE ARGUMENT ......................................... 23

STANDARD OF REVIEW....................................................29

ARGUMENT ................................................................... 30

I.    THE STATE OF IOWA LACKS ARTICLE III STANDING
TO APPEAL A PRIVATE CLASS SETTLEMENT IN
WHICH IT IS NOT A CLASS MEMBER AND SUFFERED
NO INJURY OF ITS OWN .......................................... 30

    A.    Iowa Is Not a Class Member and Identifies No
Concrete, Particularized Injury .............................31

    B.    CAFA Confers No Standing Because § 1715(f)
Disclaims Any Expansion of State Authority and
§ 1715(e)(1) Gives the Only Enforcement Right to a
Class Member..................................................33

C.   Iowa's *Parens Patriae* Theory Fails Because Its
Objection Is Indistinguishable from the Private
Objections ...................................................................... 36

D.   The Extinguishment Theory Fails Because Iowa Has
No Claim of Its Own to Extinguish ..................................... 38

E.   The District Court's Acceptance of Iowa's Objection Did
Not Create Appellate Jurisdiction ..................................... 40

II.   THE DISTRICT COURT HAD ARTICLE III
JURISDICTION TO APPROVE THE SETTLEMENT ................. 41

A.   The Named Plaintiffs Assert a Present, Continuing
Injury from Schwab's Challenged Practices and Their
Anticompetitive Effects ..................................................... 42

B.   The Class Is Defined as Current Schwab Customers, So
Under the *Denney* Class-Definition Test It Contains No
Uninjured Members ............................................................ 46

III.   THE DISTRICT COURT DID NOT ABUSE ITS
DISCRETION IN APPROVING A RULE 23(B)(2)
INJUNCTIVE SETTLEMENT THAT PRESERVED
DAMAGES CLAIMS AND SATISFIED RULE 23, DUE
PROCESS, AND CAFA ......................................................... 48

A.   The Settlement Releases Only Classwide Injunctive
Claims; Absent Class Members' Damages Claims
Remain Intact .................................................................... 50

B.   The District Court Applied the Rule 23(e)(2) and *Reed*
Factors Across a Fully Developed Record ........................... 51

C.   The Compliance Program Is Concrete, Uniform, and
Court-Supervised—Not Illusory ......................................... 52

D.   The Named Plaintiffs Adequately Represented the
Class, and the $50 Individual-Damages Release and
$5,000 Service Awards Created No Conflict ........................ 55

1.   The $50 Payments to Resolve Individual
Damages Claims—Which the Class Kept—Did
Not Introduce Conflict or Inadequacy ......................... 56

2.   The $5,000 Service Awards Are Documented, Modest, and Deplete No Class Recovery ..................... 62

3.   Huang's Rules Enabling Act Argument is Meritless (and Unpreserved) ....................................... 64

E.   The Class Notice and the CAFA Notice Satisfied Rule 23, Due Process, and 28 U.S.C. § 1715 ................................ 68

1.   Direct Notice Reached 97% of the Class Months Before the Hearing and Disclosed Everything Rule 23 Requires ........................................................... 69

2.   Iowa's CAFA-Notice Argument Is Its Standing Problem in Another Form ............................................. 70

3.   Any CAFA-Notice Defect Was Non-Jurisdictional and Caused Iowa No Prejudice. .................................. 71

F.   No Appellant Preserved the Tolling-Notice Objection, and the Notice Class Members Received Was Accurate ...... 72

IV.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN AWARDING BELOW-LODESTAR FEES SEPARATELY PAID BY SCHWAB ............................................ 76

A.   The Fee Order Is Not Properly Before this Court ............... 76

B.   The District Court Adequately Weighed the Appropriate Rule 23(h) Considerations as Part of Its Analysis and Findings, and Did Not Abuse Its Discretion as to the Fee Award ............................................ 77

C.   Appellants' *Johnson* Factor Challenge Fails Because the District Court's Analysis Considered All of the Relevant Factors ............................................................... 82

CONCLUSION ............................................................................... 87

CERTIFICATE OF SERVICE ............................................................. 89

CERTIFICATE OF COMPLIANCE ...................................................... 90

# TABLE OF AUTHORITIES

## Cases

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
572 F.3d 221 (5th Cir. 2009) ........................................................... 48

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
458 U.S. 592 (1982) .................................................................... 24, 37

*Allison v. Citgo Petroleum Corp.*,
151 F.3d 402 (5th Cir. 1998) ...................................................... 58, 59

*American Pipe & Constr. Co. v. Utah*,
414 U.S. 538 (1974) ...................................................................... 73

*Angell v. GEICO Advantage Ins. Co.*,
67 F.4th 727 (5th Cir. 2023) ........................................................... 42

*Arbaugh v. Y&H Corp.*,
546 U.S. 500 (2006) .................................................................. 29, 40

*Audler v. CBC Innovis, Inc.*,
519 F.3d 239 (5th Cir. 2008) ........................................................... 32

*Brantley v. Surles*,
804 F.2d 321 (5th Cir. 1986) ........................................................... 85

*California v. IntelliGender, LLC*,
771 F.3d 1169 (9th Cir. 2014) ..................................................... 38, 39

*Central Railroad & Banking Co. v. Pettus*,
113 U.S. 116 (1885) .................................................................. 66, 67

*Chapman v. Tristar Prods., Inc.*,
940 F.3d 299 (6th Cir. 2019) ................................................. 34, 36, 38

*China Agritech v. Michael H. Resh*,
584 U.S. 732 (2018) ................................................................ *passim*

# TABLE OF AUTHORITIES

## Cases

### (*continued*)

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983) .................................................................. 44, 45

*Cruz v. Maverick Cty.,*
957 F.3d 563 (5th Cir. 2020) ....................................................... 77, 82

*DeHoyos v. Allstate Corp.,*
240 F.R.D. 269 (W.D. Tex. 2007)...................................................... 62

*Denney v. Deutsche Bank AG,*
443 F.3d 253 (2d Cir. 2006)........................................................... 41

*Devlin v. Scardelletti,*
536 U.S. 1 (2002) ...................................................................... 73

*Duncan v. JPMorgan Chase Bank, N.A.,*
2016 WL 4419472 (W.D. Tex. May 24, 2016) ...................................... 62

*Earl v. Boeing Co.,*
53 F.4th 897 (5th Cir. 2022).......................................................... 47

*Escalante v. Lidge,*
34 F.4th 486 (5th Cir. 2022).......................................................... 33

*Farber v. Crestwood Midstream Partners L.P.,*
863 F.3d 410 (5th Cir. 2017) ......................................................... 73

*Fessler v. Porcelana Corona de Mexico, S.A. de C.V.,*
23 F.4th 408 (5th Cir. 2022).......................................................... 86

*Flecha v. Medicredit, Inc.,*
946 F.3d 762 (5th Cir. 2020) ......................................................... 47

*Forbush v. J.C. Penney Co.,*
98 F.3d 817 (5th Cir. 1996) ....................................................... 30, 86

# TABLE OF AUTHORITIES

## Cases

*(continued)*

*Frank v. Gaos,*
   586 U.S. 485 (2019) ....................................................................41

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l,*
   695 F.3d 330 (5th Cir. 2012) .....................................................44

*Gonzales v. Cassidy,*
   474 F.2d 67 (5th Cir. 1973) ..............................................60, 61

*Gurule v. Land Guardian, Inc.,*
   912 F.3d 252 (5th Cir. 2018) .....................................................77

*Hollingsworth v. Perry,*
   570 U.S. 693 (2013) ............................................................23, 30

*Huyer v. Njema,*
   847 F.3d 934 (8th Cir. 2017) .....................................................36

*Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.,*
   2018 WL 1602460 (E.D. Tex. Apr. 3, 2018) ...........................81

*In re Apple Inc. Device Performance Litig.,*
   50 F.4th 769 (9th Cir. 2022)......................................................67

*In re Corrugated Container Antitrust Litig.,*
   643 F.2d 195 (5th Cir. 1981) .................................29, 48, 75

*In re Deepwater Horizon,*
   739 F.3d 790 (5th Cir. 2014) ...............................................29, 76

*In re Domestic Air Transp. Antitrust Litig.,*
   148 F.R.D. 297 (N.D. Ga. 1993) ..............................................53

*In re Dry Max Pampers Litig.,*
   724 F.3d 713 (6th Cir. 2013) .....................................................54

# TABLE OF AUTHORITIES

## Cases
*(continued)*

*In re Dynamic Random Access Memory Antitrust Litig.*,
  2013 WL 12387371 (N.D. Cal. Nov. 5, 2013) ........................................53

*In re Flonase Antitrust Litig.*,
  879 F.3d 61 (3d Cir. 2017) ...................................................................36

*In re High Sulfur Content Gasoline Prods. Liab. Litig.*,
  517 F.3d 220 (5th Cir. 2008) ...............................................................85

*In re Katrina Canal Breaches Litig.*,
  628 F.3d 185, 197 (5th Cir. 2010) ............................................... *passim*

*In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg.,
  Sales Pracs. & Prods. Liab. Litig.*,
  27 F.4th 291 (4th Cir. 2022) ................................................................71

*In re Monumental Life Ins. Co.*,
  365 F.3d 408 (5th Cir. 2004) ..........................................................59, 60

*In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico,
  on April 20, 2010*,
  910 F. Supp. 2d 891 (E.D. La. 2012) ...................................................35

*In re Packaged Ice Antitrust Litig.*,
  No. 17-2137,
  2018 WL 4520931 (6th Cir. May 24, 2018) ..........................................36

*In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig.*,
  869 F.3d 551 (7th Cir. 2017) ...............................................................54

*Johnson v. Ga. Highway Express, Inc.*,
  488 F.2d 714 (5th Cir. 1974) ........................................................ *passim*

*Johnson v. NPAS Sols., LLC*,
  43 F.4th 1138 (11th Cir. 2022) ...........................................................65

# TABLE OF AUTHORITIES

## Cases
### (*continued*)

*Johnson v. NPAS Sols., LLC,*
  975 F.3d 1244 (11th Cir. 2020) .......................................... 65, 66, 67, 68

*Kincade v. Gen. Tire & Rubber Co.,*
  635 F.2d 501 (5th Cir. 1981) ...................................................... 61, 62

*Koby v. ARS Nat'l Servs., Inc.,*
  846 F.3d 1071 (9th Cir. 2017) ........................................................ 54

*Kohen v. Pacific Inv. Mgmt. Co.,*
  571 F.3d 672 (7th Cir. 2009) ......................................................... 41

*Kurtz v. Kimberly-Clark Corp.,*
  142 F.4th 112 (2d Cir. 2025) ......................................................... 35

*La. Power & Light Co. v. Kellstrom,*
  50 F.3d 319 (5th Cir. 1995) ........................................................... 87

*Longden v. Sunderman,*
  979 F.2d 1095 (5th Cir. 1992) ....................................................... 30

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ............................................................ *passim*

*M.D. ex rel. Stukenberg v. Perry,*
  675 F.3d 832 (5th Cir. 2012) ......................................................... 59

*Maher v. Zapata Corp.,*
  714 F.2d 436 (5th Cir. 1983) ......................................................... 75

*Maldonado v. Ochsner Clinic Found.,*
  493 F.3d 521 (5th Cir. 2007) ...................................................... 57, 59

*Moses v. N.Y. Times Co.,*
  79 F.4th 235 (2d Cir. 2023) ....................................................... 67, 71

# TABLE OF AUTHORITIES

## Cases
(*continued*)

*Murray v. Grocery Delivery E-Servs. USA Inc.*,
  55 F.4th 340 (1st Cir. 2022) ...................................................67

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ..................................................................43

*Nat'l Veterans Legal Servs. Program v. United States*,
  170 F.4th 1353 (Fed. Cir. 2026) ...........................................67

*O'Shea v. Littleton*,
  414 U.S. 488 (1974) ................................................................45

*Paterson v. Texas*,
  308 F.3d 448 (5th Cir. 2002) .................................................32

*Piambino v. Bailey*,
  610 F.2d 1306 (5th Cir. 1980) ...............................................85

*Reed v. Gen. Motors Corp.*,
  703 F.2d 170 (5th Cir. 1983) ........................................*passim*

*Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*,
  32 F.3d 205 (5th Cir. 1994) ...........................23, 30, 31, 33

*Russello v. United States*,
  464 U.S. 16 (1983) ..................................................................34

*Scott v. Dart*,
  99 F.4th 1076 (7th Cir. 2024).........................................66, 68

*Stringer v. Whitley*,
  942 F.3d 715 (5th Cir. 2019) .................................................44

*Strong v. BellSouth Telecomms., Inc.*,
  137 F.3d 844 (5th Cir. 1998) ...........................................30, 78

# TABLE OF AUTHORITIES

## Cases
(*continued*)

*Summers v. Earth Island Inst.*,
 555 U.S. 488 (2009) ...................................................................35

*Susan B. Anthony List v. Driehaus*,
 573 U.S. 149 (2014) ...................................................................43

*Torres v. SGE Mgmt., L.L.C.*,
 945 F.3d 347 (5th Cir. 2019). .....................................................85

*TransUnion LLC v. Ramirez*,
 594 U.S. 413 (2021) ........................................................ 26, 35, 47

*Trump v. CASA, Inc.*,
 606 U.S. 831 (2025) ...................................................................38

*Trustees v. Greenough*,
 105 U.S. 527 (1882) .............................................................. 66, 67

*United States v. Cotton*,
 535 U.S. 625 (2002) ...................................................................29

*Wal-Mart Stores, Inc. v. Dukes*,
 564 U.S. 338 (2011) .............................................................. 59, 60

*Wilson v. Centene Mgmt. Co.*,
 168 F.4th 217 (5th Cir. 2026)......................................................*passim*

## Statutes and Rules

15 U.S.C. § 15 ..............................................................................87

15 U.S.C. § 18 ..........................................................................1, 87

28 U.S.C. § 1291 ...........................................................................1

28 U.S.C. § 1331 ...........................................................................1

# TABLE OF AUTHORITIES

## Statutes and Rules

(*continued*)

28 U.S.C. § 1715 ........................................................................ *passim*

FED. R. CIV. P. 12 ................................................................................29

FED. R. CIV. P. 23 ......................................................................... *passim*

IOWA CODE § 13.2 ..............................................................................40

IOWA CODE § 714.16(7) .....................................................................40

IOWA RULE OF CIVIL PROCEDURE 1.262-1.263...........................................40

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because this antitrust class action asserted claims under Section 7 of the Clayton Act, 15 U.S.C. § 18, and sought relief under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26. The district court entered its Final Approval Order and Fee Order on November 24, 2025, disposing of all claims and dismissing the action with prejudice while retaining jurisdiction to enforce the settlement. ROA.2441-92; ROA.2493-521.

