No. 25-40774

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

JONATHAN CORRENTE; CHARLES SHAW; LEO WILLIAMS,

Plaintiffs-Appellees,

v.

THE CHARLES SCHWAB CORPORATION,

Defendant-Appellee,

v.

SHIYANG HUANG, OBJECTOR; STATE OF IOWA, OBJECTOR,

Appellants.

On Appeal from the United States District Court for the Eastern District of Texas, No. 4:22-cv-470, Hon. Amos L. Mazzant, III

## BRIEF FOR DEFENDANT-APPELLEE THE CHARLES SCHWAB CORPORATION

<div style="display:flex">
<div>

Veronica S. Moye
KING & SPALDING LLP
2601 Olive Street
Suite 2300
Dallas, Texas 75201
(214) 764-4418
vmoye@kslaw.com

Daniel G. Swanson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7430
dswanson@gibsondunn.com

</div>
<div>

Jason J. Mendro
  *Counsel of Record*
Jeffrey Liu
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
jmendro@gibsondunn.com
jyliu@gibsondunn.com

</div>
</div>

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities, as described in Fifth Circuit Rule 28.2.1, may have an interest in the outcome of this case.  These representations are made in order that the judges of the Court may evaluate possible disqualification or recusal.

**A.    Appellants**

Shiyang Huang (pro se)

State of Iowa

**B.    Counsel for Appellant State of Iowa**

Brenna Bird, Attorney General of Iowa
Eric Wessan, Solicitor General
Breanne A. Stoltze, Assistant Solicitor General
Hoover State Office Building
1305 East Walnut Street
Des Moines, Iowa 50319

**C.    Plaintiffs-Appellees**

Jonathan Corrente

Charles Shaw

Leo Williams

i

## D.    Counsel for Plaintiffs-Appellees

Brian J. Dunne
Edward M. Grauman
BATHAEE DUNNE LLP
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, Texas 78746

Yavar Bathaee
Priscilla Ghita
BATHAEE DUNNE LLP
445 Park Avenue, 9th Floor
New York, New York 10022

Allison Watson
BATHAEE DUNNE LLP
3420 Bristol Street, Suite 600
Costa Mesa, California 92626

Christopher M. Burke
BURKE LLP
402 West Broadway, Suite 1890
San Diego, California 92101

## E.    Settlement Class Members

All persons, entities, and corporations who, as of November 24, 2025 (the date of final approval), were current U.S. brokerage customers of Schwab or any of its affiliates, including customers who previously held accounts at TD Ameritrade.

**F.    Defendant-Appellee**

The Charles Schwab Corporation

Defendant-Appellee The Charles Schwab Corporation is a publicly traded corporation and has no parent corporation.   No publicly held corporation owns more than 10% of the common stock of The Charles Schwab Corporation.

**G.    Counsel for Defendant-Appellee**

Jason J. Mendro
Jeffrey Liu
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036

Daniel G. Swanson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071

Veronica S. Moye
KING & SPALDING LLP
2601 Olive Street
Suite 2300
Dallas, Texas 75201

**H.**    **Amicus Curiae**

The Honorable Alex Kozinski

**I.**    **Counsel for Amicus Curiae**

Eugene Volokh
Hoover Institution
Stanford University
434 Galvez Mall
Stanford, California 94305

Dated: May 22, 2026

Respectfully submitted,

*/s/ Jason J. Mendro*

Jason J. Mendro
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
jmendro@gibsondunn.com

*Counsel for Defendant-Appellee*
*The Charles Schwab Corporation*

## STATEMENT REGARDING ORAL ARGUMENT

Because the precedents and principles that support affirming the district court are straightforward, oral argument is not necessary for resolution of the issues presented.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................... i

STATEMENT REGARDING ORAL ARGUMENT ................................. v

TABLE OF CONTENTS ..................................................................... vi

TABLE OF AUTHORITIES ............................................................ viii

INTRODUCTION ............................................................................... 1

JURISDICTIONAL STATEMENT ..................................................... 6

STATEMENT OF THE ISSUES........................................................ 6

STATEMENT OF THE CASE ........................................................... 7

    A.    Schwab Acquires Ameritrade ............................................... 7

    B.    Plaintiffs Sue Years Later ..................................................... 8

    C.    Schwab Negotiates A Settlement To Avoid Further Burden And Uncertainty ...................................................... 10

    D.    The Parties Issue Ample Notice To The Settlement Class..................................................................................... 13

    E.    Following A Fairness Hearing, The District Court Grants Final Settlement Approval...................................... 16

SUMMARY OF ARGUMENT .......................................................... 17

STANDARD OF REVIEW................................................................ 19

ARGUMENT.................................................................................... 21

I.    The District Court Properly Exercised Its Broad Discretion To Approve The Settlement ............................................................. 21

    A.    The Settlement Is Fair, Reasonable, And Adequate ........... 22

    B.    Appellants' Challenges To The Settlement's Reasonableness Lack Merit.............................................. 30

        1.    The *Reed* Factors Support The Settlement's Adequacy And Fairness .............................................. 30

        2.    The Settlement Provides Meaningful Relief ............. 32

3.    The Attorney's Fees Do Not Undermine The Settlement's Reasonableness ....................................... 38

4.    The Named Plaintiffs' Individual Settlements And Service Awards Were Appropriate............................. 41

II.    The Settlement Is Procedurally Proper........................................ 47

A.    The Settlement Notices Satisfied Rule 23 And Due Process ................................................................. 48

B.    The Settlement Notices Complied With CAFA ................... 53

C.    The District Court Had Jurisdiction .................................. 57

CONCLUSION ................................................................. 60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Pipe & Constr. Co. v. Utah,*
   414 U.S. 538 (1974)..................................................................50

*Ayers v. Thompson,*
   358 F.3d 356 (5th Cir. 2004)...................... 19, 21, 30, 31, 32

*Bezdek v. Vibram USA, Inc.,*
   809 F.3d 78 (1st Cir. 2015) ................................................33

*Blessing v. Sirius XM Radio Inc.,*
   507 F. App'x 1 (2d Cir. 2012)...............................35, 40, 55

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
   429 U.S. 477 (1977)..................................................................27

*In re Cal. Pizza Kitchen Data Breach Litig.,*
   129 F.4th 667 (9th Cir. 2025) ............................................39

*Califano v. Yamasaki,*
   442 U.S. 682 (1979)..................................................................51

*California v. Am. Stores Co.,*
   495 U.S. 271 (1990)..................................................................29

*Campbell v. Facebook, Inc.,*
   951 F.3d 1106 (9th Cir. 2020).................................33, 36, 40

*Chapman v. Tristar Prods., Inc.,*
   940 F.3d (6th Cir. 2019)..........................................................22

*China Agritech v. Resh,*
   584 U.S. 732 (2018)..............................................................37, 50

*In re Corrugated Container Antitrust Litig.,*
   643 F.2d 195 (5th Cir. 1981)...................................................51, 52

*Cotton v. Hinton*,
 559 F.2d 1326 (5th Cir. 1977)......................................................23, 31

*Davis v. United States*,
 564 U.S. 229 (2011)................................................................58

*In re Deepwater Horizon*,
 739 F.3d 790 (5th Cir. 2014)................................... 1, 20, 41, 57, 59, 60

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*,
 732 F.2d 480 (5th Cir. 1984)................................................25

*In re Dry Max Pampers Litig.*,
 724 F.3d 713 (6th Cir. 2013)................................................35

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
 2013 WL 4399215 (S.D.N.Y. Aug. 13, 2013).....................................51

*Farber v. Crestwood Midstream Partners L.P.*,
 863 F.3d 412 (5th Cir. 2017)................................................35

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
 62 F.4th 704 (2d Cir. 2023).................................................39

*Flecha v. Medicredit, Inc.*,
 946 F.3d 762 (5th Cir. 2020)................................................60

*In re Flint Water Cases*,
 63 F.4th 486 (6th Cir. 2023) ...............................................22

*Frank v. Gaos*,
 586 U.S. 485 (2019)................................................................58

*Garcia v. Matson*,
 2022 WL 6935303 (5th Cir. Oct. 12, 2022).....................................21

*Gonzales v. Cassidy*,
 474 F.2d 67 (5th Cir. 1973).................................................46

*Grunin v. Int'l House of Pancakes*,
 513 F.2d 114 (8th Cir. 1975)................................................49

ix

*Hyland v. Navient Corp.*,
  48 F.4th 110 (2d Cir. 2022)............................................................23, 45

*In re Jan. 2021 Short Squeeze Trading Litig.*,
  2023 WL 6534502 (S.D. Fla. Sep. 7, 2023)..........................................51

*Johnson v. Ga. Highway Exp., Inc.*,
  488 F.2d 714 (5th Cir. 1974)...............................................................38

*Johnson v. NPAS Sols., LLC*,
  975 F.3d 1244 (11th Cir. 2020)............................................................45

*Jones v. Singing River Health Servs. Found.*,
  742 F. App'x 846 (5th Cir. 2018) .........................................................44

*In re Katrina Canal Breaches Litig.*,
  628 F.3d 185 (5th Cir. 2010)...............................................48, 50, 53

*Kincade v. Gen. Tire & Rubber Co.*,
  635 F.2d 501 (5th Cir. 1981)...........................................................45, 46

*Koby v. ARS Nat'l Servs., Inc.*,
  846 F.3d 1071 (9th Cir. 2017)..............................................................34

*Legacy Cmty. Health Servs., Inc. v. Smith*,
  881 F.3d 358 (5th Cir. 2018)................................................................58

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992).......................................................................58, 59

