No. 25-40774

IN THE

# United States Court of Appeals for the Fifth Circuit

JONATHAN CORRENTE; CHARLES SHAW; LEO WILLIAMS,

*Plaintiffs-Appellees*,

v.

THE CHARLES SCHWAB CORPORATION,

*Defendant-Appellee*,

v.

SHIYANG HUANG, OBJECTOR; STATE OF IOWA, OBJECTOR,

*Movants-Appellants*.

On Appeal from the United States District Court
for the Eastern District of Texas
4:22-cv-00470
(The Honorable Amos L. Mazzant III)

## REPLY BRIEF OF APPELLANT STATE OF IOWA

BRENNA BIRD
Attorney General of Iowa

ERIC WESSAN
*Solicitor General*

BREANNE A. STOLTZE
*Assistant Solicitor General*
Hoover State Office Building
1305 East Walnut Street
Des Moines, Iowa 50319
(515) 823-9117 / (515) 281-8770
eric.wessan@ag.iowa.gov
breanne.stoltze@ag.iowa.gov

June 12, 2026

*Counsel for Appellant State of Iowa*

**TABLE OF CONTENTS**

<u>Page</u>

TABLE OF AUTHORITIES.................................................................iii

INTRODUCTION............................................................................ 1

ARGUMENT ...................................................................................3

I. THE DISTRICT COURT ABUSED ITS DISCRETION IN APPROVING A SETTLEMENT THAT GIVES CLASS MEMBERS "UNCERTAIN" INJUCTIVE RELIEF WHILE NAMED PLAINTIFFS AND CLASS COUNSEL RECEIVE WINDFALLS. ........................3

II. THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT APPROVED A NEARLY $9-MILLION FEE AWARD WITHOUT FOLLOWING THE PROPER PROCESS. ............................ 14

    A. The Nearly $9-Million Fee Award Violates Rule 23............................................................. 15

    B. The District Court Abused Its Discretion When Calculated the Lodestar Without Properly Scrutinizing Counsel's Hours or Rates............................................................... 20

    C. The District Court Abused Its Discretion When It Disclaimed Use of the *Johnson* Factors. ...................................................... 24

III. DEFENDANT DID NOT SATISFY ITS CAFA NOTICE OBLIGATIONS.................................... 30

IV. IOWA HAS STANDING TO CHALLENGE THE SETTLEMENT AND FEE AWARD. .................. 33

CONCLUSION .............................................................................. 34

CERTIFICATE OF SERVICE........................................................ 35

i

**TABLE OF CONTENTS—Continued**

<u>**Page**</u>

CERTIFICATE OF COMPLIANCE ....................................................... 36

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Black v. SettlePou, P.C.*, 732 F.3d 492 (5th Cir. 2013) ........................... 38

*Bode v. United States*, 919 F.2d 1044 (5th Cir. 1990) ........................... 26

*Brantley v. Surles*, 804 F.2d 321 (5th Cir. 1986) ................................... 36

*Combs v. City of Huntington, Texas*,
  829 F.3d 388 (5th Cir. 2016) ...................................................... 22, 23

*Corley v. United States*, 556 U.S. 303 (2009) .......................................... 41

*Cruz v. Maverick Cnty.*, 957 F.3d 563 (5th Cir. 2020) ...................... 28, 31

*DeHoyas v. Allstate Corp.*, 240 F.R.D. 269 (W.D. Tex. 2007) ................ 33

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  2018 WL 1942227 (N.D. Tex. Apr. 25, 2018) .................................... 32

*Evans v. Jeff D.*, 475 U.S. 717 (1986) ...................................................... 3

*Exelon Wind 1, LLC v. Nelson*, 766 F.3d 380 (5th Cir. 2014) ................ 40

*Farrar v. Hobby*, 506 U.S. 103 (1992) .................................................... 22

*Fessler v. Porcelana Corona De Mexico S.A. DE C.V.*,
  23 F.4th 408 (5th Cir. 2022) ................................................... passim

*Gurule v. Land Guardian, Inc.*,
  2017 WL 6761821 (S.D. Tex. Oct. 24, 2017) .................................... 37

*Gurule v. Land Guardian, Inc.*, 912 F.3d 252 (5th Cir. 2018) .............. 36

*Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*,
  2018 WL 1602460 (E.D. Tex. Apr. 3, 2018) ...................................... 30

# TABLE OF AUTHORITIES—Continued

**Page(s)**

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
55 F.3d 768 (3d Cir. 1995) ........................................................24

*In re High Sulphur Content Gasoline Prods. Liab. Litig.*,
517 F.3d 220 (5th Cir. 2008)................................................. 19, 26, 31

*In re Katrina Canal Land Breaches Litig.*,
628 F.3d 185 (5th Cir. 2010).......................................... passim

*In re Sw. Airlines Voucher Litig.*, 799 F.3d 701 (7th Cir. 2015).............24

*Johnson v. Georgia Highway Express, Inc.*,
488 F.2d 714 (5th Cir. 1974)........................................... 31, 33

*Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241 (8th Cir. 1996)...........24

*Jones v. Signing River Health Servs. Found.*,
865 F.3d 285 (5th Cir. 2017)........................................... 3, 25

*Migis v. Pearle Vision, Inc.*, 135 F.3d 1041 (5th Cir. 1998)..............22, 23

*Piambino v. Bailey*, 610 F.2d 1306 (5th Cir. 1980)...............................20

*Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir. 1983).......... 4, 7, 25

*Saizan v. Delta Concrete Prods. Co.*,
448 F.3d 795 (5th Cir. 2006) (per curiam)........................................27

*Strong v. BellSouth Telecomms., Inc.*,
137 F.3d 844 (5th Cir. 1998).......................................... passim