Objector Huang filed a notice of appeal from both orders on November 24, 2025. ROA.3123. The State of Iowa filed a notice of appeal from both orders on December 19, 2025. ROA.3125-26. Both notices were directed to final orders disposing of all claims, and this Court's jurisdiction over Huang's appeal rests on 28 U.S.C. § 1291.

Iowa's standing to pursue this appeal is contested. Plaintiffs-Appellees moved to dismiss Iowa's appeal for lack of Article III standing because Iowa is not a class member, holds no Schwab account, asserts no constitutional injury, and identifies no independent settlement-objection authority. Dkt. 44 (Jan. 26, 2026). Iowa responded, Dkt. 59 (Mar. 6, 2026), and Plaintiffs-Appellees replied, Dkt. 66 (Mar. 13, 2026). This

Court carried that motion with the merits rather than resolving it separately. Dkt. 74 (Mar. 17, 2026). The question whether Iowa has Article III standing to appeal remains open and is presented in Section I, *infra.*

## STATEMENT OF THE ISSUES

1. Whether the State of Iowa—which is not a class member, holds no Schwab account, identifies no state-owned claim, and asserts no redressable injury of its own—has Article III standing to appeal the approval of a private class settlement.

2. Whether the district court had Article III jurisdiction to approve a Rule 23(b)(2) settlement for current Schwab customers who alleged ongoing price-improvement injury traceable to Schwab's order-routing practices and redressable by the settlement's compliance program.

3. Whether the district court abused its discretion in certifying and approving a Rule 23(b)(2) injunctive settlement that released only classwide non-monetary claims, preserved every absent class member's damages claim, followed direct notice to 97% of the class, and satisfied Rule 23.

4. Whether the district court abused its discretion in awarding fees below counsel's lodestar and separately paid by Schwab.

3

**INTRODUCTION**

After three years of antitrust litigation, notice to more than 24 million class members, a fairness hearing, and two detailed orders, the district court approved a private Rule 23(b)(2) class settlement. Three challengers now ask this Court to undo it: the State of Iowa, which identifies no injury of its own and lacks standing; serial class-action objector Shiyang Huang ("Huang"), who misdescribes the release; and an amicus, Alex Kozinski ("Kozinski"), whose brief presses objections no appellant raised in the district court.

The settlement the district court approved is straightforward. It secures forward-looking antitrust relief for current Schwab customers: a four-year compliance program, independent consultant review of Schwab's order-routing and price-improvement practices, annual certifications, and retained district-court jurisdiction to enforce the agreement. ROA.1340-43. The release is limited to classwide injunctive, equitable, and other non-monetary claims. ROA.1339 ("Settlement Class Released Claims"); *see also* ROA.1343-44. It expressly preserves every absent class member's damages claim. ROA.1339.

The settlement followed a substantial record. Plaintiffs alleged that Schwab's acquisition of TD Ameritrade reduced competition in retail order flow and diminished the price improvement customers received on trades. ROA.37, 44, 130-33. After Schwab's motion to dismiss was denied, the parties took executive and Rule 30(b)(6) depositions, produced 218,319 documents totaling 950,021 pages, exchanged 6.5 terabytes of financial data covering roughly 6.4 billion trades, and mediated before former United States District Judge Nancy F. Atlas. ROA.1397-400, 1424-25, 2442. At the approval stage, Plaintiffs supported and quantified the value of the prospective relief through expert analysis of Schwab's order-routing and price-improvement practices. ROA.2832-62, 2205-44. The district court credited that evidence and found the compliance program will produce price-improvement gains for class members, citing the expert quantification of gains of approximately 1.8% to 2.4%, translating into $10.7 million to $14.5 million in monthly savings (roughly $128.4 million to $174 million annually) for Schwab's retail customers. ROA.2454, 2477, 2489.

The district court subjected the settlement to rigorous review. It directed notice, held a fairness hearing, "read every single one of the

5

objection letters," raised for itself whether *China Agritech* limited *American Pipe* tolling for later class claims, and entered a 52-page Final Approval Order and a 29-page Fee Order. ROA.2441-92, 2493-521, 2922-23, 2931. The Final Approval Order addressed Article III standing under both settlement-class frameworks: one requiring an assessment of named-plaintiff standing, and the other asking whether the class included uninjured members. ROA.2445-49. The order found direct notice reached 97% of the class and found there were about 70 objections (the "about" coming from different ways such objections could be counted; as noted earlier, the district court read every piece of paper submitted as an objection). ROA.2468-69. It credited arm's-length negotiations, litigation risks, and meaningful relief. ROA.2472-77.

The objectors—or more accurately, Mr. Huang, because he is the only complainant with standing—ask this Court to undo a fully litigated, indisputably beneficial settlement on grounds the district court already considered and rejected. Iowa's appeal should be dismissed, and the Final Approval Order and Fee Order should be affirmed. Four points underscore why:

*First*, Iowa lacks Article III standing to appeal, and its appeal should be dismissed. Iowa is not a class member, holds no Schwab account, identifies no state-owned claim, and asserts only derivative interests of Iowa residents who are themselves class members already represented in the case. Nor does the notice provision of the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1715, supply the missing injury or redressability. Section 1715(f) disclaims any expansion of state authority, and § 1715(e)(1) assigns the statutory remedy for deficient notice to class members themselves, not to a State claiming independent settlement-objection authority.

*Second*, the district court had Article III jurisdiction to approve the settlement. The named plaintiffs are current Schwab customers who alleged a continuing price-improvement injury traceable to the merger, and each has remained a Schwab customer and plans to continue as such—and to keep trading. ROA.37, 44, 130-33, 2446-49, 2485-86. The settlement class is drawn to that same group: current Schwab customers whose future trades will run through the order-routing and price-improvement practices the compliance program addresses. ROA.1338, 2448-49, 2485-86. The district court further found that the injunctive-

relief compliance program will "increase the amount of money in the pocket of the class members," ROA.2454 n.6, crediting expert evidence that the program could produce price-improvement gains of 1.8% to 2.4%, or $10.7 million to $14.5 million monthly for Schwab's retail customers. ROA.2454, 2477, 2489. This evidence, credited by the district court, ties the standing elements together: Plaintiffs' injury flows from Schwab's order-routing practices; price-improvement gains put money in those same Plaintiffs' pockets and flow from the compliance program directed at those same order-routing practices. Article III injury, traceability, and redressability are each established for the named plaintiffs—and for other Schwab retail traders (*i.e.*, the Settlement Class).

*Third*, Appellants' settlement-approval objections describe a settlement the district court did not approve. That is, Huang and Iowa describe a supposed damages settlement that paid the class nothing. The district court, however, approved a Rule 23(b)(2) injunction settlement that released only non-monetary class claims and preserved absent class members' damages claims. That structure answers the fairness and adequacy objections: Rule 23(e) required review of the prospective relief obtained for the non-monetary claims released, and the named plaintiffs'

8

$50 payments resolved only their own individual damages claims while absent members kept theirs.

And the notice objections fare no better. The notice accurately told class members they were "not releasing any damage or monetary claims against Schwab," ROA.1155, and no appellant raised amicus Kozinski's new theory—that the class notice should have warned members that classwide damages claims were not tolled by the filing of this case under Supreme Court precedent, *see* Kozinski Br. 8-9.

*Finally*, the Fee Order reflects a thorough review of an award below counsel's lodestar. The district court calculated a $10,803,933.50 lodestar, reviewed counsel's hours, rates, expenses, and service-award evidence, addressed objections, and awarded $8.25 million—about $2.55 million below that lodestar, a 0.763 multiplier and roughly a 24% reduction from counsel's documented time. ROA.2493-521.

The settlement approved by the district court released only classwide injunctive relief claims, preserved every absent member's damages claim, and obtained four years of court-supervised compliance the district court found will "increase the amount of money in the pocket of the class members," ROA.2454 n.6, an out-of-pocket gain valued at

9

$128.4 million to $174 million a year in expert testimony credited by the district court, ROA.2454, 2477, 2489—miles away from the "zero" figure implied in (indeed, required by) Appellants' standing arguments.

The Court should dismiss Iowa's appeal and affirm the Final Approval Order and the Fee Order.

## STATEMENT OF THE CASE

### A.    The Merger and the Antitrust Suit

In October 2020, The Charles Schwab Corporation completed its acquisition of TD Ameritrade, combining two of the largest brokerage firms in the United States. ROA.37. On June 2, 2022, three Schwab retail brokerage customers—Jonathan Corrente, Charles Shaw, and Leo Williams—filed a putative class action under Section 7 of the Clayton Act, alleging the Schwab-TD Ameritrade merger substantially lessened competition in an asserted retail order-flow market and reduced the price improvement customers received on their trades. ROA.37, 44, 130-33, 2441. The complaint ran 103 pages and 488 paragraphs, and it sought damages as well as equitable relief, including divestiture and segregation. ROA.34-139. Schwab moved to dismiss, and the district court denied that motion on February 24, 2023. ROA.410-23, 2441-42.

The alleged injury arose from the mechanics of retail order routing. The complaint alleged that Schwab routes customer orders to market makers, that market makers pay for order flow, and that retail brokers compete by passing part of that value back to customers through rebates, price improvement, or similar trading-cost reductions. ROA.37-44. Plaintiffs further alleged that, after the merger, Schwab's increased share of retail order flow (coupled with competitive conditions, including entry barriers) allowed it to reduce pass-through to retail customers— meaning lower rebates, lesser price improvement, and diminished liquidity improvement for Schwab retail traders against a non-merger but-for world. ROA.37, 44, 130-33. The complaint supported that theory with a statistical analysis of Form 606 routing allocations, alleging that the merger shifted routing distributions and concentrated trades with Citadel and Virtu, the two largest market makers by transaction volume. ROA.125-29. Plaintiffs' experts later addressed the same order-routing and price-improvement mechanics. ROA.2832-62, 2205-44.

## B.    Litigation and Discovery

The parties litigated for more than three years and conducted extensive discovery. Plaintiffs served written discovery, deposed Schwab

through a Rule 30(b)(6) designee who was a Senior Vice President, noticed seven key Schwab and TD Ameritrade executives, and completed four executive depositions before settlement discussions began. ROA.1398, 2442. Those executives included Schwab's Managing Director of Market and Execution Services; Managing Director of Corporate Development; Managing Director of Trading Order Management and Risk; and Managing Director of Trading Operation, Equity, Options and Futures Trading Operations. ROA.1398. Schwab produced 218,319 documents comprising 950,021 pages, which plaintiffs reviewed, and plaintiffs filed two motions to compel—one addressing documents withheld under a claimed confidential-supervisory-information privilege and another seeking the DOJ merger-review file. ROA.1398-99, 2442.

Data discovery was likewise substantial. Schwab produced 6.5 terabytes of financial data, covering approximately 6.4 billion individual trades placed by Schwab and TD Ameritrade customers from 2019 to 2023. ROA.1398, 2442. Plaintiffs retained econometric and industrial-organization experts to build a multivariate regression model testing whether the merger reduced price improvement below but-for levels, and retained a finance professor specializing in securities trading and market

structure to study how the retail order-flow market affects price formation and investor transaction costs. ROA.1398. This discovery and expert record reflected the scope and difficulty of proving the claims, and it supported the district court's finding that the litigation was complex and its outcome at trial uncertain. ROA.2474-75.

### C.   Settlement Negotiations

The parties mediated in person on July 9, 2024, before the Honorable Nancy F. Atlas, a former United States District Judge. ROA.1399, 1424, 2442. After further negotiations with Judge Atlas's assistance, the parties signed a term sheet on September 20, 2024, and reported an agreement in principle to the court on September 27, 2024. ROA.1399-1400. On December 12, 2024, they executed the Stipulation and Agreement of Settlement. ROA.1400, 2443.

After the settlement was executed, the parties mediated the fee and expense issue separately on January 24, 2025, and agreed to cap their fee request at $8.25 million and expenses at $700,000, plus service awards of up to $5,000 for each of the three named plaintiffs. ROA.1400, 2479, 2494. Judge Atlas attested that the negotiations were at arm's length and showed no apparent collusion. ROA.1425, 2472.

### D.    The Settlement Structure

The settlement is a Rule 23(b)(2) injunctive-relief-only settlement. The district court certified the following settlement class:

> persons, entities, and corporations who are current U.S. brokerage customers of Schwab or any of its affiliates, including customers who previously held accounts at TD Ameritrade. Excluded from the Settlement Class are: (a) the Defendant; (b) its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates; and (c) the judicial officers and their immediate family members and associated court staff assigned to this case.

ROA.1176, 1338, 2451.

The classwide consideration is a forward-looking antitrust compliance program: Schwab is to retain an independent third-party consultant, submit to review of its order-routing and price-improvement practices, respond to recommendations, and certify compliance annually for four years, subject to the district court's retained jurisdiction. ROA.1340-43, 2462.