*Macias v. Catapult Painting, LLC*,
  2020 WL 6253589 (S.D. Tex. Oct. 22, 2020) ......................................49

*Maher v. Zapata Corp.*,
  714 F.2d 436 (5th Cir. 1983)................................32, 37, 38, 38, 48, 51

*Murray v. Grocery Delivery E-Servs. USA Inc.*,
  55 F.4th 340 (1st Cir. 2022)...........................................41, 42, 44

*In re Nat'l Football League Players Concussion Inj. Litig.*,
  821 F.3d 410 (3d Cir. 2016) ................................................................40

x

*Newby v. Enron Corp.*,
394 F.3d 296 (5th Cir. 2004)................................................ 20

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018).............................................................26

*Parker v. Anderson*,
667 F.2d 1204 (5th Cir. 1982).............................. 19, 21, 22, 45

*Paterson v. Texas*,
308 F.3d 448 (5th Cir. 2002)...............................................22

*Pro. Firefighters Ass'n of Omaha, Loc. 385 v. Zalewski*,
678 F.3d 640 (8th Cir. 2012)...............................................20

*Reed v. Gen. Motors Corp.*,
703 F.2d 170 (5th Cir. 1983)................................... 30, 31, 37

*Roes, 1-2 v. SFBSC Mgmt., LLC*,
944 F.3d 1035 (9th Cir. 2019)..............................................48

*Scott v. Dart*,
99 F.4th 1076 (7th Cir. 2024) .............................................45

*Strong v. BellSouth Telecomms., Inc.*,
137 F.3d 844 (5th Cir. 1998)...............................................39

*M.D. ex rel. Stukenberg v. Perry*,
675 F.3d 832 (5th Cir. 2012)...............................................43

*In re Subway Footlong Sandwich Mktg. & Sales Practices
Litig.*,
869 F.3d 551 (7th Cir. 2017)...............................................34

*Sullivan v. DB Invs., Inc.*,
667 F.3d 273 (3d Cir. 2011) ...............................................47

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009).............................................................22

xi

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)................................................................58

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,
669 F.3d 632 (5th Cir. 2012)........................................20, 39

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)................................................................43

*Whitlock v. FSL Mgmt., LLC*,
843 F.3d 1084 (6th Cir. 2016)..............................................47

**Statutes**

28 U.S.C. § 1715(b) ..................................................................53

28 U.S.C. § 2072(b) ..................................................................46

**Other Authorities**

*Award-winning investing: our clients have spoken*, The
Charles Schwab Corp., https://perma.cc/P8FC-U96P ........28

U.S. Dep't of Just. Antitrust Div., *Evaluation of Corporate
Compliance Programs in Criminal Antitrust
Investigations* (Nov. 2024), https://perma.cc/ZAD3-6R62 ..................24

Registration Statement (Form S-4) (March 10, 2020), The
Charles Schwab Corp., https://perma.cc/5BJB-37P4 ...........7

S. Rep. 109-14 (2005)................................................................56

*Schwab Order Execution Advantage*, The Charles Schwab
Corp., https://perma.cc/CQ8X-VVYZ....................................28

**Rules**

Fed. R. Civ. P. 23(e) ..........................................................17, 22

## INTRODUCTION

This appeal concerns a class-action settlement that enabled embattled litigants to resolve a long-pending lawsuit, conserved vital judicial resources, and secured valuable relief for a class that could not have obtained it through further litigation. The settlement was achieved through extensive, arms-length negotiations. Out of a class of 25 million, only one class member and one State (which is not a class member) appealed the settlement. Their respective appeals raise contradictory challenges to the settlement and fail to show that the district court abused its broad discretion in approving the settlement. There must be a path to resolving complex litigation before trial. This Court should affirm and preserve the "overriding public interest in favor of settlement . . . in class action suits." *In re Deepwater Horizon*, 739 F.3d 790, 807 (5th Cir. 2014).

The Charles Schwab Corporation ("Schwab") is a leading financial services company that offers a full range of banking, financial advisory, and brokerage services. In 2020, Schwab acquired TD Ameritrade Holding Corporation ("Ameritrade"), another brokerage firm. After thorough review, the U.S. Department of Justice allowed the deal to go

forward. Since then, the merger has enhanced Schwab's services to its clients. In 2022, however, the three named plaintiffs here filed a putative class action on behalf of Schwab clients, challenging the merger under federal antitrust law, seeking damages on behalf of a massive purported class, and seeking to force Schwab to divest itself of Ameritrade. Schwab vigorously defended against the lawsuit and is confident it would have prevailed if it had litigated through expert discovery, class certification, summary judgment, and trial if necessary. Both the district court and plaintiffs recognized the weaknesses in plaintiffs' case. But after years of costly and burdensome litigation and in the anticipation of years more, Schwab made the difficult choice to settle.

Schwab and plaintiffs reached an agreement only after months of negotiations facilitated by a neutral former federal judge. Ultimately, Schwab agreed to implement an antitrust compliance program designed by eminent antitrust experts. In exchange, plaintiffs agreed to release only the class's nonmonetary claims, freeing Schwab and its customers from the threat of any restructuring of or other interference with Schwab's business. The named plaintiffs could seek service awards for their efforts in the litigation of up to $5,000 and released their individual

2

damages claims in exchange for $50 in account credits each. The absent class members, however, would *not* release their damages claims and, thus, could pursue them after the settlement.

After fully negotiating the substantive terms of the settlement and executing a written term sheet, the parties began separate negotiations over plaintiffs' demand for attorney's fees. Eventually, they agreed plaintiffs would seek no more than $8,250,000 in attorney's fees and $700,000 in litigation expenses, leaving the specific fee and expense amounts to be awarded to the trial court's discretion. Schwab would pay any amount awarded by the court.

Following notice to the class and a fairness hearing, the district court issued a 52-page opinion approving the settlement. It also granted plaintiffs' motion for service awards, attorney's fees, and expenses.

Under this Court's deferential standard of review, it should not disturb the district court's robust assessment of the settlement's fairness and procedural propriety—guided by its deep familiarity with the parties and their counsel, their relative positions, and the record. Appellants do not remotely demonstrate any abuse of discretion.

*First*, appellants' challenges to the settlement's adequacy fail. Appellants maintain both that the settlement provided inadequate consideration for releasing the class's nonmonetary claims *and* that the named plaintiffs lacked standing to assert those claims in the first place. Those contradictory arguments show that appellants have no coherent theory to invalidate the settlement.

The standing argument suggests the nonmonetary claims should be dismissed (not more richly rewarded), but the argument lacks merit. Schwab agrees that plaintiffs' antitrust theory is wrong, but plaintiffs do not need show they are right to plead allegations sufficient to establish Article III standing and later settle this case.

The adequacy argument undervalues the settlement consideration, overvalues the claims, and overlooks the district court's discretion. The district court correctly found that the settlement promises to provide the class with valuable injunctive relief, an antitrust compliance program targeted at plaintiffs' claims of antitrust violations enabled by the merger. In return, the class will release only nonmonetary claims, which have little value or prospect of success. The notion that this suit could unravel Schwab's 2020 acquisition of Ameritrade was unserious when

4

the case was filed and absurd now that the companies have been combined for more than half a decade. Plaintiffs and their counsel negotiated the settlement with the class's best interests at heart and secured a result that the class could not have obtained through further litigation. As the district court rightly concluded, the settlement was thus fair, adequate, and equitable.

Appellants fixate on the attorney's fees and service awards to the named plaintiffs, but they overlook a critical feature of the settlement: Those terms are expressly severable from the rest of the settlement. Moreover, all substantive terms of the settlement were fully negotiated *before* the fees, when plaintiffs' counsel could not know what would be gained for their efforts. The settlement's validity thus does not depend on—and is not undermined by—either award.

*Second*, the settlement was procedurally proper. The parties provided more than adequate notice of the settlement to States and class members alike: Direct notice reached over 99% of the class and every state attorney general, and it fully apprised interested parties of the settlement's terms and the opportunity to object. Precedent and common sense foreclose appellants' novel claim that settlement notices must

5

detail the deadlines to assert unreleased claims. And Iowa's argument that it received inadequate notice under the Class Action Fairness Act of 2005 ("CAFA") is unsupported by the record and irrelevant to the settlement's validity.

This Court should affirm.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1332(d). ROA.47¶53. This Court has jurisdiction under 28 U.S.C. § 1291 to review the district court's November 24, 2025 orders granting final approval of the settlement and awarding attorney's fees, litigation expenses, and service awards. *See* ROA.2441-521. Huang and the State of Iowa timely appealed on November 24 and December 19, 2025, respectively. ROA.2522, ROA.3125-26.

## STATEMENT OF THE ISSUES

1. The district court approved a class settlement that provides adequate and meaningful relief for the release of a class's nonmonetary claims, was negotiated at arm's length by class counsel who adequately represented the class, and treats class members equitably relative to

each other. Did the district court abuse its broad discretion in approving the settlement?

2.     The parties issued court-approved notice of the settlement, including extensive direct notice, to class members and State Attorneys General, stating all the information required under Rule 23 of the Federal Rules of Civil Procedure and CAFA, respectively. Should the settlement be reversed for lack of notice?

3.     Plaintiffs alleged an ongoing injury in fact redressable by prospective relief. Did the district court lack jurisdiction to approve the settlement?

## STATEMENT OF THE CASE

### A.    Schwab Acquires Ameritrade

Schwab is a public holding company that through its subsidiaries provides a wide range of wealth management, securities brokerage, banking, asset management, custody, and financial advisory services.