*Tech Pharmacy Servs., LLC v. Alixa Rx LLC*,
298 F.Supp.3d 892 (E.D. Tex. 2017)..............................................30

*Torres v. SGE Mgm't, LLC*,
2018 WL 11357930 (W.D. Tex. Nov. 7, 2018)...........................33, 34

*Torres v. SGE Mgm't, LLC*, 945 F.3d 347 (5th Cir. 2019).... 32, 33, 34, 35

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Von Clark v. Butler*, 916 F.2d 255 (5th Cir. 1990)................................26

**Statutes:**

28 U.S.C. § 1715(*e*)(1) ..............................................................40

28 U.S.C. § 1717(*b*)..................................................................39

**Rules:**

Fed. R. Civ. P. 23........................................................ 1, 19, 25

Fed. R. Civ. P. 23(b)(1) ................................................................6

Fed. R. Civ. P. 23(b)(2) ................................................................6

Fed. R. Civ. P. 23(e) ....................................................................3

Fed. R. Civ. P. 23(e)(2)(A)....................................................... 7, 21

Fed. R. Civ. P. 23(e)(2)(C)............................................. 7, 17, 19, 20

Fed. R. Civ. P. 23(e)(2)(D) ...................................................... 7, 20

Fed. R. Civ. P.(e)(2)(A) and (B) Advisory Committee Notes to
    2018 Amendment ...................................................... 17, 19

**Other Authorities:**

*Cruz v. Maverick Cnty.*, No. 2:14-cv-00050-AM-CW, Dkt. No. 110
    (W.D. Tex. May 16, 2018) ......................................... 28, 29

U.S. Dep't of Justice, Antitrust Div., *Evaluation of Corporate
    Compliance Programs in Criminal Antitrust
    Investigations* (Nov. 2024) ....................................... passim

U.S. Dep't of Justice, *Justice Manual, Principles of Federal
    Prosecution of Business Organizations,* § 9-28.800............................12

## INTRODUCTION

After hundreds of pages of briefing, it is important to take a step back and remember what the settlement agreement here does (and does not do). The district court approved a settlement and fee award where:

- Named Plaintiffs get paid: $5,000 in cash and $50 in brokerage account credits;

- Plaintiffs' counsel get paid: nearly $9 million in fees and costs;

- Outside consultants get paid: unknown fee to design a to-be-determined antitrust compliance plan;

- Defendant gets paid: retention of all financial benefits of its merger—an accomplishment for which its attorneys also get paid; and

- Class members get a plan to make a plan.

In short, everyone walks away with something valuable except for the people who are supposed to benefit the most: the class members. And in exchange for an undrafted antitrust monitoring plan, those individuals must give up nearly all the relief Plaintiffs originally sought. That settlement is not fair, adequate, or reasonable under either this Court's

precedent or Federal Rule of Civil Procedure 23. And the district court abused its discretion when it approved that settlement agreement.

The district court also abused its discretion when it approved Plaintiffs' nearly $9-million fee award. First, it accepted the validity of the Plaintiffs' proposed lodestar based on: (1) opaque bottom-line billing summaries that prevented any assessment of whether those hours were reasonable, duplicative, or efficiently allocated; and (2) rate comparisons from drastically different cases. Because of those errors, the district court approved an improperly calculated lodestar based on record-high hourly rates without any true scrutiny of the hours billed.

The district court then further abused its discretion when it disclaimed any use of the *Johnson* factors to determine whether to adjust the lodestar—in direct conflict with this Court's precedent.

Each of those errors requires reversal.

## ARGUMENT

### I.   THE DISTRICT COURT ABUSED ITS DISCRETION IN APPROVING A SETTLEMENT THAT GIVES CLASS MEMBERS "UNCERTAIN" INJUCTIVE RELIEF WHILE NAMED PLAINTIFFS AND CLASS COUNSEL RECEIVE WINDFALLS.

Courts have a "duty under Rule 23 to protect absent class members and to police class action proceedings." *Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 849 (5th Cir. 1998) (citing Fed. R. Civ. P. 23(e); *Evans v. Jeff D.*, 475 U.S.717, 726 (1986)). So this Court requires district courts to "exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions to consider whether the settlement is fair, adequate, and reasonable, and not a product of collusion." *Jones v. Signing River Health Servs. Found.*, 865 F.3d 285, 293 (5th Cir. 2017) (citation and internal quotation marks omitted). The 2018 Amendments to Rule 23 and this Court's six-factor test in *Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir. 1983), guide district courts in fulfilling that duty.

Among that guidance: "[T]he court must be assured that the settlement secures an adequate advantage for the class in return for the surrender of litigation rights against the defendants." *In re Katrina Canal Land Breaches Litig.*, 628 F.3d 185, 195 (5th Cir. 2010) (citations

3

omitted). So where "there has been no demonstration on the record below that the settlement will benefit the class in any way," that settlement "is not fair, reasonable, and adequate under Rule 23(e)." *Id.* That is the case with the settlement here where class members receive only an antitrust monitoring program that has not been designed, that might take many different forms, and that even Plaintiffs' experts say will provide only "uncertain" relief.

*1.* This Court has held that it is reversible error to approve a class action settlement where the court is "unable to definitively state, based on the record below, that the class will receive any benefit from the settlement." *Id.* at 196. And this Court should not allow Plaintiffs to dissuade it from relying on its clear precedent.

Plaintiffs contend that *Katrina* "is not on point" because: (1) "*Katrina* reversed approval of a mandatory class settlement because the notice failed to tell class members they might receive zero recovery for the very damages claims the mandatory class extinguished," and (2) "*Katrina*'s heighted concern attaches to a 'mandatory class settlement, which will deprive class members of their claims.'" Pls.' Br. at 54–55 (quoting *Katrina,* 628 F.3d at 197).