Plaintiffs supported that prospective relief with expert valuation work by Dr. Hal Singer and Ted Tatos. Their analysis examined how the compliance program could be expected to affect Schwab's order-routing practices in the retail order-flow market, where market makers pay for

order flow and compete in part by providing price improvement against the National Best Bid and Offer. ROA.2832-62, 2205-44. Dr. Singer and Mr. Tatos used two alternative methodologies grounded in public Form 605 reports filed by market makers, Form 606 reports filed by brokers such as Schwab, Schwab execution-quality data used in its own order-routing review, and internal data produced in discovery. ROA.2851-58, 2340.

One methodology used Schwab's historical E/Q-ratio trend as a benchmark for expected price improvement; another compared market-maker price-improvement performance with Schwab's order-allocation rankings and evaluated how a compliance program could require documentation or adjustment where those rankings diverged. ROA.2852-58. As the district court recounted, the expert analysis showed the compliance program "could yield price improvement gains of approximately 1.8% to 2.4%," translating to "$10.7 million to $14.5 million in monthly savings—or roughly $128.4 million to $174 million annually—for Schwab's retail customers." ROA.2454. Those gains map directly onto the harm the complaint alleged—reduced price improvement on Schwab customers' executed trades—so the compliance

15

program redresses the precise effect the case was brought to remedy. ROA.37, 44, 130-33.

Huang separately moved to exclude the expert analysis on admissibility grounds. ROA.1861-72. Singer and Tatos responded that Huang's criticisms did not alter their opinions. ROA.2205-44. The district court considered the admissibility challenge, credited the expert evidence, and overruled the objections to the adequacy of the relief, resolving the dispute within the approval order rather than by a separate *Daubert* order. ROA.2454, 2477, 2489. Huang now argues on appeal that the court nonetheless relied on inadmissible or conjectural expert evidence.

The release is limited by its terms. The "Settlement Class Released Claims" are defined as "any and all injunctive, equitable and non-monetary claims or remedies . . . ," and the Stipulation states that those released claims "shall not include any damages or monetary claims or any future claims relating to enforcement of the terms of this Stipulation." ROA.1339. The three named plaintiffs separately settled their own individual damages claims for $50 each, and each received a

16

$5,000 service award; no absent class member's damages claim was released. ROA.1340, 2443, 2509-11.

### E.     Preliminary Approval, Notice, and Objections

On February 4, 2025, plaintiffs moved for preliminary approval, and on February 19, 2025, the district court granted such approval, certified the settlement class under Rule 23(b)(2), directed notice, and set a fairness hearing for August 28, 2025. ROA.2443-44. The notice program was designed and administered by a professional administrator. ROA.1134-35. Of 25,539,532 class members noticed, 24,165,364—approximately 97%—were reached; the first batch of 19,586,731 notices was sent on April 14, 2025, and 73.6% of the class received direct notice at least 136 days before the hearing. ROA.1438, 2468-69, 2487.

The long-form notice told class members what they would release in exchange for the injunctive relief: they "are not releasing any damage or monetary claims against Schwab or any future claims relating to enforcement of the Settlement terms." ROA.1155. The notice also disclosed the compliance program, the mandatory no-opt-out structure, the binding effect of the settlement, the objection procedure, the hearing date, and the fee and service-award requests. ROA.1151-59, 2467-68.

17

Approximately 70 objections were filed—about 0.00028% of the class. ROA.2469. Huang objected on June 9, 2025, and filed a revised objection on July 23, 2025. ROA.1254-65, 1831-43. The State of Iowa objected on July 29, 2025; Iowa did not claim to be a class member or to hold a Schwab account, but invoked the Class Action Fairness Act, Iowa law, and its asserted *parens patriae* authority as a basis for standing. ROA.1956-83.

At the August 28, 2025 fairness hearing, plaintiffs' counsel appeared and argued for approval; no objector appeared. ROA.2444, 2919-56. The district court itself raised a *China Agritech* question at the hearing—whether, given that decision's bar on using a prior class action's tolling to bring a later, time-barred class action, approving an injunctive-only settlement now could foreclose a future classwide damages action—and asked whether approval would foreclose the ability to file any kind of class action, and heard argument on the point. ROA.2929-34. Huang later separately moved for a ruling on plaintiffs' Article III standing, and plaintiffs responded. ROA.2420-24.

18

### F.    The Final Approval and Fee Orders

After the fairness hearing, the district court entered two written orders: a 52-page Final Approval Order and a 29-page Fee Order. ROA.2441-92, 2493-521. The court conducted the rigorous analysis Rule 23(e) requires. At the hearing, the court noted that it had "read every single one of the objection letters," observed that no objector had appeared, and identified the principal objection themes as "there's no monetary benefit to the class" and "the attorneys are getting too much." ROA.2922-23. The written order then grouped the roughly 70 objections into four categories—Article III standing, notice, no monetary benefit, and fees—and addressed each. ROA.2444, 2483-90.

The Final Approval Order expressly evaluated Article III standing. The court applied both the named-plaintiff-focused *Kohen* test and the class-definition-focused *Denney* test and found the settlement satisfied "both the *Kohen* and the *Denney* test." ROA.2446-49. Under the named-plaintiff test, the court found that each named plaintiff identified an injury in fact: "underpayment of their order flow, in the form of reduced price improvement." ROA.2448. Under the class-definition test, it found that the class was limited to persons who could allege causation and

19

injury. ROA.2448. When overruling the Article III standing objections, the court reiterated that the merger harm was "ongoing," that current Schwab brokerage customers "will continue to suffer harm" absent injunctive relief, and that each named plaintiff had sworn he intended to remain a Schwab customer and execute additional trades. ROA.2485-86.

The court then analyzed Rule 23(a), Rule 23(b)(2), notice, and settlement fairness. ROA.2449-2483. On notice, it found that 24,165,364 of 25,539,532 class members—97% of the class—received direct notice and that only about 70 class members, or 0.00028% of the class, objected. ROA.2468-69. It also found that 73.6% of the class received direct notice at least 136 days before the hearing. ROA.2487. On that record, the court found the notice "reasonable" and compliant with Rule 23 and due process. ROA.2464-69, 2486-88.

The district court grounded its fairness finding in specific record evidence. It credited Judge Atlas's sworn statement that the negotiations were "hard-fought," civil, professional, non-collusive, and at arm's length. ROA.2472. It considered the complexity and risk of antitrust class litigation, then found that the settlement supplied a "clear process for undisputed prospective relief" tailored to the alleged anticompetitive

20

harm. ROA.2474. And it credited plaintiffs' expert evidence that the compliance program would yield additional price improvement for Schwab brokerage customers, quantified at approximately $10.7 million to $14.5 million per month, concluding that the relief was "more than fair" to the class against the risk that continued litigation could leave the class with no remedy. ROA.2477.

The hearing also shows the court engaged the *China Agritech* objection now pressed solely by amicus. The court itself raised the *China Agritech* case, asking whether approval would "foreclose the ability to file any kind of class action" and whether "any ability to get monetary damages will be foreclosed." ROA.2931. Schwab answered that, in its view, the limitations period for a new damages class action had expired before the settlement and that the settlement was "not cutting off claims that otherwise would have existed." ROA.2948-49. Schwab also emphasized that individuals retained an "opportunity to seek relief because there's no release of individual damage claims here." ROA.2949. No objector—in a written objection or at the fairness hearing—argued that the class notice should have warned members that under *China*

21

*Agritech*, classwide damages claims were not tolled upon the filing of this class action.

The Fee Order reflected the same independent review. The district court began with the lodestar method, calculated a lodestar of $10,803,933.50, and reviewed counsel's time records, rates, and expenses, plus the service awards. ROA.2497-21. The court found counsel's evidence supported the reasonableness of the hours submitted, citing the case's complexity, counsel's pre-suit investigation, three years of litigation, complicated antitrust and securities issues, 218,319 documents, 950,021 pages of production, and 6.5 terabytes of financial data. ROA.2501-02, 2518. The court addressed block billing and found no reduction warranted. ROA.2502. It separately addressed Iowa's objections to rates, hours, and the requested 0.763 multiplier, and overruled them. ROA.2516-19. The award ultimately approved—$8.25 million in fees and $686,492.60 in expenses—was below lodestar and separately paid by Schwab. ROA.2494, 2507, 2520.

## G.    The Appeals

Huang and Iowa appealed. ROA.2522, 3125-26.

Plaintiffs-Appellees moved to dismiss Iowa's appeal for lack of Article III standing, arguing that Iowa is not a class member, holds no Schwab account, identifies no injury of its own, and seeks only to assert the interests of Iowa residents who are themselves absent class members. Dkt. 44. Iowa opposed, and Plaintiffs-Appellees replied. Dkts. 59, 66. On March 17, 2026, this Court carried the motion with the case. Dkt. 74.

Alex Kozinski filed an amicus brief on March 30, 2026, as amicus supporting Appellants and pressing a new "notice" objection under *China Agritech* that no appellant raised below or in their own briefs on appeal. Dkt. 88.

## SUMMARY OF THE ARGUMENT

**I.** Iowa's appeal should be dismissed for lack of Article III standing. An appellant must possess its own concrete, redressable stake and may not appeal merely to champion the rights of another. *Hollingsworth v. Perry*, 570 U.S. 693, 705-06 (2013); *Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*, 32 F.3d 205, 208 (5th Cir. 1994). Iowa is not a class member, holds no Schwab account, and identifies no state-owned claim; the injury it asserts belongs to Iowa residents who are themselves represented class members that received notice and could object. CAFA's

23

notice scheme supplies neither the missing injury nor redressability, and it does not authorize vacatur of an approved settlement at a State's request: 28 U.S.C. § 1715(e)(1) sets forth the consequence for providing deficient notice to class members, and § 1715(f) disclaims any expansion of state authority. *See Chapman v. Tristar Prods., Inc.*, 940 F.3d 299, 305-07 (6th Cir. 2019).

Iowa argues that it has standing because CAFA's notice scheme casts state attorneys general as monitors of class settlements, because it appears as *parens patriae* for the economic well-being of Iowa consumers, and because the settlement may extinguish Iowa's own future enforcement claim. Dkt. 59 at 6-16; ROA.1967-68. None of these clothes Iowa with injury. The interest Iowa asserts is the private financial interest of Iowa residents who are themselves class members, not a quasi-sovereign interest apart from them, so the *parens patriae* theory fails. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 600-07 (1982). Iowa identifies no Iowa enforcement action and no Iowa-owned claim for the settlement to extinguish, so its extinguishment theory—that approving the settlement would wipe out Iowa's own future enforcement claim against Schwab—rests on a conjectural injury that

24

cannot support Article III standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). And Iowa's participation in the district-court proceeding did not manufacture appellate jurisdiction. Iowa lacks Article III injury and redressability.

**II.** The district court had Article III jurisdiction to approve the settlement. The named plaintiffs are current Schwab customers who alleged a present, ongoing injury—reduced price improvement on the trades they continue to execute—and swore they would remain customers and keep trading. ROA.37, 44, 130-33, 1415-23, 2448, 2485-86. That is a continuing injury, not a *Lujan* "some day" intention, and the compliance program redresses it by directing the order-routing and price-improvement practices that cause it. ROA.2446-49. The district court evaluated standing under both the named-plaintiff *Kohen* test and the class-definition *Denney* test and found each satisfied, and it credited expert evidence valuing the program at 1.8% to 2.4% additional price improvement, or $10.7 million to $14.5 million per month. ROA.2446-49, 2454, 2477, 2489. Standing was proper under either the "class-certification approach" or "standing approach" posited by this Court after the Supreme Court's *TransUnion* decision. *See, e.g., Wilson v. Centene*

25

*Mgmt. Co.*, 168 F.4th 217, 230-31 (5th Cir. 2026). Because both tests are satisfied, the district court's jurisdiction does not turn on which governs. Further, Huang argues for a per-member burden of proof, but no decision of this Court has imposed such a burden, and the Supreme Court did not reach the question in *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 & n.4 (2021). *See* Huang Br. 32-33.

**III.** The district court did not abuse its discretion in approving the settlement. Huang and Iowa describe a settlement entirely different from the one before this Court—a damages settlement that paid the class nothing, when the district court approved a Rule 23(b)(2) injunction settlement that released only classwide non-monetary claims and preserved every absent member's damages claim. ROA.1339, 2477, 2489. The fairness analysis stems from the actual settlement, not a phantom one: the settlement is measured against the classwide injunctive claims it actually released, not against a hypothetical damages recovery the class never gave up.

The court applied Rule 23(e)(2) as informed by the *Reed* factors—arm's-length negotiation, the complexity and likely duration of the litigation, the stage of the proceedings, and the reaction of the class—

across a developed record. *See Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983). It credited a former United States District Judge's account of an arm's-length mediation, bounded the range of recovery, weighed the court-supervised compliance program against the litigation risk, found direct notice reached approximately 97% of more than 25 million class members, and overruled roughly 70 objections. ROA.2468-69, 2472-77. *Katrina* is the objectors' lead authority, but it confirms that this Court should affirm: the defect that required reversal there— extinguishment of damages claims without disclosure—is absent here. *See In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 197 (5th Cir. 2010).

The remaining objections do not change the result. The tolling-notice objection—the contention that the class notice should have warned members that classwide damages claims (as opposed to individual damages claims) were not tolled by the filing of this case, Kozinski Br. 8-10—was raised by no appellant in the district court, rests on a misreading of a notice that affirmatively told members their damages claims were not released, and fails on the law because *China Agritech* itself holds that the tolling rule abridges no substantive right. The named plaintiffs' separate $50 payments, which Huang challenges as a named-plaintiff

adequacy and conflict problem, resolved only the representatives' own damages claims, while every absent member kept theirs; the $5,000 service awards rest on findings and deplete no class recovery; and the class and CAFA notices satisfied Rule 23, due process, and § 1715, with any CAFA shortfall non-jurisdictional and remediable only as § 1715(e)(1) provides.