In November 2019, Schwab announced its intention to acquire Ameritrade, a retail securities brokerage firm with a leading online trading platform. ROA.43¶31; *see* The Charles Schwab Corp., Registration Statement (Form S-4) 107 (Mar. 10, 2020),

7

https://perma.cc/5BJB-37P4. The United States Department of Justice reviewed the prospective acquisition for compliance with the Hart-Scott Rodino Act. ROA.2772-74. After a comprehensive, months-long probe, *id.*, DOJ closed its investigation without imposing any conditions on the merger. The deal closed in October 2020. ROA.176.

## B.   Plaintiffs Sue Years Later

Approximately two-and-a-half years after the merger closed, three Schwab customers—Jonathan Corrente, Leo Williams, and Charles Shaw—sued Schwab on behalf of a putative class of Schwab's "retail" customers, which they described as investors who trade securities for themselves (as opposed to trading professionally). ROA.38¶7, ROA.137-39. Plaintiffs claimed the merger violated Section 7 of the Clayton Act, 15 U.S.C. § 18, and demanded monetary and injunctive relief, including a segregation order or divestiture remedy ordering the merger to be unwound. ROA.137-39, ROA.181.

The complaint claimed the merger unlawfully reduced competition within a supposed "market for [r]etail [o]rder [f]low." ROA.137¶482. According to plaintiffs, in that market "[r]etail investors produced order flow" by placing orders to buy or sell securities with retail brokers, "which

profited by aggregating and selling those orders" to third parties to fill or "execute." ROA.38-39¶11, ROA.42¶27, ROA.108¶328. In exchange, the complaint claimed, retail brokers buy their customers' trade orders in the currencies of favorable trading prices and rebates. ROA.101¶¶294-95; ROA.104¶311. Plaintiffs theorized that the merger increased Schwab's control of their asserted market, ROA.116¶373, thereby enabling it to pay less favorable trading prices and rebates for the order flow it supposedly bought from its customers, ROA.37¶3, ROA.116¶372.

Schwab moved to dismiss. *See* ROA.170-207. As Schwab explained, plaintiffs' so-called "market for order flow" was artificial and mischaracterized the brokerage industry. ROA.184-89. Schwab provides customers with accounts, investments tools, services, and platforms for taking their orders to buy and sell securities. ROA.186-87. Neither Schwab nor its many competitors *buy* orders from their retail customers. *Id.* The opposite is true: Retail customers purchase investment products and services from Schwab and other brokerage firms, who compete for that business based on the quality and price of their offerings. ROA.185-87. Schwab showed that the merger would not reduce competition in any properly defined, relevant market. ROA.189-93.

### C.    Schwab Negotiates A Settlement To Avoid Further Burden And Uncertainty

Despite the striking divergence between plaintiffs' claims and market realities, the district court denied Schwab's motion to dismiss, finding that "the issue of market realities is better addressed after the parties have had an opportunity to conduct discovery." ROA.410, ROA.418.  A period of extensive and burdensome discovery followed.  In response to plaintiffs' requests, Schwab produced data on approximately 6.4 billion individual trades placed by its customers between 2019 and 2023, a total of approximately 6.5 terabytes of financial data. ROA.1497¶10.  Schwab also produced approximately 950,000 pages of documents and made several of its executives available for depositions, including a 30(b)(6) corporate representative.  ROA.1497¶8.

Given the protracted and costly nature of the proceedings, Schwab agreed to consider a settlement.  The parties began arm's-length negotiations in July 2024 with assistance from a former federal district court judge.  ROA.1131¶¶1-3.  During these negotiations, the parties did not discuss the amounts of attorney's fees or litigation expenses plaintiffs' counsel would seek.  ROA.1303-04.  Negotiations continued until September 2024, when the parties executed a settlement term sheet.

ROA.1067. The parties then executed a complete stipulation and agreement of settlement on December 12, 2024. ROA.1360.

That bargain required compromise on both sides. Schwab agreed to implement an antitrust compliance program, designed by an independent, third-party consultant. ROA.1047-50. "After proposing, considering, and jointly interviewing multiple candidates, Schwab and Plaintiffs determined that" the consultant would consist of a team of leading antitrust attorneys from Fried, Frank, Harris Shriver & Jacobson LLP, helmed by Bernard A. Nigro, Jr., who previously served as the Department of Justice's Principal Deputy Assistant Attorney General for Antitrust and the Federal Trade Commission's Deputy Director for the Bureau of Competition. ROA.1048; *see* ROA.1107-08¶21.

The consultant's "[r]emit" would include access to Schwab's "[p]olicies, practices, and procedures" related to its "communications with and among market makers and other broker-dealers," its "order routing allocations and price improvement," and its "order routing committees and decisionmakers, including as to communications and coordination with market makers and other broker-dealers." ROA.1048. Under the settlement, the consultant would complete its review within 180 days,

11

then work with the parties on a report setting out recommendations for the compliance program over the next 120–150 days. ROA.1049. Schwab would then "adopt and begin to implement all recommendations" in the consultant's final report, with mandatory annual certifications for four years that it was implementing and complying with the report. ROA.1050.

Schwab agreed to pay all reasonable costs associated with the third-party consultant and with implementation of the antitrust compliance program, ROA.1047-48, as well as with providing notice of the settlement to absent class members and to State Attorneys General, ROA.1055. As the mediator concluded, the settlement "provides meaningful relief to the members of the settlement class." ROA.1132¶10.

In exchange, class members would release their claims for injunctive relief, including the unwinding of the merger, but would retain all individual claims for monetary damages. *See* ROA.1046, ROA.1050. The settlement class includes, with limited exceptions, all "persons, entities, and corporations who are current U.S. brokerage customers of Schwab or any of its affiliates, including customers who previously held accounts at Ameritrade." ROA.1045. The parties also agreed that the

named plaintiffs would release their individual damages claims for $50 account credits, ROA.1047, and that plaintiffs' counsel would submit an application for a service award of no more than $5,000 for each plaintiff, ROA.1057.

In January 2025, after executing the settlement stipulation, the parties participated in a separate mediation addressing, for the first time, plaintiffs' demand for attorney's fees. Following that mediation, plaintiffs' counsel agreed it would seek attorney's fees no greater than $8,250,000 and litigation expenses no greater than $700,000 without opposition from Schwab. ROA.1304. The mediator acknowledged that all negotiations "were hard-fought"; that "[t]here was no apparent collusion between the parties"; and that "the negotiations were conducted at arm's length." ROA.1132¶7.

Plaintiffs promptly moved for preliminary settlement approval. ROA.1002-36.

### D.   The Parties Issue Ample Notice To The Settlement Class

In February 2025, the district court preliminarily certified the settlement class under Rule 23(b)(2) and preliminarily approved the

13

settlement. ROA.1176. The court set a deadline for objections and scheduled a fairness hearing on final approval. ROA.1178, ROA.1181.

The parties proposed, and the district court appointed, Ankura Consulting Group LLC—a leading settlement administrator—to administer notice of the settlement to members of the settlement class. ROA.1427¶5.

Schwab compiled contact information for approximately 25 million customers comprising the settlement class. ROA.1054, ROA.1428-29¶¶8-11. Ankura then executed a direct notice campaign that transmitted millions of notices by email "to ensure timely and efficient delivery of notices." ROA.1431-32¶18. Ankura sent postcard notices to those class members without working email addresses. *Id.* Ankura also established and maintained a settlement website, which provided basic information about the settlement and key documents including the class notice and the settlement agreement itself, and staffed a settlement helpdesk that class members could call for more information. ROA.1431¶17, ROA.1437¶¶32-34.

The notice informed class members of the terms of the settlement, the affected claims and class definition, the identities of class counsel,

how to file an objection, and where to find additional information about the settlement. ROA.1088-1100. The notice also specified that class members "are not releasing any damage or monetary claims against Schwab." ROA.1093.

By the end of the notice period, Ankura successfully noticed 99.5% of the approximately 25-million-member settlement class— approximately 18.3 million by email and approximately 6.5 million by postcard. ROA.1438¶36. The settlement website had approximately 300,000 views, and the settlement helpline fielded approximately 25,000 calls. ROA.1431¶17, ROA.1436¶31. Schwab shouldered the costs of paying the notice administrator, printing the notice, postage, and maintaining a settlement-related website and call center. ROA.1055.

In compliance with the Class Action Fairness Act, Schwab caused all individualized notices of the settlement to be sent to all State Attorneys General and the Attorney General of the United States. ROA.1429¶12-13, ROA 2096-97¶3. Ankura helped deliver the notices, which were all dispatched with return-receipt requested. ROA.1430. Schwab and Ankura confirmed successful delivery of all notices, except

15

to the Attorney General of American Samoa, whose office consented to receive the notice electronically.  ROA.1430¶14, ROA.2097¶4.

Following the issuance of notice, approximately 70 purported class members filed objections.  ROA.2080.  These filings included repeat objections from the same class members, *e.g.*, ROA.1254, ROA.1831, objections from non-class members, *e.g.*, ROA.1956, and "objections" in name only from Schwab customers who wrote merely to express complete "satisf[action] with [Schwab's] products, services, and prices" and their view that the claims were meritless, *e.g.*, ROA.1904, ROA.1940.  Even counting those, there were fewer than three objectors per million class members, including appellants Iowa and Huang.  None of the objectors (or anyone else) sought to intervene in the case.

### E.    Following A Fairness Hearing, The District Court Grants Final Settlement Approval

The district court held a fairness hearing that was open to all class members and objectors.  Neither of the appellants nor any of the other objectors attended.  ROA.2444.