4

Plaintiffs' first argument misreads *Katrina* by failing to acknowledge that this Court based its decision on two separate holdings. *See Katrina*, 628 F.2d at 189. The Court first addressed the notice issue that Plaintiffs highlight. *Id.* It then "*further h[e]ld* that the settlement is not fair, reasonable and adequate because its proponents fail to show that the class members will receive some benefit in exchange for the divestment of their due process rights in a mandatory class settlement." *Id.* (emphasis added). Iowa's argument relies on the second holding. Iowa Br. at 14–21.

Even without that misreading, the attempted distinctions in Plaintiffs' second argument do not change the analysis. Although the settlement in *Katrina* arose under Rule 23(b)(1)(B) rather than Rule 23(b)(2), both types of settlements are mandatory, barring class members from opting out of the proposed settlement. Iowa Br. at 59 (quoting ROA.2465 n.8). And both types of settlements "will deprive class members of their claims." Pls.' Br. at 55 (quoting *Katrina*, 628 F.3d at 197). The settlement here unquestionably extinguishes injunctive claims, including divestiture and segregation (as much as Schwab predictably objects to the practicability of such relief). *See* Iowa Br. at 16–17, 34–35.

5

And the settlement extinguishes many damages claims as a practical matter. *See* Iowa Br. at 35–39. Therein lies the problem with the settlement. In return for losing any relief on both injunctive and damages claims, the class members receive only uncertain, hypothetical relief. Iowa Br. at 15–21.

*2.* Meanwhile, Defendant asserts that "Iowa hardly disputes (Def.'s Br. 22-23) that the settlement satisfies the Rule 23(e) fairness factors. Def.'s Br. at 30. Iowa is unsure how any reading of its brief could support that statement. Iowa argued that the settlement: offers inadequate relief in violation of Rule 23(e)(2)(C) (Iowa Br. at 23–26); treats class member inequitably in violation of Rule 23(e)(2)(D) (Iowa Br. at 26–29); and is a product of inadequate representation in violation of Rule 23(e)(2)(A) (Iowa Br. 29–34). In short, the settlement here violates both Rule 23 and *Reed*.

*3.* Turning back to the hypothetical relief here, Plaintiffs assert that the undrafted compliance program is "concrete" (Pls.' Br. at 49, 52, 55), while Defendant similarly contends that "[t]he settlement provides meaningful relief." (Def.'s Br. at 6, 17, 32). But both arguments rely on

6

abstract statements about antirust monitoring. And neither party addresses the problems with the proposed relief.

Plaintiffs' argument comes down to an assertion that the antitrust compliance plan is concrete because it is concrete. But that defense is circular. Responding to Iowa's claims that the antitrust compliance plan is deficient, the only response is that it will ensure antitrust compliance. Neither Plaintiffs nor Defendant can offer details about a plan that does not yet exist. And as will be described shortly below, Defendant does not even believe that it is currently obligated to follow the plan proposed by Plaintiffs' experts.

Plaintiffs then attempt to prove the undrafted compliance program benefits class members by repeating the same flawed, out-of-context valuation upon which the district court based its decision. Iowa Br. at 20, (citing ROA.2477). Indeed, Plaintiffs do so more than half a dozen times throughout their brief, without ever acknowledging that their own experts are uncertain that their valuation is accurate. Pls.' Br. at 5, 8, 9–10, 15, 21, 25, 84.

As Plaintiffs' experts explained, "[a]t this stage, the benefits reasonably expected to redound to consumers from the proposal above

remain uncertain as the parties have not yet finalized the Compliance Program's provisions. Moreover, we have limited data on the basis of which to estimate such potential benefits." ROA.2851–2852 [¶ 57]. As such, "[w]e preface our analysis with the caveat that our estimates provide a value range, the accuracy of which is subject to considerable uncertainty." *Id.* Thus, Plaintiffs directly contradict their own experts.

Despite that, Plaintiffs argue their experts' "uncertain" valuation supports the settlement here. But the record does not support the district court's reliance on that flawed valuation, and the court abused its discretion when it based its settlement approval on that estimate.

Indeed, in Defendant's response in support of settlement approval, Defendant unequivocally stated that "Schwab does not endorse that report's recommendations and has not agreed to adopt the measures it outlines." ROA.2088. And "[s]ince Schwab is not bound by the expert's premature proposals, its value calculations are conjecture." *Id.* Plaintiffs rely on their proposed plan to have a rigorous antitrust compliance plan to justify relief. Defendant argues that they are not bound to follow that plan. Any relief at all appears to be uncertain, at best, if the parties to

the settlement cannot even agree on what needs to be evaluated for adequacy.

Defendant tries to backpedal on appeal, asserting that "all the record evidence points in the same direction: The value of the settlement to class members will be substantial." Def.'s Br. at 25. But Defendant offers no record citation for its assertion, does not explain how the settlement value will be "substantial," and states "Schwab does not endorse the specific analysis in plaintiffs' expert report." *Id.* So, if the record points in any direction, it points only toward uncertainty.

*4.* Defendant also argues that "Iowa cites no record evidence the district court overlooked." (Def.'s Br. at 33) (internal citation omitted). Defendant is wrong. Iowa explained at length that the district court ignored almost the entire 29-page expert (ROA.2832–2862), relying only on two paragraphs stripped of context. Iowa Br. at 6, 11–12, 17–21. And Iowa explained that while the settlement agreement sets forth a (lengthy) timeline, the monitoring program's parameters and compliance benchmarks are completely unknown. *Id.* at 11, 16–21.