**IV.** The fee award should be affirmed. Huang, Iowa, and the amicus challenge the award on a single ground—the Fee Order's statement that the district court did not run the full twelve-factor analysis—and contend that statement shows an abdication of the district court's duty under Rule 23(h) to determine independently that the fee was reasonable. The record refutes this charge. The court calculated a $10,803,933.50 lodestar, scrutinized hours, rates, expenses, and block-billing objections against a complex three-year record—218,319 documents, 950,021 pages, and 6.5 terabytes of trading data—and awarded $8.25 million, roughly 24% below the documented lodestar, plus $686,492.60 in expenses separately paid by Schwab and carved from no class recovery. ROA.2497-513. That award came only after the district court expressly set forth the *Johnson* factors, then analyzed them, in his Fee Order—and scrutinized

28

counsel's hours, billing rates, expenses, and block-billing objections against the three-year record, exercising the independent judgment Rule 23(h) requires.

## STANDARD OF REVIEW

Iowa's standing presents a jurisdictional question subject to *de novo* review. Subject-matter jurisdiction is not waivable and may be raised at any stage. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506, 514 (2006) (citing FED. R. CIV. P. 12(h)(3) and *United States v. Cotton*, 535 U.S. 625 (2002)).

Questions of law as to the Article III jurisdiction of the district court are reviewed *de novo*. *In re Deepwater Horizon*, 739 F.3d 790, 798 (5th Cir. 2014).

Class certification and the approval of a class settlement are reviewed for abuse of discretion, with underlying legal conclusions reviewed *de novo* and factual findings for clear error; the approval "is not to be upset unless the [district] court clearly abused its discretion." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 207 (5th Cir. 1981) (quotation marks and citation omitted); *In re Deepwater Horizon*, 739 F.3d at 798. The adequacy of class notice is reviewed for abuse of discretion. *See In re Katrina Canal Breaches Litig.*, 628 F.3d at 197-99.

29

Because an abuse of discretion includes a decision resting on an error of law, the legal questions embedded in settlement approval and the fee award are reviewed *de novo* within that standard.

A fee award is reviewed for abuse of discretion, with factual findings reviewed for clear error. *Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 849-50 (5th Cir. 1998) (citing *Forbush v. J.C. Penney Co.*, 98 F.3d 817, 821 (5th Cir. 1996) and *Longden v. Sunderman*, 979 F.2d 1095, 1100 (5th Cir. 1992)).

## ARGUMENT

### I.    THE STATE OF IOWA LACKS ARTICLE III STANDING TO APPEAL A PRIVATE CLASS SETTLEMENT IN WHICH IT IS NOT A CLASS MEMBER AND SUFFERED NO INJURY OF ITS OWN

To have standing, an appellant must show a concrete injury to itself that this Court can redress. *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013) (appellant must possess Article III standing); *Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*, 32 F.3d 205, 208 (5th Cir. 1994) (party may not appeal merely to "champion the rights of another"). Iowa has no such stake. It is not a settlement-class member; it does not claim to have held a Schwab or TD Ameritrade brokerage account; and it identifies no state-owned claim or redressable injury of its own. Iowa instead asserts

interests of Iowa consumers, CAFA notice authority, Iowa-law attorney-general authority, and *parens patriae.* Dkt. 59 at 6-18; ROA.1967-68. All fail. Iowa had no standing to object, and it has no standing to appeal.

### A.    Iowa Is Not a Class Member and Identifies No Concrete, Particularized Injury

Iowa's objection identified no injury to the State. It asserted that the challenged settlement affects Iowa class members and invoked the Iowa Attorney General's asserted authority to act when, in the Attorney General's judgment, the State is interested. ROA.1967-68. But none of this is concrete injury to the State of Iowa itself. The settlement binds current Schwab customers and releases only their classwide injunctive claims; it imposes no obligation on Iowa, takes no money from Iowa, adjudicates no Iowa enforcement action, and releases no claim belonging to Iowa. ROA.2451, 2477, 2489.

Iowa's asserted injury is therefore the alleged injury of other persons—class members who are already represented in a certified class, already received notice, could object, and did object. Direct notice reached 24,165,364 of 25,539,532 class members, and roughly 70 objections were filed. ROA.2468-69. A State may not appeal to "champion the rights of another." *Rohm & Hass*, 32 F.3d at 208; *see Audler v. CBC Innovis, Inc.*,

519 F.3d 239, 248 (5th Cir. 2008) (appellant may not seek relief based on another person's rights).

This Court's opinion in *Paterson v. Texas*, 308 F.3d 448 (5th Cir. 2002), is on point. *Paterson* involved a private nationwide class settlement of claims against Western Union. *Id.* at 449. Texas objected to the settlement's treatment of unclaimed funds. *Id.* at 449-50. It argued that Texas law required a different result and appealed after the district court approved the settlement. *Id.* at 450. But Texas was not a class member. *Id.* It claimed instead to stand in the shoes of Texas class members whose interests the settlement affected. *Id.* at 450-51. This Court dismissed for lack of standing because Texas "ha[d] not itself suffered an actual or imminent injury" and had no authority to represent class members in that capacity. *Id.* at 451. The Court reasoned that Texas could only speculate about which funds, if any, would go unclaimed, had no present interest in the settlement funds, and could not displace the class representatives whom federal law—not the State—authorized to prosecute and settle class members' claims. *Id.* at 450-51. Iowa is in the same position. It identifies no Iowa-owned account, no Iowa-owned settlement claim, and no state injury caused by the judgment.

32

Nor does Iowa's objection below alter the jurisdictional analysis: appearing in a district court proceeding does not automatically create appellate standing. *See Rohm & Hass*, 32 F.3d at 208 (requiring an appellant to be aggrieved by the judgment appealed and dismissing where the asserted injury was conjectural); *Escalante v. Lidge*, 34 F.4th 486, 491 (5th Cir. 2022) (explaining that appearance below does not automatically confer appellate standing and that appellants must be aggrieved by the lower court's decision).

**B.   CAFA Confers No Standing Because § 1715(f) Disclaims Any Expansion of State Authority and § 1715(e)(1) Gives the Only Enforcement Right to a Class Member**

CAFA does not cure Iowa's injury defect, and it creates a separate redressability problem for Iowa's standing here. Section 1715(b) requires notice to state officials, but § 1715(f) provides that nothing in § 1715 "shall be construed to expand the authority of, or impose any obligations, duties, or responsibilities upon, Federal or State officials." 28 U.S.C. § 1715(f). Section 1715(e)(1) then announces the consequence of noncompliance: "a class member may refuse to comply with and may choose not to be bound by a settlement agreement" if required notice is not provided. 28 U.S.C. § 1715(e)(1). That is, Congress spoke on the CAFA

notice remedy issue: it specified the remedy (refusal to comply with and the choice not be bound by a settlement agreement), and it specified who could claim it (class members). Iowa is not among the persons given a remedy by CAFA, and the action it claims Congress authorized (free-ranging standing to object to settlements in federal court) is not in CAFA either.

Section 1715's structure confirms the point: Congress placed the consequence of deficient CAFA notice in § 1715(e)(1), which lets a class member refuse to be bound, and in § 1715(f) disclaimed any construction that would expand state authority. 28 U.S.C. §§ 1715(e)(1), (f). Where Congress provides a remedy for one actor and withholds it from another, the omission is presumed deliberate. *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion" (citation omitted)). The Sixth Circuit applied that principle to this same attorney-general theory in *Chapman v. Tristar Prods., Inc.*, 940 F.3d 299, 305-07 (6th Cir. 2019), holding that CAFA "does not create a right of action for state attorneys general" and

34

that § 1715(f)'s text forecloses any expansion of state authority. A district court in this circuit reached the same result in *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 910 F. Supp. 2d 891, 943 (E.D. La. 2012), explaining that § 1715 "simply requires notification" and "does not create standing that a state official otherwise lacks." Even if CAFA created some procedural interest for Iowa, a procedural right "*in vacuo*" is not Article III injury. *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426-27 (2021) (rejecting the view that a statutory right automatically creates injury in fact and explaining that "an injury in law is not an injury in fact").

Iowa relies on a set of CAFA decisions for the proposition that § 1715 equips a state attorney general with authority to object to and appeal a class settlement. Dkt. 59 at 11, 16, 18. None confers Article III standing on a non-class-member State. Iowa invokes *Kurtz v. Kimberly-Clark Corp.*, 142 F.4th 112, 121 (2d Cir. 2025), for the result an out-of-circuit panel reached after an Iowa-led state coalition appeared as amici. Dkt. 59 at 11. But *Kurtz* illustrates Plaintiffs-Appellees' point, not Iowa's: the States there appeared as amici, and the settlement was vacated on a

class member's appeal, not a State's. Iowa invokes *In re Packaged Ice Antitrust Litig.*, No. 17-2137, 2018 WL 4520931, at *7 (6th Cir. May 24, 2018), for the proposition that an attorney general may submit objections, Dkt. 59 at 18, but that unpublished decision preceded *Chapman*'s published analysis and recognized only that an attorney general may object—not that a non-class-member State has Article III standing to appeal. *Chapman*, 940 F.3d at 305-07. *In re Flonase Antitrust Litig.*, 879 F.3d 61, 68-70 (3d Cir. 2017), on which Iowa also relies, addressed sovereign immunity after Louisiana declined to enter the case; it did not hold that CAFA supplies Article III appellate standing. And *Huyer v. Njema,* 847 F.3d 934, 941 (8th Cir. 2017), which Iowa distinguishes as a waiver case, Dkt. 59 at 20, held a § 1715(b) objection forfeited; it did not give a State a § 1715 remedy beyond the class-member remedy Congress provided in § 1715(e)(1).

## C.    Iowa's *Parens Patriae* Theory Fails Because Its Objection Is Indistinguishable from the Private Objections

Iowa argues that it appears as *parens patriae* because the settlement harms its quasi-sovereign interest in the economic well-being of Iowa residents, and it points to its statutory duty to litigate on the

36

State's behalf and its consumer-protection laws as evidence of that interest. Dkt. 59 at 14-16; ROA.1967-68. But a State proceeding as *parens patriae* must assert a quasi-sovereign interest "apart from the interests of particular private parties" and must be "more than a nominal party." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 600-07 (1982). Iowa's own objection framed the harm as the impaired "economic well-being of Iowa consumer class members." ROA.1968. That is the private financial interest of Iowa residents who are themselves class members, not a sovereign interest of Iowa apart from them. Iowa's substantive objections confirm the overlap: they track the private objections—no cash to the class, assertedly inadequate injunctive relief, disproportionate fees, and notice defects. ROA.1956-86, 2483-89, 2511-20. Restating those class-member objections in the State's name does not convert them into an injury to Iowa, and Article III standing requires an injury that belongs to Iowa itself.

Iowa argues that the modern class action descends from the equitable bill of peace, in which government officials historically participated, so that CAFA's notice provision must be read as an invitation to States to participate in the settlement process and preserve

37

a right to object and appeal; Iowa adds that this history is a development that undermines *Chapman.* Dkt. 59 at 4, 13, 17-18. *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), traced the ancestry of Rule 23; it did not hold that a State may appeal a private class settlement when it is not a class member and identifies no injury of its own. *Id.* at 847-48.

Nor does Iowa gain standing because its objection was timely. Iowa contends that timeliness distinguishes *Chapman*, where Arizona moved to intervene and objected only in the alternative. Dkt. 59 at 17. But *Chapman*'s jurisdictional holding did not turn on tardiness; it rejected the same CAFA and *parens patriae* theories because Arizona's asserted interest was indistinguishable from private class-member objections and § 1715(f) foreclosed an expansion of state authority. *Chapman*, 940 F.3d at 305-07. A timely objection can preserve an argument for review; it cannot supply the Article III injury or redressability Iowa lacks.

## D. The Extinguishment Theory Fails Because Iowa Has No Claim of Its Own to Extinguish

Iowa argues that, by failing to object or intervene, a State can be precluded under *California v. IntelliGender, LLC*, 771 F.3d 1169, 1172-73, 1180-81 (9th Cir. 2014), from later bringing its own restitution or disgorgement action for the same conduct, so the risk that this settlement

forecloses a future Iowa enforcement action is a present injury that confers standing. Dkt. 59 at 7-8 (asserting that "there is a reasonable chance that Iowa's own potential claim is extinguished"). Iowa does not contend that the settlement releases a claim Iowa owns; the release reaches only the class's classwide injunctive claims. ROA.1339, 2477, 2489. Iowa instead posits a future Iowa consumer-protection or disgorgement action that might be precluded if it does not participate now. But Iowa identifies no pending or contemplated Iowa enforcement action against Schwab and no Iowa-law claim adjudicated by the district court; the merger closed in October 2020, and this case proceeded as a private federal Clayton Act class action. ROA.37, 133-39, 2441. A "conjectural or hypothetical" injury does not satisfy Article III standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). *California v. IntelliGender, LLC* does not bridge the gap, because preclusion there arose from California's own filed enforcement action under California consumer-protection statutes—an action Iowa has never brought. 771 F.3d at 1180-81. And the redressability requirement independently defeats the theory: vacating an approved settlement would not redress a concrete injury to Iowa, because Iowa has identified none.