After the hearing, the court issued a 52-page opinion, holding that the settlement class had been appropriately noticed, ROA.2467-68, the objections lacked merit, ROA.2483, and the settlement was "fair,

16

reasonable, and adequate," *see* ROA.2441, ROA.2469. The district court separately approved plaintiffs' application for attorney's fees and expenses. ROA.2507-09.

Only two objectors appealed: Iowa and Huang. Plaintiffs moved to dismiss Iowa's appeal for lack of Article III standing. A motions panel of this Court deferred the motion to the merits panel.

## SUMMARY OF ARGUMENT

**I.** The district court properly held that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The settlement reasonably resolves the injunctive-relief claims by requiring Schwab to adopt an antitrust compliance program. That relief was more than adequate, given the weakness of the claims. Plaintiffs' requested remedy for divestiture was fanciful, and the class members retain their damages claims. The district court thus properly exercised its wide discretion in deeming the settlement reasonable in light of the range of potential relief on plaintiffs' claims.

Appellants' substantive objections to the settlement fail. The record shows that the settlement provides meaningful relief to the class. Dissatisfaction with the credits the named plaintiffs received for

17

releasing their individual damages claims, their service awards, and the attorney's fees provide no reason to upset the settlement. The named plaintiffs settled only their own damages claims. The class members preserved their claims, so there is no conflict that could undermine the adequacy of the settlement or the named plaintiffs' representations. Furthermore, the district court acted well within its discretion in determining that the attorney's fees and service awards were reasonable. And in any event, appellants overlook that both the attorney's fees and the service awards were expressly severable from the rest of the settlement. Thus, this Court should affirm approval of the settlement without regard to those awards.

**II.**　Appellants' procedural challenges to the settlement fare no better. Schwab and Ankura, the notice administrator, submitted sworn declarations confirming the issuance of complete CAFA notices to every entity entitled to receive them. Iowa offered no evidence to rebut those declarations. In any event, irrespective of whether Iowa's notice was missing pages, Iowa was quite clearly unharmed; Iowa *did* file a timely objection.

18

Notice to the class was also proper. The notice explained the claims released by the settlement, the consideration received by class members, and all other information that was reasonably necessary for class members to determine whether to object. Contrary to Huang's contention, the settling parties had no duty to advise the class of *independent* legal bars to potential class claims (such as a potentially applicable statute of limitations).

Finally, the district court had jurisdiction to approve the settlement because plaintiffs had Article III standing. Plaintiffs alleged they were experiencing less favorable prices and reduced rebates on their trades as a result of the merger and that prospective relief targeted at the merger's allegedly anticompetitive effects would redress their harms. Those allegations could not be proven and were legally unsound, but they were enough to satisfy Article III's standing requirements.

## STANDARD OF REVIEW

"[A]ppellate review of the district court's approval of a [class-action] settlement" is "limited." *Ayers v. Thompson*, 358 F.3d 356, 368 (5th Cir. 2004). This "limited review rule is a product of the strong judicial policy favoring the resolution of disputes through settlement." *Parker v.*

19

*Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982). And it reflects that the district court alone is "exposed to the litigants," "their strategies, positions and proof," and "the expense and possible bars to success," and thus must be afforded "broad discretion" in deciding whether to approve a settlement. *Id.* at 1209 n.5; *Pro. Firefighters Ass'n of Omaha, Loc. 385 v. Zalewski*, 678 F.3d 640, 645 (8th Cir. 2012) (citation omitted).

Accordingly, "[a] district court's approval of a class action settlement may be set aside only" if the court clearly "abuse[d]" its discretion. *Newby v. Enron Corp.*, 394 F.3d 296, 300 (5th Cir. 2004). "An abuse of discretion occurs only when all reasonable persons would reject the view of the district court." *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 638 (5th Cir. 2012). The district court's rulings on class certification and fee awards are also reviewed for abuse of discretion. *Id.*

Standing is reviewed de novo. *In re Deepwater Horizon*, 739 F.3d at 798.

20

# ARGUMENT

## I. The District Court Properly Exercised Its Broad Discretion To Approve The Settlement

A district court has "broad discretion" to decide whether to approve a settlement. *Parker*, 667 F.2d at 1209 n.5. This Court, meanwhile, fulfills the "limited" role of confirming that the district court did not "clearly" abuse its discretion. *Id.* at 1209 & n.5; *Ayers*, 358 F.3d at 368.

The district court's decision to approve the settlement readily passes muster under that "highly deferential" standard. *Garcia v. Matson*, 2022 WL 6935303, at *3 (5th Cir. Oct. 12, 2022). The court carefully examined the settlement, thoughtfully engaged with arguments from objectors, and granted final approval after finding that the settlement was fair, reasonable, and adequate. *See* ROA.2441-92.

Appellants challenge the adequacy of the settlement's relief, the reasonableness of the attorney's fees, and the validity of the individual damages and service awards received by the named plaintiffs. None of those challenges has merit.[1]

---

[1] Schwab agrees with Plaintiffs that Iowa lacks standing to object and to appeal. *See* Plaintiffs-Appellees' Motion to Dismiss Appeal of the State of Iowa 6-13, ECF No. 44. This Court has squarely held that States lack standing to object to settlements in a *parens patriae* capacity on behalf of

### A.     The Settlement Is Fair, Reasonable, And Adequate

A district court may approve a class-action settlement if it finds that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). A proposed settlement meets that standard if the class representatives and class counsel adequately represented the class, the proposal was negotiated at arm's length, the proposal treats class members equitably relative to each other, and the relief is adequate. *Id.* Adequacy in turn depends on "the costs, risks, and delay of trial and appeal," "the effectiveness of any proposed method of distributing relief to the class," and the terms of any fee award. Fed. R. Civ. P. 23(e)(2)(C). "[T]he probability of the plaintiffs' success on the merits" is "the most important factor" in assessing the adequacy of a settlement. *Parker*, 667 F.2d at 1209. In making that assessment, district courts are "entitled to

---

an identifiable subset of their citizens. *Paterson v. Texas*, 308 F.3d 448, 450 (5th Cir. 2002); *see Chapman v. Tristar Prods., Inc.*, 940 F.3d 299, 303 (6th Cir. 2019). Iowa's purported CAFA injury is the classic sort of bare procedural injury that is "insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). At most, Iowa's alleged CAFA injury would give it standing to challenge its own supposed lack of notice—not to object to any other aspect of the settlement. *See In re Flint Water Cases*, 63 F.4th 486, 503 (6th Cir. 2023) (objectors "lack standing to appeal aspects of the settlement that do not adversely affect them").

rely upon the judgment" of the parties' "experienced counsel" and generally "should be hesitant to substitute [their] own judgment for that of counsel." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977).

As the district court found, the settlement here checked every box. The court credited the named plaintiffs and class counsel for adequately representing the class and obtaining a settlement in the class's "best interest." ROA.2471, ROA.2475. It recognized that the settlement reflected roughly five months of what the mediator described as "hard-fought" negotiations "conducted at arm's length" without any fraud or collusion. ROA.2472. And it found that Schwab's agreement to adopt an antitrust compliance program "applie[d] uniformly to all members of the Settlement Class" and promised meaningful relief for the release of the class's injunctive claims. ROA.2481.

The district court correctly held that the promised antitrust compliance program affords the class adequate relief for the compromise of their injunctive-relief claims. *Cf. Hyland v. Navient Corp.*, 48 F.4th 110, 119 (2d Cir. 2022) (affirming district court's approval of a Rule 23(b)(2) settlement under which the defendant agreed "to implement a number of business-practice enhancements"). As the Department of

23

Justice has recognized, "[a]ntitrust compliance programs promote vigorous competition in a free market economy by creating a culture of good corporate citizenship." Dep't of Just. Antitrust Div., *Evaluation of Corporate Compliance Programs in Criminal Antitrust Investigations* 2 (Nov. 2024), https://perma.cc/ZAD3-6R62. "[W]hen potential antitrust issues arise, an effective compliance program should enable a company to swiftly detect and address them." *Id.* Thus, "[a] strong culture of compliance can allow a company to steer clear of civil antitrust violations and, if violations do occur, to promptly self-disclose and remedy them and cooperate with a civil antitrust investigation." *Id.* at 2-3.

The compliance program proposed here reflects those principles. It empowers leading antitrust experts to undertake a thorough examination of and propose reforms to Schwab's policies. *See* ROA.1048-49. And it commits Schwab to adopting and implementing those reforms, keeping Plaintiffs apprised of its progress, and allowing the district court to retain jurisdiction to uphold the settlement terms. ROA.1048-50.

Accordingly, the district court determined that the compliance program would "ensure that going forward Schwab's policies, practices, and procedures promote competitive price improvement on trades for all

members of the Settlement Class as well as future Schwab brokerage customers." ROA.2477. The court further found that the program is "specifically tailored to remedy" plaintiffs' alleged injuries. ROA.2474. That determination also tracked the findings of the mediator, who determined that "the antitrust compliance program . . . provides meaningful relief to the members of the settlement class." ROA.1132¶¶9-10. And although Schwab does not endorse the specific analysis in plaintiffs' expert report, *see* ROA.2832-62, all the record evidence points in the same direction: The value of the settlement to class members will be substantial.