And Defendant's argument in support of the settlement changes nothing. Defendant touts the fact "the Department of Justice has

recognized, '[a]ntitrust compliance programs promote vigorous competition in a free market economy by creating a culture of good corporate citizenship.'" Def.'s Br. at 23–24 (quoting U.S. Dep't of Justice, Antitrust Div., *Evaluation of Corporate Compliance Programs in Criminal Antitrust Investigations* at 2 (Nov. 2024), https://perma.cc/ZAD3-6R62).

Iowa does not dispute that antitrust compliance programs can broadly benefit consumers. But as DOJ emphasized throughout its guidance document, those benefits turn on whether that program is "effective." *Id.* at 2–8, 10, 12–16. And as the guidance document establishes, effectiveness depends on the details. *Id.* at 3–16. That is because "the 'critical factors in evaluating any program are whether the program is adequately designed for maximum effectiveness in preventing and detecting wrongdoing by employees and whether corporate management is enforcing the program or is tacitly encouraging or pressuring employees to engage in misconduct.'" *Id.* at 4 (quoting U.S. Dep't of Justice, *Justice Manual*, *Principles of Federal Prosecution of Business Organizations,* § 9-28.800). As such, there are three "'fundamental' questions" that determine whether an antitrust

compliance program functions effectively and delivers the promised benefits. *Id.* at 3. First among them: Is the corporation's compliance program well designed? *Id.* Here, the answer to that question is: no. At least not to the extent that the district court has an independent burden to evaluate an actual antitrust compliance program.

Indeed, the DOJ guidance document lays out more than ten pages of questions that establish just how much information is missing here. For example:

- "What is the format of the antitrust compliance program?" *Id.* at 5;

- "Are compliance materials updated with recent developments and periodically refreshed so they do not become stale?" *Id.*;

- "How does the antitrust compliance program fit into the company's broader compliance program?" *Id.*;

- "Who has overall responsibility for the antitrust compliance program?" *Id.* at 7;

- "Who is delegated day-to-day operational responsibility for the antitrust compliance program?" *Id.* at 8;

- "Is there a process to identify emerging risks as the company's business environment changes?" *Id.* at 9;

- "As new technology tools are deployed by the company, does the company assess the antitrust risk the tools pose?" *Id.* at 10;

- "How has the company communicated its antitrust policies and procedures to all employees? . . . Must employees certify that they have read the compliance policy? If so, how?" *Id.* at 11;

- "Does the company provide antitrust compliance training?" And, if so, "[w]ho receives antitrust compliance training?" *Id.*;

- "What methods does the company use to evaluate the effectiveness of its antitrust compliance program?" *Id.* at 12;

- "How do compliance personnel utilize company data to audit and monitor employees?" *Id.* at 13;

- "What is the company's process for designing and implementing revisions to its antitrust compliance policy[?]" *Id.*;

- "How does the company determine which antitrust complaints or red flags merit further investigation?" *Id.* at 14;

- "How does the company determine who should conduct and investigation and who makes that determination?" *Id.*; and

- "What disciplinary measures does the company have for those who engage in antitrust violations or those who fail to take reasonable steps to prevent or detect violations?" *Id.* at 15.

Neither Plaintiffs nor Defendant can answer any of those questions. Nor can Iowa. And neither party explains why even the best designed antitrust compliance program benefits consumers when the program ends after just four years. *See* Iowa Br. at 4, 10–11, 16, 19–20.

*5*. Finally, although both parties still contend that damages claims survive, Iowa disagrees. Iowa Br. at 34–39. At minimum, the purported preservation of damages claim does not afford the unequivocal support either party asserts.

* * *

In the end, the consultants here might end up designing an excellent compliance plan. And that plan might give consumers some benefit. Indeed, Defendant argues that just because the compliance program has not been designed, it "does not somehow show that [the compliance program] will lack substantial value once implemented." Def.'s Br. at 32–33. But that flips Appellees' burden and the district court's obligation on their heads. "The burden is on the settlement proponents to persuade the court that the agreement is fair, reasonable, and adequate for the absent class members who are to be bound by the settlement." *Katrina*, 628 F.3d at 196 (citations omitted). And the

13

settlement proponents simply have not met their burden based on the record here.

## II. THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT APPROVED A NEARLY $9-MILLION FEE AWARD WITHOUT FOLLOWING THE PROPER PROCESS.

The district court and Plaintiffs contend that 32 attorneys, divided over 14,775 hours, times record high billable rates, plus costs, justifiably equals nearly $9 million. But because no one showed their work, that equation instead sums up to be an abuse of discretion.

Appellees' arguments do not change that calculation. Defendant focuses only on the settlement process, without engaging with any of the substantive issues with the fee award. Def.'s Br. at 38–40. And under Rule 23, the Court must scrutinize a fee award for both procedural and substantive unfairness. *See* Fed. R. Civ. P. 23(e)(2)(C)(iii) (court to consider "the terms of any proposed award of attorney's fees, including timing of payment"); Fed. R. Civ. P.(e)(2)(A) and (B) Advisory Committee Notes to 2018 Amendment ("Particular attention might focus on the treatment of any award of attorney's fees, with respect to both the manner of negotiating the fee award and its terms."); *Strong*, 137 F.3d at 849 (court's duty under Rule 23 "includes the obligation to explore the

14

manner in which fees of class counsel are to be paid and the dollar amount for such services") (citation omitted).

Plaintiffs on the other hand, defend the fee award's substance. But Plaintiffs have not shown that the district court followed the required procedures in approving Plaintiffs' nearly $9-million fee award. This Court has established a set process that a district court must follow when evaluating class action attorneys' fees. The district court failed at each stage of that process. Indeed, the authority Plaintiffs provide illustrates just how far they and the district court were from meeting their respective burdens. Any one of those abuses of discretion requires reversal.