**E.    The District Court's Acceptance of Iowa's Objection Did Not Create Appellate Jurisdiction**

Iowa makes two further procedural arguments for standing. It contends that the district court accepted it as an objector and ruled on its objections on the merits, which it says confirms its status under Rule 23 and § 1715. Dkt. 59 at 5, 16. And it invokes its own state law—Iowa Code § 13.2, which directs the Attorney General to prosecute actions in which the State is interested; Iowa Code § 714.16(7), which authorizes disgorgement; and Iowa Rule of Civil Procedure 1.262-1.263, Iowa's analogue to Rule 23—as evidence of a sovereign interest supporting its appeal. Dkt. 59 at 15; ROA.1967-68. Neither argument supplies Article III injury. Subject-matter jurisdiction cannot be waived or forfeited and may be raised at any stage, so the district court's decision to entertain Iowa's objection on the merits could not create appellate standing that Article III otherwise denies. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006). And Iowa's state statutes and class-action rule describe the Attorney General's authority under Iowa law; they do not show a state program impaired, a state treasury depleted, or state enforcement authority curtailed in this private federal antitrust settlement to which Iowa is not a party.

At bottom, Iowa's appeal should be dismissed for lack of Article III standing. If the Court reaches the merits of the issues Iowa raised, those objections fail for the independent reasons stated in Sections III and IV, *infra.*

## II.     THE DISTRICT COURT HAD ARTICLE III JURISDICTION TO APPROVE THE SETTLEMENT

A federal court must assure itself that plaintiffs have Article III standing before it approves a class settlement, and it lacks jurisdiction if none does. *Frank v. Gaos*, 586 U.S. 485, 492 (2019). Here, the district court discharged that obligation. It evaluated standing on a developed record under both the named-plaintiff-focused test drawn from *Kohen v. Pacific Investment Management Co.*, 571 F.3d 672 (7th Cir. 2009), and the class-definition-focused test drawn from *Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006), and found the settlement satisfied both. ROA.2446-49. This is sufficient for Article III standing. *See Wilson*, 168 F.4th at 230-31 ("There is a circuit split regarding which of these is the appropriate test, and this court has so far declined to determine the correct approach. We continue to decline. . . . If the Plaintiffs have demonstrated standing under each, we need not decide between the two.").

41

### A. The Named Plaintiffs Assert a Present, Continuing Injury from Schwab's Challenged Practices and Their Anticompetitive Effects

Under the "class certification approach" to standing, the Court "analyzes only a named plaintiff's individual standing," and "if that is satisfied, any remaining analysis is considered a matter of class certification under Rule 23." *Wilson*, 168 F.4th at 230 (citing *Angell v. GEICO Advantage Ins. Co.*, 67 F.4th 727, 733-34 (5th Cir. 2023)). That test is readily met here.

Each named plaintiff suffers ongoing injury from Schwab's order execution and information barrier practices as to the market makers—underpayment for their order flow in the form of reduced price improvement on trades through Schwab—and the injunctive relief mitigates that same injury because the compliance program targets the areas of Schwab's business that affected price improvement. ROA.2447-48. Indeed, the district court found that each named plaintiff identified an injury in fact—"underpayment of their order flow, in the form of reduced price improvement on their trades"—that was "traceable to the Merger and susceptible to redress by the injunctive relief provided by the Settlement." ROA.2448. It also found that the prospective relief "will

42

automatically increase the amount of money in the pocket of the class members" by generating price-improvement gains for Schwab retail customers. ROA.2454 n.6; *see also* ROA.2447.

That is enough for Article III standing to obtain injunctive relief. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur"); *Murthy v. Missouri*, 603 U.S. 43, 49-50 (2024) (plaintiff seeking forward-looking relief must show "a substantial risk that, in the near future," he will suffer an injury traceable to the defendant and "redressable by the injunction [he] seek[s]").

Huang frames the named plaintiffs' injury as a contingent future event.[1] Huang Br. 29-30. He argues that plaintiffs' sworn statements that they intend to keep trading are the kind of *Lujan* "some day" intentions the Supreme Court has held insufficient under Article III. *Id.* at 29; *see Lujan*, 504 U.S. at 564; *City of Los Angeles v. Lyons*, 461 U.S.

---

[1] Iowa does not contend in its opening brief that the district court lacked Article III jurisdiction to approve the settlement.

95, 105 (1983). Huang is wrong both as to the standard and as to the named plaintiffs' injuries.

The law is clear that a plaintiff seeking injunctive relief satisfies Article III standing by demonstrating "a continuing injury or threatened future injury," and the two are independent: either suffices. *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019). In the antitrust consumer setting this Court states the rule the same way, requiring "either continuing harm or a real and immediate threat of repeated injury in the future." *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 343 (5th Cir. 2012).[2]

Huang also misreads the Supreme Court's decision in *Lujan* to argue that the named plaintiffs' assertions that they will continue to

---

[2] Huang makes the demonstrably incorrect argument that the "district court conflated standing for retrospective damages with standing for prospective damages." Huang Br. 31 (emphasis removed). The district court did no such thing. Rather, it correctly held that "Plaintiffs contend that as current Schwab brokerage customers they each have alleged an ***imminent in fact, ongoing injury***—*i.e.*, the underpayment from order flow in the form of reduced payments. And Plaintiffs' threatened injury would be redressed by the injunctive relief in the Settlement—*i.e.*, compliance program targets the areas of Schwab's business that have affected price improvements." ROA.2447 (emphasis added and internal citations omitted). The district court linked past and continuing injury to the injunctive relief provided; nothing at all was conflated.

trade on Schwab's platform are insufficient for standing. Huang Br. 29-30. In *Lujan*, plaintiffs professed only an unspecified intent to revisit project sites abroad, "without any description of concrete plans," where the acts necessary to produce the injury lay in others' hands. 504 U.S. at 564. Here, in contrast, each named plaintiff is unequivocal that they will continue to trade on Schwab's platform as they have in the past. ROA.2485-86 ("[E]ach named Plaintiff has submitted a sworn affidavit to this Court attesting that they 'intend to remain a retail brokerage customer of Schwab' and 'intend to execute additional trades in the near future.'"). Moreover, because every trade is necessarily subject to Schwab's order routing practices, the Settlement's injunctive relief will necessarily impact every future trade. ROA.2454 n.6. None of this is close to the speculative intention to act in the future at issue in *Lujan*.[3]

---

[3] Huang's reliance on *O'Shea v. Littleton*, 414 U.S. 488, 496-97 (1974), and *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983), is misplaced, as those cases are facially distinguishable. In *O'Shea*, the plaintiffs sought an injunction against allegedly discriminatory practices in future state criminal proceedings; the Supreme Court held that they lacked standing because any future injury depended on the speculation that they would again violate the criminal law, be charged, and be brought before the same judges and practices. 414 U.S. at 496-97. In *Lyons*, the plaintiff sought an injunction against the police use of chokeholds; the Court held that he lacked standing to pursue that prospective relief because any future injury depended on the speculation

**B.    The Class Is Defined as Current Schwab Customers, So Under the *Denney* Class-Definition Test It Contains No Uninjured Members**

Under the *Denney* test, the court "compares 'the injuries or interests of the named plaintiff with those of the putative class and will hold that the named plaintiff lacks standing for the class claims if his or her harms are not sufficiently analogous to those suffered by the rest of the class.'" *Wilson*, 168 F.4th at 230-31. Thus, in *Wilson*, this test was met where "each policyholder was overcharged" by the same inaccuracies about whether a health insurance provider was in-network. *Id.* at 231. As this Court explained, that theory "applies equally to the named Plaintiffs and all other Plaintiffs" and "thus satisfies the class-certification approach and the standing approach." *Id.*

Here, the district court's analysis mirrored this Court's reasoning in *Wilson* on the facts at issue here:

> Applying the *Denney* test to the definition of the class proposed for certification, the Court comes to the same conclusion. The Class Definition is set

---

that he would again be stopped by the police and again be subjected to an unlawful chokehold. 461 U.S. at 105-10 (1983). Here, in contrast, there is no question that Schwab's order routing and price improvement practices will necessarily impact every trade the named Plaintiffs make on Schwab's trading platform, and the district court found so below, ROA.2454 n.6.

forth in section 1.31 of the Settlement with Schwab. Under the plain terms of the Class Definition, a "person, entity or corporation" is included in the Settlement Class only if they are "current U.S. brokerage customers of Schwab or any of its affiliates, including customers who previously held accounts at Ameritrade." Thus, by limiting the Settlement Class to only "current U.S. brokerage customers of Schwab or any of its affiliates" the class includes only persons, entities, and corporations that have suffered the same injury in fact as the three named Plaintiffs which is traceable to the Merger and susceptible to redress by the injunctive relief provided by the Settlement. Accordingly, the Settlement Class does not include any members who lack any causally related injury.

ROA.2448-49 (citation omitted). Put simply, there is no mismatch between the class definition and the injury of the named plaintiffs and thus no standing issue presented under the *Denney* test.[4]

---

[4] Huang misreads this Court's decisions to require individual proof of standing as to every absent class member. None of the cases he cites stand for any such proposition. *See, e.g.*, *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 768-69 (5th Cir. 2020) (declining to reach absent class member standing at all, and holding that the question is logically antecedent to the Article III standing inquiry); *Earl v. Boeing Co.*, 53 F.4th 897, 903 (5th Cir. 2022) (holding that plaintiffs' fraud-based theory of damages did not plausibly have price impact; no injunctive relief sought by plaintiffs); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 & n.4 (2021) ("We do not here address the distinct question whether every class member must demonstrate standing before a court certifies a class." (citation omitted)). Indeed, the principal case Huang relies upon for this point did not address Article III standing at all. *See Alaska Elec. Pension Fund v.*

47

### III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN APPROVING A RULE 23(B)(2) INJUNCTIVE SETTLEMENT THAT PRESERVED DAMAGES CLAIMS AND SATISFIED RULE 23, DUE PROCESS, AND CAFA

Huang and Iowa describe the settlement as a release of valuable class claims for inadequate consideration. The record refutes that description. The class gave up only its classwide injunctive relief claims; class members kept their damages claims. ROA.1339, 2477, 2489. The district court relied on that structural fact, and it is the benchmark for the fairness analysis: an injunctive-only settlement is judged against the injunctive relief the class could realistically have won, not against a damages recovery it never released. Review is for abuse of discretion, and the district court's approval "is not to be upset unless the [district] court clearly abused its discretion." *In re Corrugated Container Antitrust Litig.*, 643 F.2d at 207.

The district court approved the settlement on a developed record. It applied the Rule 23(e)(2) factors as informed by *Reed*, credited a former United States District Judge's sworn account of an arm's-length

---

*Flowserve Corp.*, 572 F.3d 221 (5th Cir. 2009) (addressing loss causation under the preponderance of the evidence standard).

48

mediation, bounded the range of recovery, weighed the compliance program against litigation risk, found direct notice had reached approximately 97% of more than 25 million class members, and overruled roughly 70 objections—about 0.00028% of the class. Huang and Iowa do not engage these findings. Instead, they describe (and attack) a damages release that simply never happened in this case.

The remaining arguments on fairness do not demonstrate any error at all, let alone an abuse of discretion by the district court. Addressing each in turn: The release reaches only classwide injunctive claims, and absent members' damages claims survive intact (Section III.A, *infra*). The district court applied the Rule 23(e)(2) and *Reed* factors across a developed record (Section III.B, *infra*). The compliance program is concrete, uniform, and court-supervised, not illusory (Section III.C, *infra*). The named plaintiffs' separate $50 settlement of their own damages claims and the modest, documented $5,000 service awards created no conflict and depleted no class recovery (Section III.D, *infra*). The class notice and CAFA notice satisfied Rule 23, due process, and § 1715, with any CAFA shortfall non-jurisdictional and remediable only as Congress provided (Section III.E, *infra*). And the tolling-notice

49

objection is unpreserved by any appellant, rests on a misreading of the notice, and fails on the law of both *China Agritech* and Rule 23 notice (Section III.F, *infra*).

### A. The Settlement Releases Only Classwide Injunctive Claims; Absent Class Members' Damages Claims Remain Intact.

The Stipulation and Agreement of Settlement defines the "Settlement Class Released Claims" as "any and all injunctive, equitable and non-monetary claims or remedies . . . ," and provides that the released claims "shall not include any damages or monetary claims." ROA.1339. The district court found, on that basis, that there was no concern the named plaintiffs had sacrificed absent class members' rights—simply put, these class members' damages claims were not released. ROA.2477, 2489. That structural feature frames the appropriate fairness inquiry. The right comparator for a Rule 23(b)(2) injunctive relief settlement is the injunctive relief the class could realistically obtain, measured against the litigation risk—not the damages a complaint once sought, when the settlement did not release any absent class member's damages claim. The district court correctly anchored its range-of-recovery analysis to this reality, with no recovery

at the low end and structural relief at the high end. ROA.2476-77. Iowa incorrectly asks this Court to value the settlement against a damages recovery the class members still retain their right to pursue. *See* Iowa Br. 32.

### B.    The District Court Applied the Rule 23(e)(2) and *Reed* Factors Across a Fully Developed Record.

This Court's six-factor fairness test requires consideration of, among other things, whether the settlement was the product of arm's-length negotiation, the complexity and likely duration of the litigation, the stage of the proceedings, and the reaction of the class. *Reed*, 703 F.2d at 172. The district court applied the Rule 23(e)(2) factors as informed by *Reed* and found each favored approval. ROA.2469-83.

The record supports every finding. A former United States District Judge mediated the settlement and attested under oath that it was reached at arm's length with no apparent collusion. ROA.1425, 2472. The parties litigated for more than three years, defeated a motion to dismiss, took depositions, and exchanged 218,319 documents and 6.5 terabytes of trading data. ROA.1397-98, 2474-75. The case was the kind of complex antitrust litigation in which recovery at trial was far from assured. ROA.2475-76. And the class reaction was overwhelmingly favorable:

51

roughly 70 objections out of more than 25 million class members, about 0.00028%. ROA.2483. A settlement reached on that record, by those negotiators, after that much litigation, is the product of the considered judgment Rule 23(e) protects.