On the other side of the ledger, the district court found that plaintiffs "face[d] significant factual and legal hurdles to prevail on their claims at trial." ROA.2475-76. That was correct. "[T]he first step in analyzing a section seven claim" under the Clayton Act—plaintiffs' only claim—"is defining the relevant product and geographic markets." *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 491 (5th Cir. 1984). But the plaintiffs' market definition was belied by market realities. As noted above, plaintiffs' theory was that Schwab is a *buyer* in a retail order flow market, rather than a *seller* in a highly competitive

brokerage services market. *See supra* 8-9. That theory gets the market structure backwards, a fatal defect. "[W]ithout an accurate definition of the relevant market . . . 'there is no way to measure [the defendant's] ability to lessen or destroy competition.'" *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018) (third alteration in original).

As Schwab explained below, plaintiffs' conception of the retail order flow market is a contrivance designed to dodge the appropriate product market: the overall market for brokerage services, in which the merger promoted rather than lessened competition, ROA.186-88, as the Department of Justice recognized. To compete successfully in that market, a larger Schwab must continue to provide its customers with outstanding service, including execution quality—*i.e.*, the efficient execution of clients' trade orders at favorable prices. Plaintiffs themselves admit that fulfilling trade orders at favorable prices "is an important way—perhaps the most important way—that retail brokerages compete with one another." ROA.115-16¶371. Acquiring Ameritrade did not change that; the combined company continues to compete fiercely for customers, including by touting its exceptional execution quality. ROA.2079.

Plaintiffs also would have failed to prove "antitrust injury," another essential element of their claims. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). For starters, plaintiffs' theory that the merger reduced "rebates" customers received on trade orders was a work of their imaginations. After extensive discovery, plaintiffs adduced no evidence that Schwab ever paid "rebates," not after or before the merger. ROA.2078. And Plaintiffs' contention that the merger worsened their trading prices was entirely speculative. As Iowa correctly observes (Br. 24-25), "there is little evidence that actual order flow costs will increase or that they will do so in a way that harms the class." The price at which any trade order is filled or "executed" depends on a host of variables—including the timing and size of the order, what other orders were placed around the same time, the volatility of the security, and short-term market trends. ROA.190-93; *see* ROA.2078. These variables change constantly. Plaintiffs had no prospect of proving that *any* trade would have had a different outcome if the merger had never happened— much less of proving, classwide, that hundreds of millions of trades executed over many years in a rapidly changing market would have all

27

landed at different but lower prices.  That reality also would have doomed any effort to certify a damages class under Rule 23(b)(3).

Although plaintiffs complained that the merger provided Schwab with more retail trade orders to route to the third parties that execute them, ROA.88¶236, ROA.98¶283, they offered no coherent theory of why that would harm Schwab's customers.  Having additional orders to route should enhance, not reduce, Schwab's ability to demand excellent execution services from third parties, thus *improving* outcomes for Schwab's customers.  *See* Iowa Br. 19 (arguing that the merger actually resulted in "price decreases . . . due to economies of scale").  Indeed, after the merger, the quality of trades executed through Schwab's trading platform has achieved industry-leading highs:  Internal measures indicate that, in 2025, Schwab beat the industry benchmark 97% of the time.  *See* ROA.2079; *Schwab Order Execution Advantage*, The Charles Schwab Corp., https://perma.cc/CQ8X-VVYZ (last visited May 22, 2026); *Award-winning investing: our clients have spoken*, The Charles Schwab Corp., https://perma.cc/P8FC-U96P (last visited May 22, 2026). Experienced industry-watchers have lauded Schwab's excellence as an online broker and the quality of its trade execution.  ROA.2079.

28

Nor could plaintiffs have prevailed on their aggressive injunctive-relief claims for divestiture. By the time the case settled, five years had elapsed since the merger. In that time, as plaintiffs were well aware, Schwab and Ameritrade worked diligently to integrate their operations, and they are now completely intertwined. Having sat on their hands for five years, plaintiffs had no realistic prospect of obtaining the radical relief of splitting apart a unitary company, particularly after the Department of Justice found nothing objectionable about the merger. *See California v. Am. Stores Co.*, 495 U.S. 271, 296 (1990) (recognizing that multiple "equitable defenses" "protect consummated transactions from belated attacks by private parties"); ROA.203-05.

Moreover, the district court observed that if this case had proceeded, the parties would have been forced to engage in complex and resource-intensive disputes over class certification, expert evidence, and summary judgment. ROA.2473-76. Schwab's decision to settle the case sensibly balanced the weaknesses in plaintiffs' claims against the significant costs and risks of litigating the case to a final judgment. Resolving this case through settlement promised certainty and spared all

parties "the risks and burdens of potentially protracted litigation." *Ayers*, 358 F.3d at 369.

### B.    Appellants' Challenges To The Settlement's Reasonableness Lack Merit

Neither Huang nor Iowa comes close to identifying any abuse of discretion in the district court's sound analysis.

### 1.    The *Reed* Factors Support The Settlement's Adequacy And Fairness

Iowa hardly disputes (Br. 22-23) that the settlement satisfies the Rule 23(e) fairness factors.  It instead invokes the factors for settlement approval identified in *Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir. 1983), which long predates the 2018 amendment to Rule 23 that specified the considerations that should guide settlement approval.  To the extent *Reed* remains relevant, the *Reed* factors "overlap significantly" with the Rule 23(e) factors, and the district court rightly determined that they support the same result.  ROA.2470.

As explained above, there was no "fraud or collusion behind the settlement," and "the complexity, expense, and likely duration of the litigation" without a settlement and the low "probability of plaintiffs' success on the merits" all favor the settlement.  *Reed*, 703 F.2d at 172.

30

The advanced "stage of the proceedings" and the "extensive" "amount of discovery completed," *id.*; ROA.2474-75, allowed the parties to negotiate the settlement with "ample information" about each other's positions, *Ayers*, 358 F.3d at 369. And "the opinions of the class counsel, class representatives, and absent class members," *Reed*, 703 F.2d at 172, "overwhelmingly" favored the settlement—with only a "very small number" of objectors relative to the size of the class, ROA.2482-83.

The "range of possible recovery" also supported approval of the settlement. *Reed*, 703 F.2d at 172. That range included plaintiffs' aggressive request for divestiture at the top end. But while the settlement promises less than that, it was nonetheless "more than fair" given the weaknesses in plaintiffs' claims and the "substantial" value to the class of the antitrust compliance program. ROA.2477. "[I]nherent in compromise is a yielding of absolutes and an abandoning of highest hopes." *Cotton*, 559 F.2d at 1330.

Iowa quibbles (Br. 32) that the district court should also have considered plaintiffs' damages requests as part of the range of recovery, but it cites no case holding that courts must consider the range of *damages* when a settlement releases only *injunctive*-relief claims in

exchange for only prospective relief. The class members retain their damages claims. And as Iowa's cited authority makes clear, courts need not estimate "the range of possible monetary recovery" where the primary impact of a successful suit on the claim released—here, divestiture—"does not lend itself to meaningful quantification." *Maher v. Zapata Corp.*, 714 F.2d 436, 461 (5th Cir. 1983). Any purported error in specifying the range of relief would be harmless in any event, given the other "relevant factors favoring approval." *Id.*

## 2. The Settlement Provides Meaningful Relief

Iowa generally attacks (Br. 10-29) the settlement by contending that it provides only "uncertain," "hypothetical" relief to the class and that plaintiffs gave up too much in exchange for that relief. Both arguments are meritless.

*First*, Iowa complains (Br. 28-29) that the compliance program's details remain uncertain, but it offers nothing to show that the district court "clearly" abused its discretion in finding the program to offer meaningful value. *Ayers*, 358 F.3d at 368. The contours of the program remain to be designed simply because the consultants—some of the country's foremost experts in antitrust compliance, ROA.1107-08¶21—

32

must analyze Schwab's business and practices before they can design an effective program. Schwab's care in implementing the program does not somehow show that it will lack substantial value once implemented. And in the unlikely event the program's implementation ultimately faces delays, Iowa Br. 28-29, the district court has retained jurisdiction to intervene and enforce the settlement. *See supra* 24.

As Iowa's own cases stress, where the district court's finding that a settlement's "injunctive relief ha[s] value" is not "clearly erroneous," courts should "decline to adopt" an objector's contrary "view of the settlement's value." *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1123 (9th Cir. 2020). Iowa cites (Br. 15-21) no record evidence the district court overlooked; does not dispute the consultants' expertise or that their remit is focused on the issues that motivated this suit; and cannot contest that the settlement commits both Schwab and the consultants to move promptly to establish the compliance program. Iowa's insubstantial efforts to second-guess the settlement's value thus do not come close to identifying any abuse of discretion. *See, e.g.*, *Bezdek v. Vibram USA, Inc.*, 809 F.3d 78, 84 (1st Cir. 2015) (no abuse of discretion where district court

33

reasonably "directly considered and rejected" challenge to value of settlement's injunctive relief).

Iowa compares (Br. 23-26) this case to three other out-of-circuit cases disapproving injunction-only settlements, but those cases are far afield. In *In re Subway Footlong Sandwich Marketing & Sales Practices Litigation*, 869 F.3d 551 (7th Cir. 2017), Subway simultaneously promised both to take steps to ensure that the bread loaves of its footlong sandwiches were twelve inches long and to issue a disclaimer denying it could even *possibly* provide consistent "uniformity in bread length" at twelve inches. *Id.* at 557. In the Seventh Circuit's view, that contradictory disclaimer confirmed that Subway's promised steps were "worthless" and did nothing to reduce the risk that it might "sell a class member a sandwich that is slightly shorter than advertised." *Id.* at 556-57. Schwab's very real promise to implement an antitrust compliance program looks like nothing like Subway's illusory promise to make every sandwich exactly twelve inches long.