### A.    The Nearly $9-Million Fee Award Violates Rule 23.

"[T]he district court has an independent duty under Federal Rule of Civil Procedure 23 to the class and the public to ensure that attorneys' fees are reasonable." *In re High Sulphur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 227 (5th Cir. 2008) (citations omitted).

Defendant incorrectly argues that "Appellants' attacks on the fee amount provide no basis to disturb the settlement's other terms, including the release of the nonmonetary claims." Def.'s Br. at 38. But

under Rule 23 and this Court's precedent, the reasonableness of a class action fee award is inextricably intertwined with overall settlement approval. *See* Fed. R. Civ. P. 23(e)(2)(C)(iii); Fed. R. Civ. P.(e)(2)(A) and (B) Advisory Committee Notes to 2018 Amendment; *Strong*, 137 F.3d at 850 ("The court's review of the attorneys' fee component of a settlement agreement is . . . an essential part of its role as guardian of the interests of class members.").

As such, this Court has "repeatedly held that a district court abuses its discretion if it approves a class action settlement without determining that any attorneys' fees claimed as part of that settlement are reasonable and that the settlement itself is reasonable in light of those fees." *Katrina*, 628 F.3d at 196 (citing *Strong*, 137 F.3d at 849; *Piambino v. Bailey*, 610 F.2d 1306, 1328 (5th Cir. 1980)). So despite Defendant's arguments (Def.'s Br. at 38–40), the Parties cannot simply negotiate around Rule 23 and this Court's precedent. If the fee award is unreasonable, so too is the settlement.

Here, the nearly $9-million fee award further establishes that the settlement offers inadequate relief in violation of Rule 23(e)(2)(C), treats

16

class member inequitably in violation of Rule 23(e)(2)(D), and is a product of inadequate representation in violation of Rule 23(e)(2)(A).

*1.* For example, the substantial gap between the relief sought—treble damages, punitive damages, restitution, divestiture, business segregation, and additional injunctive relief—and the relief obtained—undefined antitrust monitoring—raises serious questions about the adequacy of the relief itself and of counsel's representation. *See* Iowa Br. at 29–34. Appellees now argue that Plaintiffs' original request for relief does not count because the parties agreed to walk away from any class-wide damages relief in the settlement agreement. Pls.' Br. at 50–51; Def.'s Br. at 31–32.[1] Not only does that agreement to give up class damages claims raise more Rule 23 questions than it answers, but this Court's precedent also does not allow for such procedural sleight of hand.

Contrary to Appellees' assertions, this Court has repeatedly instructed district courts to look to the relief sought in the complaint itself when evaluating the range of recovery. *See, e.g., Fessler v. Porcelana Corona De Mexico S.A. DE C.V.*, 23 F.4th 408, 418–19 (5th Cir.

---

[1] But the parties agreed that named Plaintiffs still should receive monetary damages. ROA.1340 [¶ 2.1], ROA.1350 [¶ 8.1].

2022); *Combs v. City of Huntington, Texas*, 829 F.3d 388, 397 (5th Cir. 2016); *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1048 (5th Cir. 1998).

Here, Plaintiffs' suit sought treble damages, punitive damages, and restitution. ROA.138. And this Court has explained that "when the *suit* is for damages, 'a district court in fixing fees, is obligated to give primary consideration to the amount of damages awarded as compared to the amount sought.'" *Fessler*, 23 F.4th at 418–19 (quoting *Farrar v. Hobby*, 506 U.S. 103, 114 (1992)) (emphasis added); *see also Combs*, 829 F.3d at 394 ("A reduced fee award is appropriate if the *relief*, however, significant, is limited in comparison to the scope of the litigation as a whole."); *Migis*, 135 F.3d at 1048 (analyzing range of recovery in light of plaintiff's complaint, interrogatory responses, trial arguments, and relief actually obtained). In other words, "[t]he court was required consider what was sought" in the lawsuit and the litigation as a whole. *Fessler*, 23 F.4th at 419; *Combs*, 829 F.3d at 394, 397. And "[t]his court has dutifully applied that rule." *Fessler*, 23 F.4th at 519 (collecting cases). So the district court's failure to do so was reversible error. *See Fessler*, 23 F.4th at 418–20; *Combs*, 829 F.3d at 394.

18

*2.* Defendant's argument that the fee award did not reduce what the class ultimately received (Def.'s Br. at 40) is also unavailing. Of course, the fee award did not reduce the class award—it is hard to reduce from 0. Nothing in the record shows that the settlement intended to give class members anything valuable, so there was nothing to reduce.

*3.* Defendant's arguments also ignore the reality of class action litigation. Courts have consistently recognized that to defendants, the class award and fee award "represent a package deal." *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 246 (8th Cir. 1996). That is because, as a practical matter, "a defendant is interested only in disposing of the total claim asserted against it, . . . the allocation between the class payment and the attorney's fees is of little or no interest to the defense." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 819–20 (3d Cir. 1995) (citation omitted). As such, the defendant is "interested only in the bottom line: how much the settlement will cost." *In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 712 (7th Cir. 2015).

*4.* Further, neither party addresses the inequities in payment timing. *See* Iowa Br. at 28–29. Here, Appellees' assert that they are certain that the unwritten compliance program will create tangible

benefits for the class once the one-year minimum drafting period is complete and the four-year program is implemented. But it seems Appellees are not so certain in the program's success that they would agree to agree to spread attorney fee payments over that same duration. That disparate treatment raises red flags under Rule 23 and *Reed. See Jones*, 865 F.3d at 298 ("That counsel assured themselves a multimillion-dollar bird in hand, while leaving the class members two in the bush, is disturbing.").

The failures under Rule 23 and this Court's precedent require reversal.