## C. The Compliance Program Is Concrete, Uniform, and Court-Supervised—Not Illusory

Iowa and amicus Kozinski call the compliance program required by the Settlement illusory. Iowa Br. 15-21; Kozinski Br. 10-16. Neither has standing to raise non-jurisdictional appellate issues, but in any event, both are wrong on this point. There is nothing illusory (or even speculative) about the program: the Stipulation requires Schwab to retain an independent consultant, submit its order-routing and price-improvement practices to review, respond to recommendations, and certify compliance for four years, all under the district court's retained jurisdiction. ROA.1340-43, 2447, 2454 n.6, 2462, 2477. The program applies uniformly to every current and future Schwab customer and targets the same practices the complaint challenged. ROA.2481, 2489.

The fact that the compliance program will be implemented over time does not make it illusory. Antitrust class settlements have long used forward-looking compliance obligations as part of settlement relief. *See,*

52

*e.g.*, *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 337 (N.D. Ga. 1993) (noting that, "as a condition of settlement," defendants agreed to establish formal antitrust compliance programs); *In re Dynamic Random Access Memory Antitrust Litig.*, 2013 WL 12387371, at \*16 (N.D. Cal. Nov. 5, 2013) (special master report describing settlements that included antitrust compliance programs and time-limited injunctions against anticompetitive conduct), *report and recommendation adopted*, 2014 WL 12879521 (N.D. Cal. June 27, 2014). Forward-looking antitrust compliance relief is necessarily implemented over time, and courts regularly (and properly) approve such relief on that understanding. The settlement here does more than announce a policy preference: it requires an independent consultant, review of the specific order-routing and price-improvement practices at issue, responses to recommendations, annual certifications, and retained jurisdiction. ROA.1340-43

Iowa and Kozinski invoke a line of cases that set aside settlements trading a release for an injunction of no value to the class. Each turned specifically on what the class gave up against what it got.

- In *Pampers*, the class released its claims for "perfunctory relief"—chiefly a refund program the defendant had already made available—while class counsel received a $2.73 million fee after no

53

formal discovery. *In re Dry Max Pampers Litig.*, 724 F.3d 713, 717-22 (6th Cir. 2013).

- In *Koby*, absent class members released damages claims for "worthless injunctive relief" and "nothing of value": a disclosure-only injunction that benefited at most people the defendant might contact in the future and that the defendant could seek to dissolve if the law changed. *Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1074, 1079-80 (9th Cir. 2017).

- In *Subway*, the class released its claims for an injunction the Seventh Circuit called "utterly worthless" because it yielded "zero benefits for the class" while still funding counsel. *In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig.*, 869 F.3d 551, 556-57 (7th Cir. 2017).

Here, the district court found the reverse. Crediting expert analysis of the compliance program's economic effect, the district court determined that the settlement in this case was not worthless, but indeed valuable, putting "money in the pocket of the class members," imposing a four-year process directed at the challenged order-routing practices, and remaining enforceable by the district court. ROA.2454 n.6, 2477, 2489; *see also* ROA.1340-43.

Further, Iowa relies on *In re Katrina Canal Breaches Litigation*, 628 F.3d 185, 197 (5th Cir. 2010), to challenge fairness, but that decision is not on point. Specifically, Iowa argues that a settlement should be rejected where a court is "unable to definitively state, based on the record

below, that the class will receive any benefit from the settlement." Iowa Br. 20. *Katrina* reversed approval of a mandatory class settlement because the notice failed to tell class members they might receive zero recovery for the very damages claims the mandatory class extinguished. 628 F.3d at 197-98. *Katrina*'s heightened concern attaches to "a mandatory class settlement, which will deprive class members of their claims." *Id.* at 197. The settlement here is the opposite: it extinguished no damages claim and preserved them all, releasing only classwide injunctive relief claims—and the district court found that for those, the class would receive "money in the pocket of the class members" through the concrete, court-enforced compliance program. ROA.2454 n.6.

**D.    The Named Plaintiffs Adequately Represented the Class, and the $50 Individual-Damages Release and $5,000 Service Awards Created No Conflict**

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). Adequacy turns on whether the class representatives have interests antagonistic to the class—whether they traded something belonging to the class for a benefit of their own. Huang argues that the named plaintiffs are inadequate because they received $50 to settle their

55

individual damages claims and received $5,000 service awards for their efforts as class representatives, Huang Br. 37-45; ROA.1257-63, 1837-43, but neither facts nor law support Huang's arguments. All named plaintiffs are adequate, and antagonism is wholly absent here.

### 1. The $50 Payments to Resolve Individual Damages Claims—Which the Class Kept—Did Not Introduce Conflict or Inadequacy

Huang points to two reasons that the named plaintiffs' settlement of their individual claims makes them inadequate class representatives. First, he argues that because the named plaintiffs settled their individual claims for damages for monetary relief, the settlement is "predominantly" monetary, and the district court abused its discretion in certifying the class under Rule 23(b)(2). Huang Br. 38-39. Second, Huang claims the named plaintiffs' settlement of their individual claims for damages means they were treated preferentially in contrast to unnamed class members making them inadequate class representatives. *Id.* at 40-43. Huang is wrong on both counts.

Each named plaintiff received $50 to settle his own individual damages claim. ROA.1340, 2459 & n.19. That payment resolved the named plaintiffs' personal damages claims and nothing else; no absent

class member's damages claim was released. ROA.1336-37, 1339-40, 2459 & n.19. The classwide consideration—the compliance program—is identical for every class member, named or absent, so the $50 gave the representatives no advantage over the class they represent.

The district court certified an injunctive-relief class under Federal Rule of Civil Procedure 23(b)(2) for purposes of settlement. ROA.2462. In doing so, it undertook an extensive analysis of the Rule 23(a) and 23(b)(2) factors. ROA.2452-62. The classwide settlement is entirely injunctive in nature. When certifying a Rule 23(b)(2) class, a district court must ask whether injunctive relief predominates over any money damages in the case. *See Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007). The district court did not abuse its discretion in approving the settlement here, where the only classwide relief is injunctive.

As the district court noted, no conflict of interest is created by the fact that the named plaintiffs will each receive $50 from Schwab in return for releasing their individual damages claims. This is so because the damages claims of the absent class members are not being released under the settlement. ROA.2459 & n.19. Since absent class members' individual claims for damages are preserved, "there is no concern that Plaintiffs

have sacrificed the right of the absent class members for their own benefit." ROA.2459 n.19. Indeed, to receive a modest payment for their individual damages claims, the named plaintiffs had to give up something the class members did not—their right to pursue their damages claims in the future. ROA.1336-37 (defining the releases for the named plaintiffs to include money damages claims), 1339 ("Settlement Class Released Claims shall not include any damages or monetary claims or any future claims relating to enforcement of the terms of this Stipulation"). The named plaintiffs and absent class members received uniform classwide relief for the release of their injunctive relief claims. ROA.1340-43. The district court found the named plaintiffs fairly and adequately represented class after a thorough review, ROA.2458-60, and that the settlement treated class members equitably, ROA.2481-82. It did not abuse its discretion in this regard.

Objector Huang faults the district court for purportedly failing to undertake a predominance analysis, citing *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998). Huang Br. 38-39. The district court did not ignore the predominance analysis. Rather, it recognized the predominance requirement and noted that it was met because injunctive

relief was the only relief sought for the class. ROA.2462. The district court specifically stated that it "need not delve into whether the injunctive relief 'predominates' over monetary damages claims where, as here, injunctive relief is the only relief sought." ROA.2462 (*citing Maldonado*, 493 F.3d at 524). This is exactly what *Allison* contemplates. *Allison*, 151 F.3d at 411 ("The rule is clear that claims seeking injunctive or declaratory relief are appropriate for (b)(2) class certification. Thus, if the plaintiffs sought only injunctive and declaratory relief, this case could readily be certified as a class action under Rule 23(b)(2).").

The named plaintiffs remain adequate class representatives despite their settlement of their damages claims. Huang's reliance on *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338 (2011), *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832 (5th Cir. 2012), and *In re Monumental Life Ins. Co.*, 365 F.3d 408 (5th Cir. 2004), does not move the needle. None of these cases involved classwide injunctive relief where class members' damages claims were in fact *preserved*, but the named plaintiffs settled their individual damages claims—as is the case here.

Each of these cases concerned plaintiffs' use of Rule 23(b)(2) to certify class settlements in which monetary relief was being provided to

59

the class. The focus of each case was—appropriately—whether the monetary relief provided for the class in the challenged settlement was uniform and flowed from the liability to the class as a whole. *See Dukes,* 564 U.S. at 360-61 (Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages."); *Perry*, 675 F.3d at 836 (because of the various kinds of injunctive relief present, settlement did not meet Rule 23(b)(2) requirement for uniformity); *Monumental Life Ins. Co.*, 365 F.3d at 418 (evaluating whether classwide monetary relief was "one-size-fits-all" or would require "individualized determinations," and whether it was uniform to the class and "flow[ed] directly from liability to the class as a whole."). Here, class members maintain their right to pursue individual damages claims while receiving the benefits of this Rule 23(b)(2) settlement. No adequacy issues are presented by the named plaintiffs' individualized settlement, for $50 each, or their damage claims.

Huang further argues that the named plaintiffs cannot settle their individual claims on a non-classwide basis even if the classwide settlement is fair and reasonable, citing *Gonzales v. Cassidy*, 474 F.2d 67 (5th Cir. 1973) and *Kincade v. Gen. Tire & Rubber Co.*, 635 F.2d 501 (5th

Cir. 1981). Neither case supports his argument. In *Gonzales*, the court considered the named plaintiff's failure to appeal the adverse judgment on behalf of the class while he alone obtained retrospective relief. *Gonzales*, 474 F.2d at 69. It was this action—the failure to appeal while obtaining unique relief—that the court held constituted inadequate representation. *Id.* Here, not only did the named plaintiffs obtain meaningful relief for the class—the injunctive relief compliance program—they also did not release any class members' damage claims, just their own.

In *Kincade*, the court held that the named plaintiff did not have a right to get preferred treatment in the relief "simply by reason of his status as a class representative." *Kincade*, 635 F.2d at 506 n.5. But that is not what happened here. The named plaintiffs gave up something *additional* of value in exchange for receiving a modest payment for their individual damages claims. ROA.1336-37. They are not treated preferentially in the relief given to the class as a whole "simply by reason

of [their] status as a class representative." *See Kincade*, 635 F.2d at 506 n.5.[5]

### 2.    The $5,000 Service Awards Are Documented, Modest, and Deplete No Class Recovery

Huang and amicus Kozinski also claim the named plaintiffs' receipt of incentive awards makes them inadequate class representatives. "District courts in the Fifth Circuit routinely award [incentive awards of] $5,000-$10,000 per named plaintiff." *Duncan v. JPMorgan Chase Bank, N.A.*, 2016 WL 4419472, at *16 (W.D. Tex. May 24, 2016) (citing *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 340 (W.D. Tex. 2007)). As Kozinski recognizes, this Circuit has not prohibited the use of incentive awards to

---

[5] Amicus Kozinski suggests that the damages paid to the named plaintiffs are unfair, but his arguments fare no better. Kozinski Br. 3-5. The cases Kozinski cites, all from other circuits, are readily distinguishable. *See Roes 1-2 v. SFBSC Mgmt.*, 944 F.3d 1035, 1056-58 (9th Cir. 2019) (named plaintiffs compensated from common fund); *Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003*)* (named plaintiffs sought to give themselves a handful of other class members who "participated" in the litigation more than half of the settlement fund); *Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877 (7th Cir. 2000) (named plaintiff would have been paid $500, rest of class would receive no money, and damages would have been released classwide); *Women's Comm. for Equal Emp't Opportunity v. Nat'l Broad. Co.*, 76 F.R.D. 173 (S.D.N.Y. 1977) (named plaintiffs sought to give themselves $11,000 each in damages, while other class members got at most $1000 and many got $0; court expressed concern, but nonetheless approved settlement).

compensate named plaintiffs for their participation in the case. Kozinski Br. 3-8. It should not do so here.

Here, the district court did not abuse its discretion in approving a $5,000 service award to each named plaintiff. The district court found that each named plaintiff devoted substantial time over more than three years to class representative work. ROA.2510-11. The court identified the work in concrete terms: participating in discovery, reviewing important court documents, communicating with counsel about case status and strategy, and making recommendations about whether to accept settlement offers. ROA.2510-11. It also found that counsel's supporting record showed document collection, financial record production, written discovery responses, review of pleadings and motions, and settlement communications. ROA.2510.

The awards are to be paid as part of the fee and expense structure separately addressed by Schwab; they do not reduce classwide relief, because the classwide relief is the compliance program, not a fund from which awards are subtracted. ROA.2511-13, 2489. A modest, documented payment for years of representative work, which depletes no class recovery, is within the district court's discretion to approve, and Huang

offers nothing in the record to disturb that finding (Kozinski does not either).

Kozinski's amicus brief asks for individualized scrutiny of the service awards. Kozinski Br. 6. The district court applied precisely that scrutiny. It did not justify the awards with a boilerplate recital; it identified each category of representative work in the Fee Order—participation in discovery, document and financial record production, written discovery responses, review of pleadings and motions, communications with counsel about case status and strategy, and recommendations on settlement offers over more than three years. ROA.2510-11. Kozinski's amicus brief does not say what a further individualized review of a $5,000 award for that documented work would entail or add. Indeed, the record already demonstrably contains the case-specific findings Kozinski claims was absent.