*Koby v. ARS National Services, Inc.*, 846 F.3d 1071 (9th Cir. 2017), is equally inapt. There, a defendant debt collection company promised to make disclosures in *future* voicemail messages for two years, but that

promise was "worthless" to the class, which was defined to include those who had received voicemail messages *years before* and were unlikely to be subject to future collection efforts by the defendant. *Id.* at 1079. Here, in contrast, the settlement class includes only *current* Schwab customers—each of whom will benefit equally from the antitrust compliance program.

*In re Dry Max Pampers Litigation*, 724 F.3d 713 (6th Cir. 2013), comes no closer to the mark. In that case, the settlement—entered before discovery or even motion-to-dismiss briefing—offered refunds that "most of [the class] . . . already had access to" and changes to the defendant's website that offered "only rudimentary information" with negligible value. *Id.* at 518-21. Neither the parties nor the district court disputed those realities. *Id.* In contrast, the settlement here promises significant, *new* relief, and the record amply supports the settlement's value. Contrary to Iowa's suggestion, there is nothing unusual about "zero-dollar class action settlement[s]" in complex antitrust suits. *E.g.*, *Farber v. Crestwood Midstream Partners L.P.*, 863 F.3d 410, 412 (5th Cir. 2017) (dismissing appeal of such a settlement for lack of appellate jurisdiction); *see Blessing v. Sirius XM Radio Inc.*, 507 F. App'x 1, 4 (2d Cir. 2012)

35

(affirming district court's approval of "nonmonetary antitrust settlemen[t]").

The compliance program reflects a reasonable compromise of plaintiffs' claims. As Iowa's own cases (Br. 33-34) recognize, where the underlying claim is "weak," a settlement's value must be assessed against the reality that "the class gave up very little" in releasing the claim. *Campbell*, 951 F.3d at 1123. And Iowa does not dispute that Plaintiffs faced "significant factual and legal hurdles" to win on their claims. ROA.2475-76. Indeed, Iowa itself has argued that plaintiffs have not established any cognizable "theory of harm," since "there is a robust market in and competition for" retail order flow, and because the merger benefitted customers by widening "access to $0 fee retail trades." ROA.1965-66; *see* Iowa Br. 19 (contending that the merger led to "price decreases"). Reinforcing Iowa's acknowledgement that the claims are weak, Huang even contends that plaintiffs *lacked standing* to pursue injunctive relief based on claims of future injury. *See infra* 57.

*Second*, Iowa fares no better in contending that the class members gave up too much in exchange for the compliance program. The settlement offers no monetary compensation to absent class members

36

*because* they are not releasing individual claims for damages and remain free to pursue those claims in standalone suits.

Iowa complains (Iowa Br. 34-39) it may be too late to litigate the damages claims as a class action, but that is not the result of *the settlement*. Because class damages claims are not subject to equitable tolling under *China Agritech v. Resh*, 584 U.S. 732 (2018), any such claims expired when the statute of limitations ran. Class members did not give up those claims *as part of the settlement*. Furthermore, anyone who genuinely believed those claims were valuable and had any reasonable prospect of being certified as part of a class action, could have sought to intervene and pursue them. No one did.

Ultimately, "[s]killed and more than adequate lawyers for the class believed [the settlement] to be a good bargain." *Reed*, 703 F.2d at 174. "[T]he analysis conducted by the district court was sufficient under all the circumstances, especially in view of the fact that the assertions made regarding the difficulties as to maintenance of the plaintiffs' lawsuit were largely uncontradicted." *Maher*, 714 F.2d at 466.

### 3. The Attorney's Fees Do Not Undermine The Settlement's Reasonableness

Appellants also challenge plaintiffs' attorney's fee award. Huang Br. 46-50; Iowa Br. 39-59. But heeding this Court's "encourage[ment]" to "arrive at a settlement as to attorney's fees," *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 720 (5th Cir. 1974), Schwab and plaintiffs negotiated about attorney's fees in a separate mediation, only *after* the settlement terms were otherwise resolved.

Appellants' attacks on the fee amount provide no basis to disturb the settlement's other terms, including the release of the nonmonetary claims. The parties agreed that "[t]he approval, finality and effectiveness of this Stipulation of Settlement shall not be contingent on an award of Attorney's Fees and Expenses, or on any Service Awards to Plaintiffs," and that any rejection or modification of the fees "shall not operate to, or be grounds to, terminate, modify, or cancel" the settlement. ROA.1057. Under this Court's precedents, the Court must give effect to that provision: "The provisions of the settlement agreement respecting attorney's fees . . . do not . . . furnish . . . a basis to overturn the district court's findings that the settlement" was fair and reasonable because the "settlement was *not* contingent on the award of *any* fees." *Maher*, 714

38

F.2d at 457 n.38; *see also Union Asset*, 669 F.3d at 638 (addressing fees separately from settlement reasonableness).

Other courts have applied the same rule. "Because the settlement agreement was not conditioned on attorneys' fees," this Court can review the fee award "without undoing the settlement approval, as the settlement still passes muster under Rule 23(e)." *In re Cal. Pizza Kitchen Data Breach Litig.*, 129 F.4th 667, 678-79 (9th Cir. 2025); *cf. Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 720 (2d Cir. 2023) (courts must enforce settlement terms that "ensur[e] that the Settlement Agreement will stand even if certain aspects of" the settlement "were to fall"). The reasonableness of the attorney's fees award has no bearing on the rest of the settlement.

Iowa rejoins (Br. 28-29, 40-41, 57-59) that the fee award "undercut[s]" the settlement's legitimacy and raises the specter that counsel "exploit[ed] the class action device to obtain large fees at the expense of the class." *Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 849 (5th Cir. 1998). That is wrong. The parties agreed to all substantive terms of the settlement *before* engaging in an "entirely separate" mediation on fees. ROA.2479, ROA.2492. If that second mediation

39

concluded in disagreement, Schwab would have litigated plaintiffs' fee demand, even as it supported approval of the other settlement terms. Because "the fee was negotiated only after settlement terms had been decided and did not . . . reduce what the class ultimately received," it does not undermine the reasonableness of the settlement. *Blessing*, 507 F. App'x at 4.

Iowa also complains (Br. 57-59) that the settlement contains a "clear-sailing" clause in which Schwab agreed not to object to Plaintiffs' fee and expense requests up to negotiated limits. But it points to no evidence "that the class would have gotten meaningfully more . . . relief if [Schwab] had merely been permitted to oppose class counsel's fee application." *Campbell*, 951 F.3d at 1127; *accord, e.g.*, *In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d 410, 447 (3d Cir. 2016) (same, where fees were negotiated after "principal" settlement terms and did not "diminish class recovery"). Nor could it. Schwab alone will foot the bill on the fee award, ROA.1349, so any reduction in the fees "would not confer a greater benefit upon the Settlement Class, but rather would only benefit [Schwab]," ROA.2480.

### 4. The Named Plaintiffs' Individual Settlements And Service Awards Were Appropriate

Appellants' attacks on the credits and service awards to the named plaintiffs also fail to undermine the settlement's adequacy or fairness. The district court properly exercised its discretion in approving both.

### a. Settling The Individual Plaintiffs' Damages Claims Created No Conflict

Appellants beggar belief in suggesting that a mere $50 account credit created an insuperable conflict of interest between the named plaintiffs and the settlement class. The district court reasonably found "no conflicts of interest between Plaintiffs and the Settlement Class," because—with absent class members retaining their individual damages claims—there is "no concern that Plaintiffs have sacrificed the right of the absent class members for their own benefit." ROA.1018.

Not every difference between named and absent class members imperils adequacy of representation; the standard "is not 'perfect symmetry of interest' among the class." *Murray v. Grocery Delivery E-Servs. USA Inc.*, 55 F.4th 340, 345 (1st Cir. 2022); *see In re Deepwater Horizon*, 739 F.3d at 813 ("there is no need . . . to accommodate every instance of 'differently weighted interests'"). Rather, "only those conflicts

41

that 'are fundamental to the suit and . . . go to the heart of the litigation' breach the adequacy-of-representation standard." *Murray*, 55 F.4th at 346 (ellipsis in original). "[T]he intra-class conflict must be so substantial as to overbalance the common interests of the class members as a whole." *Id.*

Named plaintiffs' settlement of their individual damages claims creates no "conflict," much less one "fundamental to the suit." *Id.* For settlement purposes, the district court certified this class under Rule 23(b)(2) *only*. All class members will share equally in this relief, which the district court held represented a "substantial monetary benefit" to a settlement class of approximately 25 million people. ROA.2510-11.

Named plaintiffs do not plausibly threaten that alignment of interest by releasing their individual damages claims for $50 each. Indeed, Huang cannot identify a single right belonging to absent class members that plaintiffs gave away by settling their individual claims: Absent class members receive full and equal injunctive relief, and they retain their own damages claims.

Finally, Huang claims (Br. 38-39) that the settlement of the named plaintiffs' claims for monetary relief shows that "each class member

42

would be entitled to an individual award of monetary damages." That is a *non sequitur*. Resolving the three named plaintiffs' individual damages claims does not even imply that *their* damages claims have merit. To the contrary, Schwab denied and continues to deny that any of the settlement claims had merit. *See supra* 2, 9. Schwab's resolution of their individual claims certainly does not imply that other parties had viable damages claims or that such claims could be litigated on a class-wide basis. As explained above, they do not and could not. *Supra* 9.