### B.    The District Court Abused Its Discretion When Calculated the Lodestar Without Properly Scrutinizing Counsel's Hours or Rates.

Under the fee award process that this Court has established, the district court must first use the "lodestar method" to "determine the reasonable number of hours expended on the litigation and the reasonable hourly rate for the participating attorney." *High Sulphur*, 517 F.3d at 228 (citing *Strong*, 137 F.3d at 850). The district court then calculates the lodestar by multiplying the number of hours by the hourly rate. *Id.*

20

But that lodestar calculation is meaningless if plaintiffs do not meet their burden to present billing records and rate evidence that allows the court to accurately determine what hours should be included. *Bode v. United States*, 919 F.2d 1044, 1047–48 (5th Cir. 1990); *see also Von Clark v. Butler*, 916 F.2d 255, 259–60 (5th Cir. 1990). The calculation is likewise meaningless if the district court simply accepts without question what little documentation it does receive and simply approves the lodestar that counsel requests. *Strong*, 137 F.3d at 849–50. Both problems occurred here, requiring reversal. And the district court's procedural failures in calculating the lodestar strip it of any presumption of reasonableness. *See Fessler*, 23 F.4th at 415 & n.10 ("This presumption only carries if the lodestar is correctly calculated in the first instance." (citing *Saizan v. Delta Concrete Prods. Co.*, 448 F.3d 795, 799–800 (5th Cir. 2006) (per curiam))).

Yet in defense of their nearly $9-million award, Plaintiffs simply recite the district court's findings without addressing the flaws with those findings. *See* Iowa Br. at 41–52. Among those flaws, Plaintiffs gave the district court just four pages time summaries for the 32 attorneys and legal staff who purportedly spent approximately 14,775 hours in the case.

21

*See* ROA.1506; ROA.1512; ROA.1519; ROA.1524. But they did not give the court any contemporaneous time records or any detailed explanations of how any of the attorneys allocated that time. ROA.1495–1525. As a result, the district court was left with bottom-line hours totals that prevented any independent analysis.

In support of the district court's analysis, Plaintiffs rely in part on *Cruz v. Maverick Cnty.*, 957 F.3d 563 (5th Cir. 2020). Pls.' Br. at 77. To be sure, the district court record in *Cruz* gives this Court a useful comparison: it shows just how short Plaintiffs fell of meeting their burden here. In *Cruz*, a collective action under the Fair Labor Standards Act, Plaintiffs' counsel submitted a 174-page appendix in support of their fee request. *See Cruz*, 957 F.3d at 567, 574–75; *Cruz v. Maverick Cnty.*, No. 2:14-cv-00050-AM-CW, Dkt. No. 110 (W.D. Tex. May 16, 2018). As part of that appendix, the two attorneys in the case gave the court nearly a dozen pages of contemporaneous billing records detailing nearly 240 time entries. *Id.* at 8–16, 173–174. The appendix also included the most recent publicly available Texas State Bar hourly rate data as well as a compilation of 117 hourly rates approved in similar cases over the past decade in all four federal district courts in Texas, including each

22

attorney's name and law school class year. *Id.* at 29, 148–171.[2] The record here is not as detailed. And the district court erred when it accepted that spare record.

Plaintiffs' refrain that this case was "a complex class action" that "was litigated for more than three years" does not change the analysis. As Iowa explained, this case reached settlement relatively quickly compared to the average antitrust class action. *See* Iowa Br. at 30–31 n.2. And the record does not establish that this case was more procedurally complicated than those upon which the district court or Plaintiffs rely. *See* Iowa Br. at 49–52.

Indeed, two of those cases involved jury trials, rather than the discovery-stage settlement here. *See id.* at 50 (discussing *Tech Pharmacy Servs., LLC v. Alixa Rx LLC*, 298 F.Supp.3d 892, 897 (E.D. Tex. 2017); *Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*, 2018 WL 1602460, at *1 (E.D. Tex. Apr. 3, 2018)). Yet, Plaintiffs puzzlingly assert

---

[2] Based on that compilation, the median hourly rate as of 2018 was $312.50/hour in the Western District of Texas, $400/hour in the Eastern District of Texas, $450/hour in the Northern District of Texas, and $470/hour in the Southern District of Texas. *See Cruz v. Maverick Cnty.*, No. 2:14-cv-00050-AM-CW, Dkt. No. 110 at 137–171 (W.D. Tex. May 16, 2018).

that they are entitled to higher fees than the attorneys in those cases. This Court's precedent does not support those assertions.

Thus, on that basis, the district court's award requires reversal.

**C.    The District Court Abused Its Discretion When It Disclaimed Use of the *Johnson* Factors.**

In *Johnson*, this Court set forth twelve factors that district court must consider after determining the lodestar. *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). A district court's analysis of the *Johnson* factors is not optional. The district court "must scrutinize a fee award under the *Johnson* factors and not merely 'ratify a pre-arranged compact.'" *High Sulphur*, 517 F.3d at 228 (citation omitted).

Here, the district court's entire discussion of the *Johnson* factors consists of a single paragraph:

> Typically, after determining the lodestar the Court would need to determine whether the lodestar value should be adjusted either upwards or downwards based on the twelve *Johnson* factors. *See Cruz*, 957 F.3d at 574 (citation modified) (explaining that "[a]fter the lodestar method is applied, courts use a twelve-factor test to determine whether counsel's performance requires an upward or downward adjustment from the lodestar."). However, neither Plaintiffs' Counsel nor Defendant argue for an adjustment to the lodestar in this case (*See* Dkt. #199 at pp. 18–19 (arguing that the Johnson factors would support a

24

> fee award in the amount of the lodestar without the multiplier they applied to their requested award, however, Plaintiffs' Counsel is not requesting an award for that amount)). Indeed, Plaintiffs' Counsel seeks an award for less than the lodestar amount in this case. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 2018 WL 1942227, at *13 (N.D. Tex. Apr. 25, 2018) ("Because there is a strong presumption that the lodestar represents a reasonable fee . . . the fact that Class Counsel seeks an award less than the lodestar supports finding that the fee award is reasonable."). Accordingly, the Court finds that Plaintiffs' Counsel's requested fee of $8,250,000, which is 76.3% of their lodestar, is reasonable.