### 3. Huang's Rules Enabling Act Argument is Meritless (and Unpreserved)

Huang's remaining theory is that the Rules Enabling Act independently forbids the service awards. The argument runs this way: a plaintiff suing alone could never receive an incentive award, so paying one to a class representative uses Rule 23 to "enlarge" a substantive right

in violation of 28 U.S.C. § 2072(b). In Huang's words, "Because individual plaintiffs cannot receive incentive awards in individual lawsuits, Rule 23 cannot transform a procedural tool into a tool for enriching representatives at the class's expense." Huang Br. 44-45.

As an initial matter, Huang did not make that argument to the district court. His objections argued preferred position and adequacy under Rule 23; they did not invoke § 2072(b) or contend that a service award enlarges a substantive right. ROA.1259-63, 1837-43. The theory is raised for the first time on appeal and has been forfeited.

The argument also fails on its own terms, because the only decision that has ever arguably adopted a categorical bar, *Johnson v. NPAS Solutions, LLC*, 975 F.3d 1244 (11th Cir. 2020), did not rest on the Rules Enabling Act at all.

Huang reasons that *Kincade*—the 1981 Fifth Circuit decision addressed above—"binds this Court and the Eleventh Circuit alike," that the Eleventh Circuit in *Johnson v. NPAS*[6] "concluded that incentive

---

[6] This brief uses "*Johnson v. NPAS*" as shorthand for *Johnson v. NPAS Solutions, LLC*, 975 F.3d 1244 (11th Cir. 2020), to avoid confusion with *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974), from which this Court's so-called "*Johnson* factors" are drawn.

awards are categorically prohibited," and that *Kincade* therefore compels the same result here. Huang Br. 44.

But *Johnson v. NPAS* does not supply the middle link. The Eleventh Circuit did not rely on *Kincade*, and it did not rely on the Rules Enabling Act. It rested its categorical bar on two nineteenth-century common-fund decisions—*Trustees v. Greenough*, 105 U.S. 527 (1882), and *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1885)—reasoning that a modern incentive award is the kind of personal payment those cases disallowed. *Johnson v. NPAS*, 975 F.3d at 1256-61.

*Greenough* and *Pettus* cannot bear that weight. *Greenough* disallowed a bondholder's claim for a personal salary and private living expenses charged against a fund he helped manage, and *Pettus* addressed only what counsel could recover from a common fund; neither concerned a representative plaintiff in a Rule 23 class action, which would not exist for another eighty years. The Seventh Circuit—the court Huang cites—made this very point using numbers: the personal allowance *Greenough* disapproved would exceed $1.4 million in today's dollars, while the median incentive award is roughly $5,250. *Scott v. Dart*, 99 F.4th 1076, 1087 (7th Cir. 2024). The $5,000 awards here are findings-based

66

compensation for documented work, separately paid in a settlement whose classwide consideration is prospective relief; they are not the salary charged against a managed fund that *Greenough* condemned.

No other court of appeals has followed *Johnson v. NPAS*. Every circuit to reach the question since 2020 has declined to adopt its reading of *Greenough* and *Pettus*. *See Nat'l Veterans Legal Servs. Program v. United States*, 170 F.4th 1353, 1364-68 (Fed. Cir. 2026) (declining to follow *Johnson v. NPAS* and collecting contrary circuit authority); *Moses v. N.Y. Times Co.*, 79 F.4th 235, 253-56 (2d Cir. 2023) (rejecting a categorical bar on incentive awards); *Murray v. Grocery Delivery E-Servs. USA Inc.*, 55 F.4th 340, 352-53 (1st Cir. 2022) (holding incentive payments are not prohibited if they fit within Rule 23(e)); *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 785-87 (9th Cir. 2022) (holding *Greenough* and *Pettus* do not foreclose reasonable incentive awards). The Seventh Circuit decision Huang relies on is among them: it "decline[d] th[e] invitation" to follow *Johnson v. NPAS*, called the Eleventh Circuit's "blanket approach to incentive awards" "anomalous," and held that

incentive awards are "permitted so long as they comply with the requirements of Rule 23." *Scott v. Dart,* 99 F.4th at 1085, 1087-88.[7]

Each of those courts treats Rule 23(e)(2)(D)—whether the settlement treats class members equitably relative to one another—as the governing inquiry, and that inquiry already polices excessive or preferential awards without a *per se* ban. This case meets that standard: the $5,000 awards rest on the district court's findings of years of documented representative work, they deplete no class recovery because the classwide consideration is a compliance program rather than a fund, and they secured the release of no absent member's damages claim. ROA.1339, 2510-11.

### E. The Class Notice and the CAFA Notice Satisfied Rule 23, Due Process, and 28 U.S.C. § 1715

Huang and Iowa also challenge certain aspects of notice with respect to the settlement, including class notice and CAFA notice. The

---

[7] The decision Huang asks this Court to adopt was itself a divided one: the *Johnson v. NPAS* panel split two to one, Judge Martin dissenting, and the Eleventh Circuit denied rehearing en banc over a dissent of four judges warning that the rule "threatens the very viability of class actions in this circuit." *Johnson v. NPAS Sols., LLC,* 43 F.4th 1138, 1140 (11th Cir. 2022) (Pryor, J., dissenting from denial of rehearing en banc).

notice objections fail for a variety of reasons, but most fundamentally this one: they do not identify any misleading release or any prejudice that could justify undoing approval. The class notice accurately described the limited non-monetary release, and CAFA supplies no jurisdictional objection or State-level vacatur remedy. Direct notice reached nearly the entire class and disclosed the limited release; Iowa's CAFA argument is its standing problem in another form; and any CAFA shortfall is non-jurisdictional and caused Iowa no prejudice.

### 1.  Direct Notice Reached 97% of the Class Months Before the Hearing and Disclosed Everything Rule 23 Requires

The notice program reached 24,165,364 of 25,539,532 class members—approximately 97%—and 73.6% received direct notice at least 136 days before the fairness hearing. ROA.2127, 2469. The notice disclosed the nature of the action, the settlement terms, the compliance program, the mandatory no-opt-out structure, the binding effect of the release, the objection procedure, the hearing date, and the fee and service-award requests. ROA.1153-59, 2466-68. The district court found the notice satisfied Rule 23 and due process, and roughly 70 class members—0.00028% of the entire Settlement Class—objected.

ROA.2468, 2483. There is no question that notice that reaches 97% of a 25-million-member class, months in advance, and discloses the settlement's terms and the recipient's options, meets the reasonableness due process requires. As for the adequacy of notice as to the tolling of claims, that issue is addressed fully in Section III.F, *infra.*

### 2.  Iowa's CAFA-Notice Argument Is Its Standing Problem in Another Form

Iowa's CAFA-notice argument supplies no basis to disturb the order, because the statute (28 U.S.C. § 1715(e)(1)) expressly provides the consequence of a notice shortfall ("may refuse to comply with and may choose not to be bound by a settlement agreement," 28 U.S.C. § 1715(e)(1)), and expressly identifies who may claim it ("A class member," *id.*), and Iowa's objection here matches neither. (Iowa is not a class member, and it does not seek a remedy set forth in § 1715(e)(1) in any event.) Further, § 1715(f) disclaims any expansion of state authority through CAFA's enactment. 28 U.S.C. § 1715(f).

A non-class-member State thus has no remedy under § 1715 and, for the reasons in Section I, *supra,* no standing to seek one on appeal. The CAFA service obligation runs to the defendant, not to class counsel, and the statutory consequence runs to class members, not to a State seeking

reversal. The two cases Iowa cites do not supply a CAFA remedy to a non-class member. *See Moses*, 79 F.4th at 242 (stating standard of review for CAFA-notice issues); *In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 27 F.4th 291, 304 n.8 (4th Cir. 2022) (same).

### 3. Any CAFA-Notice Defect Was Non-Jurisdictional and Caused Iowa No Prejudice.

A § 1715(b) service defect is not jurisdictional, and it does not unwind an approved settlement. The statute supplies one consequence and only one: under § 1715(e)(1) a class member—not a State—may decline to be bound by a judgment if the required notice was not provided. 28 U.S.C. § 1715(e)(1). That text answers Iowa's objection on the merits, not only on standing. Congress fixed what a notice shortfall produces, and a court order vacating an approved settlement at a non-member State's request is not what Congress provided. Even assuming a notice defect and assuming Iowa could press it, § 1715 does not authorize the relief Iowa seeks; the redressability defect that defeats Iowa's appeal (Section I.B, *supra*) defeats this objection for the same textual reason.

Iowa was not prejudiced in any event. The CAFA notice was served, and the settlement administrator tracked delivery to the served

71

jurisdictions and pursued the few packages the postal service did not initially confirm as delivered. ROA.1430.

Iowa used that notice to file a detailed, multi-issue objection, to litigate it through the fairness process, and to appeal. Iowa Objection, ROA.1980-81. A State that participated that fully cannot show it was deprived of the opportunity § 1715 protects. If Iowa is dismissed for lack of standing, no appellant who pressed § 1715 remains; and even if the Court reached the question, the remedy for a proven § 1715 defect is the one Congress wrote, not reversal of an otherwise valid settlement.

### F. No Appellant Preserved the Tolling-Notice Objection, and the Notice Class Members Received Was Accurate

Huang and Kozinski argue that the settlement improperly gives up class members' tolling rights related to their ability to bring a class action for damages without providing notice to class members. Huang Br. 35-37; Kozinski Br. 8-10. This argument is wrong, but it is also not properly before this Court, as none of the appellants raised it below, and the only objector who said anything even similar in the district court, Ted Frank, *see* ROA.1999-2000, declined to appeal. Objectors "will only be allowed to appeal that aspect of the District Court's order that affects him—the District Court's decision to disregard his objections." *Devlin v.*

*Scardelletti*, 536 U.S. 1, 9 (2002); *see Farber v. Crestwood Midstream Partners L.P.*, 863 F.3d 410, 418 (5th Cir. 2017).

In any event, the argument fails on the merits. First, some background: in *China Agritech v. Michael H. Resh*, 584 U.S. 732 (2018), the Supreme Court held that while the statute of limitations is tolled for individual claims during the pendency of a putative class action (*see American Pipe & Constr. Co. v. Utah,* 414 U.S. 538 (1974)), the statute of limitations is not tolled for a follow-on class action. *China Agritech*, 584 U.S. at 735-36. Per the *China Agritech* court, there are practical reasons for this distinction between individual claims and class claims: while efficiencies are gained when class members delay in bringing their individual claims during the pendency of a class action, "efficiency favors early assertion of competing class representative claims." 584 U.S. at 740. Unlike the unnamed class member who diligently pursued their individual claims after initially reasonably relying "on the class representative, who sued timely, to protect their interests," "[a] would-be class representative who commences suit after expiration of the limitation period, however, can hardly qualify as diligent in asserting claims and pursuing relief." *Id.* at 743. Any plaintiff who would like the

preserve the ability to lead a class "has every reason to file a class action early, and little reason to wait in the wings, giving another plaintiff first shot at representation." *Id.* at 747. Here, no class member preserved their procedural right to file a class action lawsuit by doing so prior to the expiration of the limitations period, despite having "every reason[]" to do so. *See id.*

According to Huang and Kozinski, all the above needed to be explained to absent class members as part of the notice in this case. But this argument—entirely unmoored from the realities of class notice—is contrary to both the facts of this case and the law of this circuit. As to facts, the settlement *did not* release class members' damages claims, and telling them otherwise, even in the guise of explaining recent Supreme Court tolling law, would not place class members on notice of their actual rights. Further, to the extent that Huang and Kozinski are saying that every class notice needs to discuss every procedural issue that may be implicated should the settlement be approved, that is simply not what class notice requires—or even attempts to do, given its purpose of trying to inform lots of people of their actual rights.

As this Court has explained, Rule 23 does not require a class notice to be a legal treatise, and a district court has discretion to determine notice's adequacy. *In re Katrina Canal Breaches Litig.*, 628 F.3d at 197. A notice "is not required to provide a complete source of settlement information" and "need not explain . . . all the consequences" of a settlement. *Maher v. Zapata Corp.*, 714 F.2d 436, 452 (5th Cir. 1983). This Court has carried that principle into the class-settlement context and has declined to require disclosure of predictions "too unreliable to submit." *In re Corrugated Container Antitrust Litig.*, 643 F.2d at 224. This notice did more than the rule requires: it affirmatively told members their damages claims were not released. ROA.1155 ("Settlement Class Members are not releasing any damage or monetary claims against Schwab or any future claims relating to enforcement of the Settlement terms.").

It was not an abuse of discretion (nor, as Huang asserts, a violation of due process) that the notice here did not include a legal exposition of class-versus-individual tolling doctrine, for an injunction-only settlement that in fact released no damages claim of any absent class member. Indeed, even a "slightly misleading" statement does not render notice

75

inadequate where it is "accurate in its essential point." *In re Deepwater Horizon*, 739 F.3d at 819-20. Here, the notice's essential point—the class settlement did not release absent class members' damages claims—was indisputably accurate.

## IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN AWARDING BELOW-LODESTAR FEES SEPARATELY PAID BY SCHWAB

The district court's fee order was not an abuse of discretion. It meticulously evaluated the relevant factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), and required by Rule 23(h), appropriately calculated the lodestar fee amount, and awarded a fee 24% less than counsels' lodestar. This Court should affirm.

### A. The Fee Order Is Not Properly Before this Court

As an initial matter, the Court need not review the Fee Order, as it is not properly before this Court. Specifically, Huang did not challenge the attorney fee calculation in the district court, and thus failed to preserve any objection for appeal.