Huang misplaces reliance (Br. 38) on *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) and *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832 (5th Cir. 2012). *Dukes* forbids the certification of "individualized monetary claims" as part of a Rule 23(b)(2) class action, because monetary claims "not incidental to the injunctive or declaratory relief" "belong in Rule 23(b)(3)." 564 U.S. at 360-63. But the settlement does not attempt to certify any such claims as part of a Rule 23(b)(2) settlement class; the class members retain their individual damages claims. And *Stukenburg*, 675 F.3d at 846, merely rejected the Rule 23(b)(2) certification of claims for individualized injunctive relief. It is

43

undisputed that the settlement here promises all class members the same injunctive relief.

At bottom, settling the individual damages claims of *only* the named plaintiffs (again, with the class members preserving their own individual damages claims) at most created an "obviously miniscule" difference with the rest of the class. *Murray*, 55 F.4th at 346. It did not introduce any conflict of interest that would "overbalance" the class members' "common interests" in achieving material, widely shared injunctive relief. *Id.* The district court therefore did not abuse its discretion in declining to find an intra-class conflict "go[ing] to the heart of the litigation" based on the settlement of named plaintiffs' individual monetary claims. *Id.*

### b.    The Service Awards Were Fair

Plaintiffs' service awards likewise cast no doubt on the settlement's other terms.

Huang contends (Br. 44) that service awards are *categorically* unlawful. But service awards have been standard practice in this Circuit, and in almost every other Circuit, for decades. *See, e.g., Jones v. Singing River Health Servs. Found.*, 742 F. App'x 846 (5th Cir. 2018) (affirming

settlement that included service awards); *Scott v. Dart*, 99 F.4th 1076, 1085 (7th Cir. 2024) (collecting cases).

Huang primarily relies on out-of-circuit authority disapproving service awards, *Johnson v. NPAS Solutions, LLC*, 975 F.3d 1244 (11th Cir. 2020), but that decision is an outlier. No other court of appeals has adopted *Johnson*'s reasoning. *See, e.g.*, *Dart*, 99 F.4th at 1084-88; *Hyland*, 48 F.4th at 123. *Johnson* relied on "a pair of nineteenth-century Supreme Court cases," *Hyland*, 48 F.4th at 123, which prohibited the payments of the named plaintiffs' "personal expenses" out of a common fund, *Dart*, 99 F.4th at 1085-86. But Rule 23 did not incorporate that "common-law . . . principle," *id.* at 1084, and it would be inapplicable anyway when, as here, the defendant alone will pay the attorney's fees.

Huang's remaining theories are makeweights. Citing *Kincade v. General Tire & Rubber Co.*, 635 F.2d 501 (5th Cir. 1981), and *Parker*, 667 F.2d 1204, Huang argues (Br. 43-45) that service awards create improper "preferred positions" among class members. But neither case concerns service awards. Those cases merely recognized that a court may approve a settlement over a named plaintiff's objection, *Parker*, 667 F.2d at 1211,

45

and held that a named plaintiff may not opt of a Rule 23(b)(2) settlement entered over his objection, *Kincade*, 635 F.2d at 506.

*Gonzales v. Cassidy*, 474 F.2d 67 (5th Cir. 1973), is even further afield. Huang asserts (Br. 40, 42-43) that *Gonzales* held that a class representative is rendered inadequate whenever he receives "both retrospective monetary relief and prospective injunctive relief," while the class receives only prospective relief. But *Gonzales* did not concern service awards or even a settlement. While the named plaintiff there indeed received better relief than the class, *Gonzales* held that the named plaintiff was an inadequate representative only because he had failed to appeal the district court's denial of retrospective relief to the class—*not* because the named plaintiff alone had received retrospective relief. *Id.* at 72, 76. *Gonzales* has no bearing here.

Huang also contends (Br. 44-45) that service awards violate the Rules Enabling Act, which requires that federal rules "not abridge, enlarge, or modify any substantive right." 28 U.S.C. § 2072(b). No court has embraced that novel view. For good reason: A "settlement *could not* violate the Rules Enabling Act since a 'court's approval of a voluntary settlement, by nature a compromise of rights, does not affect

46

substantive . . . rights.'" *Whitlock v. FSL Mgmt., LLC*, 843 F.3d 1084, 1092 (6th Cir. 2016) (emphasis added) (quoting *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 312 (3d Cir. 2011)).

In any event, the service awards cast no doubt on the settlement's other terms. The parties agreed that "[t]he approval, finality and effectiveness" of the settlement "shall not be contingent . . . on any Service Awards to Plaintiffs." ROA.1350. Appellants overlook that severability clause entirely, and they identify no legal impediment to enforcing it. None of appellants' cited cases holds that any deficiency in those awards justifies discarding the entirety of a settlement in the face of an express severability provision. Thus, just as with the attorney's fees, *supra* 38-40, if this Court deems the service awards improper, it should leave the rest of the settlement intact.

## II.  The Settlement Is Procedurally Proper

The parties complied with all procedural requirements for settling a class action, and appellants' contrary arguments lack merit. The parties directly and individually provided notice of the settlement to over 99% of the class. That notice apprised the class of the settlement's terms and the opportunity and time to object. Iowa's claims of inadequate

47

CAFA notice are unsupported by the record and offer no basis to invalidate the settlement in any event. And the district court had jurisdiction to approve the settlement.

## A. The Settlement Notices Satisfied Rule 23 And Due Process

Huang contends (Br. 35-37) that the class notice was deficient in failing to inform class members that the statute of limitations on class-wide damages claims was nearing expiration. But neither due process nor Rule 23 required the settling parties to inform class members about *independent* legal bars to their claims.

**1.** As the district court recognized, ROA.2464-65, due process and Rule 23 require class settlement notices to give class members "information reasonably necessary for them to make a decision whether to object to the settlement," *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 197 (5th Cir. 2010). That is a "broad reasonableness standar[d]." *Id.* Accordingly, a notice "need not explain . . . all the consequences involved in the settlement" or "provide a complete source of settlement information." *Maher*, 714 F.2d at 452. Nor is class notice inadequate merely because it omits "information [that] could have allowed class members to make a more 'informed' decision about their options," *Roes,*

48

*1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1045 (9th Cir. 2019), since "[c]lass members are not expected to rely upon the notices as a complete source of settlement information," *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 122 (8th Cir. 1975).

The district court rightly found that the class notice "satisfie[d] the broad reasonableness standards." ROA.2466-67. It observed that the notice informed class members of the claims and rationale for the settlement, clearly articulated the relief they would receive in exchange for the release of their rights, and informed them of their right to object to the settlement and their deadline for objections. ROA.2467-68.

The district court also confirmed that the notice had been widely disseminated to the approximately 25 million class members. ROA.2487. Directly and individually notifying class members is widely recognized as the most effective form of class action notice. *See, e.g.*, *Macias v. Catapult Painting, LLC*, 2020 WL 6253589, at *5 (S.D. Tex. Oct. 22, 2020) (collecting cases). The law requires nothing more.[2]

---

[2]  Huang claims (Br. 35) the Settlement Class consisted of 36 million people. But that "36 million" figure, which appears in Plaintiffs' motion for preliminary approval of the settlement, ROA.1017, was an initial estimate subsequently refined through extensive data collection and

49

**2.**    Huang rejoins (Br. 35-37) that the notice was nonetheless deficient because it made "misle[ading]" representations about class members' damages claims.  Specifically, Huang complains that the class notice provided that "[t]he proposed class settlement does not release or resolve any damages claims" without also mentioning that class-wide damages claims would soon be time-barred.  Although the class's *individual* damages claims were tolled during the pendency of this suit under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), their *class* damages claims were not under *China Agritech*, 584 U.S. at 748.  The objection is meritless.

To begin, the novel disclosure Huang demands does not relate to any settlement term.  The statute of limitations is not lapsing on the class damages claims because of the settlement, but because the clock has simply continued to run while this suit has proceeded.  The settlement *itself* does not release any damages claims.  Huang's disclosure thus cannot be "reasonably necessary" for class members "to make a decision whether to object *to the settlement*."  *In re Katrina*, 628 F.3d at 197

---

processing by Schwab and Ankura, *see* ROA.1428-29.  Huang simply misunderstands the record.

(emphasis added). In any event, a class action is "an exception to the usual rule" that litigation is a one-on-one endeavor, *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979), and no one has a right "to bring their own separate class action," *In re Jan. 2021 Short Squeeze Trading Litig.*, 2023 WL 6534502, at *10 (S.D. Fla. Sep. 7, 2023) (quoting *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 2013 WL 4399215, at *6 (S.D.N.Y. Aug. 13, 2013)).

Huang does not point to a single case in which a court has held class notice deficient for failing to disclose consequences unrelated to the settlement's express terms. To the contrary, this Court has underscored that settlement notices "need not explain . . . all the consequences involved in the settlement" or "provide a complete source of settlement information." *Maher*, 714 F.2d at 452. And a rule requiring parties to keep class members abreast of independent legal bars and doctrinal developments—*e.g.*, the Supreme Court's decision in *China Agritech*— would disregard this Court's admonition that notices should be "neutra[l]" and not "become so detailed that the notice[s] 'would confuse class members.'" *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 224 (5th Cir. 1981).

51

This is a case in point. The supposed need to disclose statute-of-limitations risks for class damages claims rests on a series of controversial assumptions: that the class members here had potentially certifiable class damages claims at all; that they would ordinarily believe themselves entitled to pursue seriatim class-action suits for those claims; and that absent a disclosure about *China Agritech*, they would otherwise have believed those class claims to be tolled under *American Pipe* while this suit was pending. Those assumptions are doubtful, and a disclosure grounded on such assumptions would hardly be "neutra[l]." *In re Corrugated Container*, 643 F.2d at 224. Any such disclosure could also confuse class members, potentially misleading them to believe that the settlement formally gives up otherwise meritorious class damages claims in exchange for an antitrust compliance program.