ROA.2506–07.

That record directly contradicts Plaintiffs' assertions that "the district court's analysis expressly took into account all relevant considerations under the *Johnson* factors." Pls.' Br. at 83.[3]

Indeed, the district court's *Johnson* analysis is effectively identical to the analysis that this Court found insufficient in *Torres v. SGE Management, LLC*, 945 F.3d 347, 354–55 (5th Cir. 2019), on which Plaintiffs rely. In *Torres*, the district court similarly stated that:

> Previously, the Court found, based on the attorneys' agreement that $10,275,000 represents a reasonable attorneys fee and costs for their time and expenses incurred in this case. The Court,

---

[3] Defendant does not address the district court's *Johnson* analysis.

> therefore, adopted the agreement of the parties, both plaintiffs and defendants, that the agreed upon fees and costs, apart from the sum of the class settlement, should be awarded to the attorneys. *See DeHoyas v. Allstate Corp.*, 240 F.R.D. 269, 322–23 (W.D. Tex. 2007). Because there is no dispute concerning the attorneys' fees and costs award, the Court finds it unnecessary to engage in determining the reasonableness of the fee and costs under the *Johnson* fee calculation factors. *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).

*Torres v. SGE Mgm't, LLC*, 2018 WL 11357930, at *1 (W.D. Tex. Nov. 7, 2018).

This Court held that "we have little choice but to find that the district court abused its discretion in explicitly disclaiming the use of the *Johnson* factors." *Torres*, 945 F.3d at 354. And while *Torres* specifically addressed the attorney fee *allocation*, this Court specifically noted that it does not "save the award to read the court's statement that the *Johnson* factors were 'unnecessary' as applying only to the uncontested fee *sum*, not its *allocation* among the various attorneys." *Id*.

To be sure, the district court never used the word "unnecessary," but still explicitly disclaimed the use of the *Johnson* factors. The district court stated that "typically" it "would need to determine whether the lodestar value should be adjusted either upwards or downwards based on

the twelve *Johnson* factors." ROA.2506. "However, neither Plaintiffs' Counsel nor Defendant argue for an adjustment to the lodestar in this case." *Id.* "Accordingly," the district court found that "Plaintiffs' Counsel's requested fee of $8,250,000 . . . is reasonable." ROA.2507.

In other words, "[b]ecause there is no dispute concerning the attorneys' fee and cost awards" the district court did not "engage in determining the reasonableness of the fee and costs under the *Johnson* fee calculation factors." *Torres*, 2018 WL 11357930 at *1. And "[t]hat the record does not clearly reflect that the district court utilized the *Johnson* framework is error." *Torres*, 945 F.3d at 355.

For their part, Plaintiffs concede that a district court must "articulate[] and clearly appl[y] the [*Johnson*] criteria." Pls.' Br. at 85–86 (quoting *Torres*, 945 F.3d at 354). But the fact that Plaintiffs must stitch together a Frankenstein *Johnson* analysis from various parts multiple district court orders establishes that those factors were not "clearly applied" here. Pls.' Br. at 83–84. Indeed, even if Plaintiffs piecemeal analysis could satisfy this Court's precedent, it still would be missing pieces. For example, none of the "findings" that Plaintiffs identify address whether there should be upward or downward adjustment of the lodestar.

27

Instead, the district court made most of the findings in determining whether the lodestar was reasonable. *Id.* (citing ROA.2501; ROA.2502; ROA.2504–06; ROA.2506). And still other "findings" come from the district court's separate settlement award order. *Id.* (citing ROA.2454 n.6; ROA.2477). Further, in some places, Plaintiffs cite the district court's recitation of their own argument about whether they have "[t]he skill requisite to perform the legal service properly" as satisfying the district court's burden to analyze the *Johnson* factor in question. Pls.' Br. at 83 (citing ROA.2503–04).[4]

To be sure, Plaintiffs argue that "[a]ll that is required . . . is that the district [court] ha[s] 'sufficiently considered the appropriate criteria.'" Pls.' Br. at 77 (quoting *Gurule v. Land Guardian, Inc.*, 912 F.3d 252, 258–59 (5th Cir. 2018)). As an initial matter, this Court should be wary of relying on non-class action cases that suggest a more relaxed approach to fee awards, such as those upon which Plaintiffs rely. *See, e.g.*, Pls.' Br. at 77 (citing *Gurule*, 912 F.3d at 258–59); *id.* at 85 (citing *Brantley v. Surles*, 804 F.2d 321, 325 (5th Cir. 1986)). As this Court has explained,

---

[4] Plaintiffs also do so for one of their citations about "[t]he novelty and difficulty of the questions." Pls.' Br. at 83 (citing ROA.2501 n.9).

non-collective actions—including *Gurule*, specifically—"d[o] not arise in the context of a class action where courts must be wary of strike suits intended to line attorneys' pockets while providing minimal benefit to the class." *Fessler*, 23 F.4th at 419 (citing *Strong*, 137 F.3d at 849).