With respect to Iowa, it lacks standing to object to the Fee Order, as it lacks Article III injury and its appeal must be dismissed. *See* § I,

*supra.* Moreover, in addition to its general lack of Article III injury and standing described above, Iowa is certainly not aggrieved by the Fee Order, which requires fees to be paid separately by Schwab, meaning that no class member's recovery is or would be diminished by it. Thus, even Iowa's derivative theory of standing—the incorrect notion that the State of Iowa should be able to stand in the shoes of Iowan Schwab customers who are already parties to this case—cannot reach the Fee Order.

**B.    The District Court Adequately Weighed the Appropriate Rule 23(h) Considerations as Part of Its Analysis and Findings, and Did Not Abuse Its Discretion as to the Fee Award**

Rule 23(h) provides that "[i]n a certified class action, the court may award reasonable attorneys' fees and nontaxable costs that are authorized by law or by the parties' agreement." All that is required for such an award is that the district have "sufficiently considered the appropriate criteria," *Gurule v. Land Guardian, Inc.*, 912 F.3d 252, 258-59 (5th Cir. 2018), which include, among the other *Johnson* factors, "billing records, filings, the complexity of the case, and the degree of success experienced by the parties," *Cruz v. Maverick Cty.*, 957 F.3d 563, 575 (5th Cir. 2020). A district court "must not . . . cursorily approve" a fee

request "or delegate" its review. *Strong v. BellSouth Telecomms., Inc.*, 137 F.3d at 850.

Here, the district court correctly applied the lodestar method. Specifically, it began with a lodestar calculation, finding that $8,250,000 for the "more than 14,000 hours of time (calculated conservatively) spent litigating this case since June 2, 2022, through the lodestar cutoff date of June 30, 2025" resulted in a lodestar multiplier of 0.763. ROA.2497-98. In other words, the total fees sought ($8.25 million) across three law firms were a fraction of the value of the fees incurred ($10,803,933.50), which the district court recognized "reduces Plaintiffs' Counsel's billed hours in this case by nearly 24%." ROA.2498.

The district court made the calculation after correctly determining the "compensable hours listed in the attorneys' time records," ROA.2500, including by reviewing "(1) affidavits from each attorney providing, among other things, a detailed description of the work they have done on the case; (2) timesheets which include the position, hours spent, and respective billing rate for each timekeeper involved in this case; and (3) a declaration by Warren T. Burns, a disinterested attorney who practices in the Eastern District of Texas, attesting to the reasonableness of both

the total amount of hours spent litigating this case and the billing rates of Plaintiffs' Counsel." ROA.2500-01. The district court then expressly found that "the evidence provided by Plaintiffs' Counsel supports a finding that the hours expended in this case are reasonable," including based on evidence as to "the complexity and undesirability of this case, the extensive factual and legal investigation undertaken before Plaintiffs' Counsel even filed the Complaint, and the significant amount of work required to reach a settlement in this case." ROA.2501.

The district court's findings on this point were detailed. The court explained that the case was "a complex class action involving a private challenge of the Merger between two of the largest brokerage firms in the United States"; was "litigated for more than three years before the parties were able to reach a meaningful settlement"; the "briefing involved complicated antitrust and securities issues including post-merger Section 7 challenges and challenges relating to Defendants' payment-for-order-flow practice"; "required Plaintiffs' Counsel to analyze and review voluminous amounts of complex financial information—which included more than 218,319 documents (totaling more than 950,021 pages) and 6.5 terabytes of electronic data to prepare for trial";

79

involved "282 docket entries and 103-page, 488 paragraph complaint"; and is "one of only two successful post-merger Section 7 challenges this century and would also be the only successful challenge relating to payment-for-order-flow practices." ROA.2501 & n.9.

The court concluded based on this evidence that "this Settlement was the result of litigious and hard-fought negotiations that required a considerable amount of work from all parties involved." ROA.2501. None of this detailed analysis, nor the resulting findings of fact, is remotely conclusory, cursory, or even hints at an abdication of the district court's Rule 23(h) duty to evaluate a fee award.

The district court also scrutinized the reasonableness of counsels' hourly rates, and made specific findings as to those issues. It went through the hourly rates of each law firm, at various levels of experience and seniority. ROA.2503-04. And it considered the declaration of a disinterested attorney who actively practices in the Dallas-Fort Worth area, including the Eastern District of Texas, attesting to the reasonableness of the hourly rates at issue; emphasized "that there are only a few firms in the Eastern District of Texas, Plaintiffs' Counsel being one of them, who are capable of handling complex, nationwide antitrust

80

class actions"; and explained that "the number of firms capable of handling this case is dwindled even further when the nature and risk of this litigation is taken into consideration—*i.e.*, the private enforcement of the Clayton Act to challenge the Merger of large financial institutions on a purely contingent basis." ROA.2503-04. Based on this evidence, the district court found the hourly rates charged by Plaintiffs' counsel reasonable. ROA.2504-06.

The district court also noted that Defendants did not challenge the reasonableness of the hourly rates, which the district court indicated showed that the rates "are considered *prima facie* reasonable." ROA.2505 (citing *Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*, 2018 WL 1602460, at *7 (E.D. Tex. Apr. 3, 2018)). The court further observed that "courts throughout this district—including this Court—have commonly held rates similar to those charged by Plaintiffs' Counsel are reasonable," and citing multiple examples. *Id.*

At bottom, the district court's extensive analysis and detailed findings of fact contradict any notion that the district court abdicated its duty to independently review fee applications under FED. R. CIV. P. 23(h).

81

Appellants' conclusory arguments to the contrary do not withstand scrutiny.

### C. Appellants' *Johnson* Factor Challenge Fails Because the District Court's Analysis Considered All of the Relevant Factors

Huang and Iowa (and amicus Kozinski) argue that because "neither Plaintiffs' Counsel nor Defendant argue[d] for an adjustment to the lodestar in this case," the district court did not separately weigh all twelve *Johnson* factors and thus erred. Iowa Br. 54 (quoting ROA.2506); Huang Br. 47 (quoting ROA.2506); *see also* Kozinski Br. 10-12. They are demonstrably wrong.

In its Fee Order, the district court did explain that "after determining the lodestar the Court would need to determine whether the lodestar value should be adjusted either upwards or downwards based on the twelve *Johnson* factors," ROA.2506 (citing *Cruz v. Maverick Cty.*, 957 F.3d 563, 575 (5th Cir. 2020)), and noted that "neither Plaintiffs' Counsel nor Defendant argue for an adjustment to the lodestar in this case." ROA.2506. The district court continued on to explain, however, that "Plaintiffs' Counsel seeks an award for *less* than the lodestar amount in this case," ROA.2506 (emphasis in original), and observed that Plaintiffs

had argued that the "*Johnson* factors would support a fee award in the amount of the lodestar without the multiplier they applied to their requested award," and noted that counsel was "not requesting an award for that amount." ROA.2506. Put simply, there was no upward lodestar adjustment—and in fact, there was a downward adjustment—which obviated the need for an extensive factor-by-factor analysis.

But in any event, the district court's analysis expressly took into account all relevant considerations under the *Johnson* factors:

- *The time and labor required.* The district court extensively analyzed the time required to perform the tasks at issue in the case, including, among other things, three years of work performed by counsel during the litigation; analysis of hundreds of thousands of documents and terabytes of data; and extensive pleading effort. ROA.2501. The district court found that "the more than 14,000 hours billed in this case were reasonable and necessary given the nature, length, and complexity of this case." ROA.2502.

- *The novelty and difficulty of the questions.* The district court noted that the issues were novel, including because the lawsuit was one of only two post-merger challenges this century and the only successful challenge to payment-for-order-flow practices. ROA.2501 & n.9.

- *The skill requisite to perform the legal service properly.* The district court expressly found, based on supporting evidence from a disinterested practitioner in the area and the district, that "only a few firms" had the requisite skill to handle "complex, nationwide antitrust class actions" such as this one. ROA.2503-04.

- *Whether the fee is fixed or contingent.* The district court found that the number of firms that could have handled the complexity of the matter is "dwindled even further when the nature and risk of this litigation is taken into consideration—*i.e.*, private enforcement of the Clayton Act to challenge the Merger of large financial institutions on a purely contingent basis." ROA.2504.

- *The amount involved and the results obtained.* The district court noted the significance of the litigation and found that the injunctive relief obtained would result in $10.7 million to $14.5 million monthly "in the pocket of class members," *i.e.* Schwab's retail customers. ROA.2454 n.6, 2477.

- *The experience, reputation, and ability of the attorneys.* The district court expressly found, in agreement with the declaration of an experienced litigator in the district, that "Plaintiffs' Counsel is one of the few, if not the only, firms that could handle this type of complex, nationwide antitrust class action litigation." ROA.2506.

- *The "undesirability" of the case.* The district court expressly acknowledged the "complexity and undesirability of this case." ROA.2501.

- *Awards in similar cases.* The district court surveyed comparable fee awards and found the award here reasonable considering those comparators. ROA.2504-06.

Appellants' argument that the district court failed to consider the *Johnson* factors is demonstrably false in light of the district court's extensive analysis and express findings in the Fee Order.

What's left of Appellants' argument is that the district court was supposedly required to tick through several of the inapplicable factors—

84

call them *Johnson* factors—and then explain why they do not apply. This elevates form over substance—indeed, to an absurd extent. As this Court explained in *Brantley v. Surles*, 804 F.2d 321, 325 (5th Cir. 1986), the *Johnson* factors do "not seek a rote catechism." Rather, the goal is "just compensation" and "[m]any of the *Johnson* factors may be subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate," *id.*—as they were in the district court's opinion below.[8]

On this record, the district court did not abuse its discretion—and it is not a close call. As this Court explained in *Torres v. SGE Mgmt., L.L.C.*:

> [W]e stress that even where *Johnson* applies, district courts do not abuse their discretion by omitting a lengthy analysis of each factor. "If the district court has articulated and clearly applied the criteria . . ., we will not require the trial court's findings to be so excruciatingly explicit in this area of

---

[8] The cases Appellants cite in which a fee award was reversed for failing to meet the Rule 23(h) standard bear no resemblance to the district court's detailed analysis and findings here. In *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, this Court reversed because the fee proceeding was conducted *ex parte* and under seal and the division of fees among counsel was never meaningfully reviewed. 517 F.3d 220, 227-29 (5th Cir. 2008). In *Piambino v. Bailey*, this Court condemned a summary approval that involved no independent judicial work at all. 610 F.2d 1306, 1328 (5th Cir. 1980).

minutiae that decisions of fee awards consume more paper than did the cases from which they arose.'"

945 F.3d 347, 354 (5th Cir. 2019) (quoting *Forbush v. J.C. Penney Co.*, 98 F.3d 817, 823 (5th Cir. 1996)) (additional citations omitted; ellipses in *Torres*).

In the *Torres* case, the Court nonetheless "ha[d] little choice but to find that the district court abused its discretion in explicitly disclaiming use of the *Johnson* factors," *id.*, but that is not what the district court did here. Rather, the district court expressly recited the *Johnson* factors, ROA.2496-97, squarely analyzed those factors, ROA.2497-506; *see also supra,* and later noted it would not have to *further use* those factors to evaluate a lodestar adjustment, ROA.2506—a perfectly sensible (and correct) conclusion that was not a prohibited "disclaim[er]" of those same factors as the Appellants seem to suggest.[9]

---

[9] Kozinski's amicus brief argues that the district court should have carved out time spent on supposedly "unsuccessful" damages work from the fee award. No appellant raised that objection below or presses it in an appeal from the Fee Order, and it is therefore not properly before this Court. In any event, *Fessler v. Porcelana Corona de Mexico, S.A. de C.V.,* 23 F.4th 408 (5th Cir. 2022), cited by Kozinski for this argument, does not require any reduction in fees or reconsideration by the district court. Plaintiffs there litigated "separate legal theories" involving "different product lines and plants," and the district court had not determined whether that unsuccessful work shared a compensable common core with

# CONCLUSION

The Court should affirm the Final Approval Order and the Fee Order in full and dismiss the State of Iowa's appeal for lack of Article III standing.

---

the successful work. *Id.* at 418. Here, Plaintiffs asserted one claim under Section 7 of the Clayton Act, 15 U.S.C. § 18, and settled that claim. The amicus brief conflates the treble-damages remedy under Clayton Act Section 4, 15 U.S.C. § 15, with the Section 7 claim itself. The district court found that this Section 7 result was one of only two successful post-merger Section 7 challenges this century, and the first successful class action challenging payment-for-order-flow practices. ROA.2506 n.14. And, in any event, *Fessler* itself confirms that when claims share a "common core of facts" or "related legal theories," counsel may recover for "all hours reasonably necessary to litigate those issues." 23 F.4th at 416 (quoting *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 327 (5th Cir. 1995)).

Date: May 22, 2026                    Respectfully submitted,

                                     s/ Brian J. Dunne

CHRISTOPHER M. BURKE                  BRIAN J. DUNNE
**BURKE LLP**                         EDWARD M. GRAUMAN
402 West Broadway, Suite 1890         **BATHAEE DUNNE LLP**
San Diego, CA 92101                   901 South MoPac Expressway
(619) 369-8244                        Barton Oaks Plaza I, Suite 300
                                      Austin, Texas 78746
                                      (512) 575-8848

ALLISON WATSON
**BATHAEE DUNNE LLP**                 YAVAR BATHAEE
3420 Bristol Street, Suite 600        PRISCILLA GHITA
Costa Mesa, CA 92626                  **BATHAEE DUNNE LLP**
(213) 458-7075                        445 Park Avenue, 9th Floor
                                      New York, New York 10022
                                      (332) 322-8835

                                      *Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I certify that on the date of filing I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will serve all counsel of record.

/s/ Brian J. Dunne

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation set by this Court's order permitting Plaintiffs-Appellees to file a principal brief of up to 20,000 words, because it contains 17,235 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it was prepared in a proportionally spaced, 14-point serif typeface.

/s/ Brian J. Dunne