A rule mandating technical disclosures about procedural consequences unrelated to a settlement's express terms would also be impractical. After all, if the parties were required to apprise class members of the *China Agritech* rule here, future settlements may need to apprise class members of yet other class-action doctrines. Objectors could always argue that settlement notices should have addressed other

procedural issues, that their treatment of *China Agritech* or other cases was unclear or insufficient, and that intervening changes in law require additional disclosures after the parties have devoted millions of dollars— as Schwab has here—to providing appropriate notice. It would be difficult (if not impossible) to determine which doctrines warrant disclosure *ex ante*, and objection litigation would devolve into a game of "tell me more."

At bottom, Huang effectively invites this Court to replace its "broad reasonableness standar[d]" with highly specific (yet unknowable) notice requirements. *In re Katrina*, 628 F.3d at 197. The Court should decline.

## B.    The Settlement Notices Complied With CAFA

Iowa asserts (Br. 59-63) that this Court should vacate the settlement because Schwab allegedly sent Iowa an inadequate CAFA notice. That argument is meritless.

**1.**    CAFA requires that notice be "serve[d] upon the appropriate State official of each State in which a class member resides and the appropriate Federal official," and that such notice include information about any scheduled hearing and copies of specified documents. 28 U.S.C. § 1715(b). As Schwab's counsel attested in a sworn declaration,

Schwab caused CAFA notices to be generated and delivered to all State Attorneys General, including Iowa's. ROA.2096-98¶¶3-7, ROA.2101-04.

There is no record evidence that Iowa received less than a complete CAFA notice. Ankura, the notice administrator, printed an individualized CAFA notice for Iowa, with secure Dropbox links to all required materials not physically enclosed. ROA.2107-08¶¶6-13. Ankura's transmission of that notice adhered to a rigorous quality-control process designed to minimize error and included multiple checks throughout. *Id.* Ankura received confirmation on February 17, 2025, that the envelope containing Iowa's CAFA notice reached the Attorney General's office intact. *Id.* For the five months that followed, Schwab heard nothing to indicate that Iowa's "CAFA notice was missing pages or defective in any other respect." ROA.2108¶13, ROA.2097 n.1.

Only in its objection did Iowa surface its belated claim that it had received just two pages of the notice. ROA.1980. In response to this surprising assertion, Schwab provided the full notice to Iowa the next day. ROA.2097 n.1.

Iowa submitted no evidence that its notice was incomplete when it was received in February 2025. Iowa appended a portion of the notice as

54

an exhibit to its objection. ROA.1985-86. The first page includes a stamp (marked "Attorney General's Office 2025 Feb 18 PM 3:03") confirming that the envelope had been opened and reviewed the day after it arrived. ROA.1985. But neither the person who opened the envelope nor anyone who reviewed its contents thereafter provided a sworn declaration or other testimony explaining how the envelope was handled and routed after it was received, what it contained, or why nobody consulted Schwab about its contents for five months. Notably, despite the opportunity to establish a record for its CAFA objection at the district court's fairness hearing, Iowa declined to attend. Accordingly, the only competent record evidence—the sworn declarations Schwab and Ankura submitted below—shows that a proper notice was sent to and received by Iowa.

This Court thus lacks any basis to reach the factual determination that Iowa received only two pages of the CAFA notice. *See Blessing*, 507 F. App'x at 3 (rejecting objections to district court's failure to "thoroughly evaluate the value of the settlement," where the objectors failed to "reques[t] an evidentiary hearing to ascertain the settlement's value, more time to identify expert witnesses, or an opportunity to present any witnesses"). Iowa's objection should be rejected on that ground alone.

55

**2.** Regardless, any error was harmless. CAFA "is not intended to allow settlement class members to walk away from an approved settlement based on a technical noncompliance (e.g., . . . failure of the official to receive notice that was sent), particularly where good faith efforts to comply occurred." S. Rep. 109-14, at 35 (2005). *A fortiori*, the same is true for *nonparties* to a settlement, like State Attorneys General. Iowa cannot dispute that Schwab made good-faith and rigorous efforts to comply with CAFA, all at its own expense. And Iowa cites (Br. 62-63) no authority "reject[ing] final approval" on a supposed notice "deficienc[y] alone."

Iowa's objection did not explain how the purported deficiencies compromised Iowa's ability to object in any way. ROA.1980-81. It didn't; Iowa filed a timely objection. Nor did Iowa explain why it declined for five months to ask Schwab for the supposedly missing pages. *Id.* Only after filing its objection did Iowa request those pages, which Schwab provided the next day. ROA.2097 n.1.

Iowa's CAFA arguments provide no basis for vacating the settlement. Given that it timely objected, Iowa does not even attempt to

56

identify any prejudice it suffered from any temporarily missing pages of Schwab's CAFA notice.

## C.    The District Court Had Jurisdiction

Huang argues (Br. 28-34) the settlement should be vacated because plaintiffs lacked Article III standing to seek injunctive relief and that the district court thus lacked jurisdiction to approve the settlement.  That is incorrect.  "[T]he named plaintiffs have each alleged injury in fact, traceability to the defendant's conduct, and redressability by the relief requested." *In re Deepwater Horizon*, 739 F.3d at 802.

As the district court rightly determined, plaintiffs adequately alleged an ongoing injury in fact traceable to Schwab's acquisition of Ameritrade:  As Schwab customers, they claimed the merger injures them by resulting in "reduced price improvement on their trades." ROA.2448; ROA.421 (in finding antitrust injury, noting that plaintiffs alleged that "they *now* pay higher transaction costs for their trades" (emphasis    added));    *see*    ROA.45¶¶41-44,    ROA.116¶¶372-73, ROA.137¶485.  Although Schwab maintains that plaintiffs would have been unable to prove their claims, "weakness on the merits" is no basis

57

for finding an "absence of Article III standing." *Davis v. United States*, 564 U.S. 229, 249 n.10 (2011).

Plaintiffs' alleged injuries adequately supported their Article III standing to seek injunctive relief. Plaintiffs submitted declarations averring that they are suffering "ongoing" injuries and that they "intend to execute additional trades" that will suffer from reduced price improvements due to the merger. ROA.2485-86; *e.g.*, ROA.45¶¶42-44. Far from alleging "past harms" or speculative some-day intentions, *contra* Huang Br. 30-32, these declarations plead the sort of "ongoing" injuries that establish "the kind of 'real and immediate threat of repeated injury' [needed] for injunctive relief," *Legacy Cmty. Health Servs., Inc. v. Smith*, 881 F.3d 358, 368 (5th Cir. 2018).

Insofar as Huang argues that plaintiffs must prove standing with trial-stage evidence (Br. 28-32), he is mistaken. Although courts must possess jurisdiction to approve class action settlements, *Frank v. Gaos*, 586 U.S. 485, 492 (2019), standing need only be established "with the manner and degree of evidence required at the successive stages of the litigation," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (same). Thus, in

58

*Deepwater Horizon*, this Court rejected the contention that plaintiffs or class members must prove standing through an evidentiary showing to settle a class action before the summary-judgment stage. 739 F.3d at 802-07. "In the absence of any motion for summary judgment or trial predicated upon the Article III standing of those absent class members," this Court explained, "it would be premature and improper for a court to apply evidentiary standards corresponding to those later stages of litigation." *Id.* at 802. Rather, before summary judgment, "general factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan*, 504 U.S. at 561; *see also In re Deepwater Horizon*, 739 F.3d at 802 (holding that the named plaintiffs' allegations sufficed to establish standing for a class action settlement).

Here, plaintiffs' allegations established standing sufficiently at this stage of the proceedings, and they also submitted factual declarations attesting that they are current Schwab customers who intend to trade securities in the future. ROA.2199-2204. That is more than enough to confirm the court's jurisdiction.

Huang also contends (Br. 32) that *unnamed* class members lack standing. Whether "standing must be proven for unnamed class

59

members, in addition to the class representative" is an open question in this Circuit. *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 768 (5th Cir. 2020). But even assuming it must, that requirement is satisfied here. The class is defined to include only "current U.S. brokerage customers of Schwab or any of its affiliates." ROA.1045. Those customers share the same allegedly ongoing injuries as plaintiffs, ROA.2448-49, and the class therefore "contains only persons and entities that possess Article III standing," *In re Deepwater Horizon*, 739 F.3d at 803.

## CONCLUSION

This Court should affirm the judgment and the settlement approval order.

Dated: May 22, 2026

Respectfully submitted,

/s/ *Jason J. Mendro*

Veronica S. Moye
KING & SPALDING LLP
2601 Olive Street
Suite 2300
Dallas, Texas 75201
(214) 764-4418
vmoye@kslaw.com

Jason J. Mendro
  *Counsel of Record*
Jeffrey Liu
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
jmendro@gibsondunn.com
jyliu@gibsondunn.com

Daniel G. Swanson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7430
dswanson@gibsondunn.com

*Counsel for Defendant-Appellee The Charles Schwab Corporation*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,925 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).  This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this document.

This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point, New Century Schoolbook font.

Dated:  May 22, 2026

Respectfully submitted,

*/s/ Jason J. Mendro*

Jason J. Mendro
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
jmendro@gibsondunn.com

## CERTIFICATE OF SERVICE

I hereby certify that, on May 22, 2026, I electronically filed the foregoing brief with the Clerk for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated:  May 22, 2026                 Respectfully submitted,

*/s/ Jason J. Mendro*

Jason J. Mendro
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
jmendro@gibsondunn.com