But even then, the district court decisions in some of these cases emphasize the deficient *Johnson* analysis here. *See, e.g., Gurule v. Land Guardian, Inc.*, 2017 WL 6761821, at *6–8 (S.D. Tex. Oct. 24, 2017). For example, in *Gurule*, the district court individually addressed all twelve *Johnson* factors, devoting at least a full paragraph to eight of them. *Id.* For the remaining four, the district court either found that the factor was irrelevant or expressly stated that the factor had been discussed above. *Id.* If the district court's *Johnson* analysis here had looked like that discussion, Iowa's fee argument would be different. Though had the district court analyzed the *Johnson* factors, those factors still would have required a further downward adjustment to the lodestar. Iowa Br. at 55–56.

Finally, party agreement on fees does not save the district court's deficient analysis. Iowa Br. at 57–59. Indeed, the district court separately abused its discretion when it approved the award on that basis. *Id.*

\* \* \*

When analyzing a fee award "[f]ailure to 'consider[] the appropriate criteria' is a reversible abuse of discretion." *Fessler*, 23 F.4th at 419 (quoting *Black v. SettlePou, P.C.*, 732 F.3d 492, 502 (5th Cir. 2013)). And despite Appellees' efforts to rehabilitate the district court's settlement and fee orders, that failure occurred here. This Court should reverse those orders.

## III. DEFENDANT DID NOT SATISFY ITS CAFA NOTICE OBLIGATIONS.

Defendant makes the puzzling assertion that "Iowa's claims of inadequate CAFA notice are unsupported by the record." Def.'s Br. at 47–48; *see also id.* at 54 ("There is no record evidence that Iowa received less than a complete CAFA notice."). But Iowa attached the entirety of the two-page notice that it received when it filed its objection. ROA.1985–1986. Those two pages are included in the record here and speak for themselves. *Id.*

Defendant also tries to flip the burden for fulfilling its CAFA notice requirements onto Iowa. Def.'s Br. at 54–57. Not only does Defendant make those arguments for the first time on appeal and do so without any authority for its position, but its argument ignores CAFA's plain text.

30

CAFA unequivocally places the notice burden on Defendant's shoulders. *See* 28 U.S.C. § 1717(*b*) ("each *defendant* that is participating in the proposed settlement *shall serve* upon the appropriate State official . . .") (emphases added). This Court should not allow Defendant to escape its burden.

And assuming Iowa's CAFA notice was deficient, Appellees disagree on the proper remedy. Defendant argues that CAFA does not provide any remedy at all for either class members or State officials. Def.'s Br. at 56–57. And Plaintiffs argue that CAFA gives one possible remedy, albeit one that does not apply to Iowa: class-member opt out. Pls.' Br. at 33–34 (citing 28 U.S.C. § 1715(*e*)(1)).

But not only do Appellees' arguments contradict each other, both arguments leave this Court with unanswered questions. For example, if Defendant is correct that CAFA does not allow class members or State officials to walk away from or challenge a settlement based on notice failures, then what purpose does CAFA notice serve? And if Plaintiffs are correct that CAFA's only remedy for deficient notice is to allow individual class members to opt out of the settlement, how would that process even

31

work in a mandatory class settlement like this one? And why, then, is CAFA notice required for State officers at all?

Appellees do not answer those questions. They instead leave this Court with interpretations that render CAFA's notice provisions meaningless. And such readings are "at odds with one of the most basic interpretive canons, that a statue should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Exelon Wind 1, LLC v. Nelson*, 766 F.3d 380, 399 (5th Cir. 2014) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)).

Further, even if class-member opt out were the proper remedy Defendant's actions interfered with Iowa's ability to notify class members of that right. Defendant's failure to satisfy its burden under CAFA also interfered with Iowa's ability to intervene on behalf of Iowa class members because it did not receive the statutorily required notice of their identities. Thus the district court should have rejected final approval based on those deficiencies.

## IV. IOWA HAS STANDING TO CHALLENGE THE SETTLEMENT AND FEE AWARD.

Plaintiffs devote more than 2,250 words to repeating the standing argument that they made in their motion to dismiss briefing. Pls.' Br. at 30–41. But that spilled ink does not add any additional argument or authority to those earlier arguments. This Court has ordered that the question of Iowa's standing, raised in a separate motion to dismiss, will be carried with the merits of this case. *See* Dkt. No. 74-2 (03/17/2026) ("It is ordered that Appellee's opposed motion to dismiss the appeal for lack of jurisdiction is carried with the case."). Based on that Order, Iowa did not address the standing issue in its opening brief, and Iowa relies on its motion to dismiss briefing, regarding the motion to dismiss in Reply.

33

## CONCLUSION

For these reasons, this Court should reverse the district court's approval of the class action settlement and fee award.

June 12, 2026

BRENNA BIRD
Attorney General of Iowa

Respectfully submitted,

ERIC WESSAN
*Solicitor General*

*/s/ Breanne A. Stoltze*
BREANNE A. STOLTZE
*Assistant Solicitor General*

Hoover State Office Building
1305 East Walnut Street
Des Moines, Iowa 50319
(515) 823-9117 / (515) 281-5191
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov
breanne.stoltze@ag.iowa.gov

*Counsel for Appellant State of Iowa*

# CERTIFICATE OF SERVICE

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on June 12, 2026. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

June 12, 2026

*/s/ Breanne A. Stoltze*
BREANNE A. STOLTZE
*Assistant Solicitor General*

*Counsel for Appellant State of Iowa*

## CERTIFICATE OF COMPLIANCE

Consistent with Rule 27(d)(2) of the Federal Rules of Appellate Procedure, this brief contains 6,460 words, excluding the parts of the document exempted by Rule 32(f), and complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6), as required by Rule 27(d)(1)(E), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

June 12, 2026

*/s/ Breanne A. Stoltze*
BREANNE A. STOLTZE
*Assistant Solicitor General*

*Counsel for Appellant State of Iowa*